**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| Joyce McKiver, | ) |
| Delois Lewis, | ) |
| Dennis McKiver, Jr., | ) |
| LaJune Jessup, | ) |
| Daphne McKoy, | ) |
|    Individually and as Mother and Guardian of | ) |
|    minor children Alexandria and Antonio McKoy, | ) |
| Fred Lloyd, | ) |
| Archie Wright, Jr., | ) |
| Teresa Lloyd, | ) |
| Tammy Lloyd, | ) |
| Tanechia Lloyd, | ) |
| Deborah Johnson, | ) |
| Ethel Davis, | ) |
| Priscilla Dunham, | ) |
| Carl Lewis, | ) |
| Annette McKiver, | ) |
| Karen McKiver, | ) |
| Brionna McKiver, | ) |
| Edward Owens, and | ) |
| Daisy Lloyd, | ) |
| | ) |
|       Plaintiffs, | ) |
| | ) |
|       v. | ) |
| | ) |
| Murphy-Brown, LLC, | ) |
| | ) |
|       Defendant. | ) |

<u>**COMPLAINT**</u>

Plaintiffs hereby file their Complaint against the Defendant Murphy-Brown, LLC

("Murphy-Brown") and allege as follows:

**I.   <u>INTRODUCTION</u>**

1.     The Plaintiffs are residents of Bladen County, North Carolina.  During the

pertinent times they have resided on, owned and used land in close proximity to hog confinement

sites that hold thousands of hogs owned by the Defendant.  These facilities are known as

Concentrated Animal Feeding Operations ("CAFOs"). The closest of these facilities is Kinlaw Farms ("the Facility") which is licensed to hold 14,688 of Defendant's hogs.

2. Hogs generate three times or more manure than humans. The Defendant's hogs at the CAFO facilities generate many times more sewage than entire nearby towns. Yet Defendant has failed to take adequate steps to manage the number of hogs at the sites or dispose of the millions of gallons of manure that come from the hogs. While placing thousands of its hogs at CAFO sites, Murphy-Brown has failed to take appropriate steps to eliminate the obnoxious recurrent odors and other causes of nuisance. The hogs have impaired the Plaintiffs' use and enjoyment of their properties.

3. In addition and as an independent cause of the nuisance, the presence of Defendant's hogs has caused periodic swarms of flies, other insects, and other pests. Large black flies periodically descend upon Plaintiffs' properties, ruining and interfering with family activities, cookouts and other outdoor activities. Other insects such as gnats come onto Plaintiffs' land. The flies get stuck to windows and get inside the homes. Other vermin may come onto the properties. These insects and pests are "vectors" for disease.

4. Further, as another independent cause of the nuisance, Defendant's hogs necessitate very large trucks crawling up and down the streets outside of the Plaintiffs' homes. These are often narrow and even unpaved country lanes, which normally would never be subjected to having repeated episodes of large tractor-trailers and other big trucks taking feed to the hogs, trucking in live hogs, and trucking out both live and dead hogs. These trucks often go by Plaintiffs' homes in the dead of night and they cause noise, dust, liquid spilling from the trucks and bright lights of their headlights. They are the opposite of what one would expect to see going by one's home in such a rural country neighborhood.

2

5.     Defendant is a large enterprise with the ability and the resources to reduce and end the nuisance.  Defendant's parent company Smithfield Foods, Inc. ("Smithfield") was sold to a Chinese-backed multinational corporation, Shuanghui, in late 2013 in a transaction estimated to have a value in excess of $7 billion, and reported record profits for the first quarter of 2014.  Smithfield reported sales for the first quarter of 2014 of $3.4 billion and net income of $105.3 million.  Defendant clearly has the resources to eliminate the nuisance yet has not done so.

6.     The use of the outmoded "lagoon and sprayfield" system has been banned for new farms in North Carolina for years, and many measures exist to reduce the nuisance from existing facilities.  Defendant has the means and ability to correct the nuisance but has failed to do so negligently and improperly.

## II.  PARTIES

### A.    Plaintiffs

7.     Plaintiff **Joyce McKiver** is a resident of North Carolina who resides at 142 Pearl Lloyd Road, White Oak, NC.

8.     Plaintiff **Delois Lewis** is a resident of North Carolina who resides with her mother at 142 Pearl Lloyd Road, White Oak, NC.

9.     Plaintiff **Dennis McKiver, Jr.**, is a resident of North Carolina who resides at 188 Pearl Lloyd Road, White Oak, NC.

10.     Plaintiff **LaJune Jessup** is a resident of North Carolina who resides at 146 Pearl Lloyd Road, White Oak, NC.

11.     Plaintiff **Daphne McKoy** is a resident of North Carolina who resides at 164 Pearl Lloyd Road, White Oak, NC with her minor children plaintiffs **Alexandria** and **Antonio McKoy**.

12.     Plaintiff **Fred Lloyd** is a resident of North Carolina who resides at 90 Pearl Lloyd Road, White Oak, NC.

13.     Plaintiff **Archie Wright, Jr.**, is a resident of North Carolina who resides at 427 Wright Lloyd Road, White Oak, NC.

14.     Plaintiff **Teresa Lloyd** is a resident of North Carolina who resides at 427 Wright Lloyd Road, White Oak, NC.

15.     Plaintiff **Tammy Lloyd** is a resident of North Carolina who resides at 248 Wright Lloyd Road, White Oak, NC.

16.     Plaintiff **Tanechia Lloyd** is a resident of North Carolina who resides at 280 Wright Lloyd Road, White Oak, NC.

17.     Plaintiff **Deborah Johnson** is a resident of North Carolina who resides at 6784 NC Highway 53 W, White Oak, NC.

18.     Plaintiff **Ethel Davis** is a resident of North Carolina who resides at 6799 NC Highway 53 W, White Oak, NC.

19.     Plaintiff **Priscilla Dunham** is a resident of North Carolina who resides at 6777 NC Highway 53 W, White Oak, NC.

20.     Plaintiff **Carl Lewis** is a resident of North Carolina who resides at 804 Valerie Drive, Fayetteville, NC, and owns and operates his business, Lewis's Barber Shop at 6906 NC Highway 53 W, White Oak, NC.

21.     Plaintiff **Annette McKiver** is a resident of North Carolina who resides at 6958 NC Highway 53 W, White Oak, NC.

22.     Plaintiff **Karen McKiver** is a resident of North Carolina who resides at 6948 NC Highway 53 W, White Oak, NC.

23.     Plaintiff **Brionna McKiver** is a resident of North Carolina who resides with her mother and brother at 6958 NC Highway 53 W, White Oak, NC.

24.     Plaintiff **Edward Owens** is a resident of North Carolina who resides with his mother and sister at 6948 NC Highway 53 W, White Oak, NC.

25.     Plaintiff **Daisy Lloyd** is a resident of North Carolina who resides at 5948 NC Highway 53 W, White Oak, NC.

**B.     Defendant**

26.     Defendant **Murphy-Brown, LLC** is a limited liability company organized under the law of Delaware.  Murphy-Brown's sole member is John Morrell & Company ("Morrell"), a corporation incorporated under the law of Delaware and with its principal office located at 200 Commerce Street, Smithfield, VA 23430.  Morrell is wholly-owned subsidiary of Smithfield, a corporation incorporated under the law of Virginia and with its principal office located at 200 Commerce Street, Smithfield, VA 23430.  During the pertinent times, Murphy-Brown has conducted business in numerous States including North Carolina.

**III.  JURISDICTION AND VENUE**

27.     The Court has personal jurisdiction pursuant to N.C. Gen. Stat. § 1-75.4.

28.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that this is a district in which a substantial part of the events or omissions giving rise to the claim occurred, and in which a substantial part of property that is the subject of the action is situated.

29.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that this is an action in which the matter in controversy, inclusive of monetary damages and the value of injunctive relief, exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

## IV. FACTUAL BACKGROUND

### A.       Background Regarding the Plaintiffs.

30.       During the pertinent times, the Plaintiffs have suffered injury and harm as a direct result of the tens of thousands of swine placed near their homes by Murphy-Brown. Defendant's hogs generate feces and urine that fall onto slatted floors and adhere to hog bodies, dry into particulate dust, adhere to skin cells from pigs, and drip and trickle under the slatted floor into holding ponds below the floors that hold raw feces and urine. Stench rises from below the floor and from throughout the hog sheds, and the dust, skin cells, dander, particulates, dried fecal matter and stench from below-floor manure can be sent out by large fans set in hog shed walls or by other means.

31.       The urine and feces go into giant holding ponds outdoors from which it evaporates and may leak and spill. Because Murphy-Brown does not cover the cesspools they are free to evaporate odor into the air and attract flies. The slurry or liquid containing the urine and feces is also sprayed into the air and onto fields around the hog sheds causing odorous fecal and urinous mist to drift through the air, go onto neighboring lands, and moisture and matter to fall and puddle on the soil so that more odor rises off of it. Sites must spray large quantities or else the "lagoons" will overflow. Murphy-Brown refuses to truck manure away by tanker truck although it has the capacity to do so. One or more Plaintiffs have witnessed spraying and spray mist and the spraying regularly occurs and causes sickening stench. The sites also breed and attract flies and other insects. Dead hogs are placed in "dead boxes" where they rot until picked up by "dead trucks." Large hog trucks carry hogs into and out of the facilities. All of these activities cause odor, annoyance, dust, noise and loss of use and enjoyment of homesteads. The stench and associated nuisance also embarrasses and humiliates the Plaintiffs.

32.     Plaintiffs have suffered episodes of noxious and sickening odor, onslaughts of flies and pests, nausea, burning and watery eyes, stress, anger, worry, loss of property value, loss of use and enjoyment of their property, inability to comfortably engage in outdoor activities, cookouts, gardening, lawn chores, drifting of odorous mist and spray onto their land, inability to keep windows and doors open, difficulty breathing and numerous other harms.

33.     All Plaintiffs have employed measures and incurred expenses to try to protect themselves from the odors, pests, and nuisance from the hog sites and large hog trucks that pass up and down their rural roads.  They variously engage in keeping windows and doors closed and running air conditioner during mild weather, caulking and employing other sealants on windows and doors, purchasing cans of spray insecticides, paying to have their yards sprayed with pesticides, purchasing flypaper strips, purchasing bottled water so as to avoid using well water, purchasing scented candles or incense, and purchasing air fresheners, purifiers, and deodorizers.

### i. Joyce McKiver.

34.     Plaintiff Joyce McKiver resides with her daughter, Delois Lewis, at 142 Pearl Lloyd Road in White Oak in Bladen County.

35.     Pearl Lloyd Road is a dead-end road of approximately one-tenth mile in length and all of its residents are close family members and plaintiffs in this lawsuit – Joyce McKiver, Delois Lewis, LaJune Jessup, Dennis McKiver, Jr., Fred Lloyd, and Daphne McKoy and her two minor children, Antonio and Alexandria McKoy.

36.     Ms. McKiver, now 81 years old, has lived on Pearl Lloyd Road for over 50 years. To the best of her recollection, her husband, Dennis McKiver, Sr., purchased the property from Gladwin Tatum some years before their marriage in or about 1951.  She and her late husband raised all of their children on this property and he resided here until his death on April 18, 2003.

Upon her death, she plans to leave the property to her family, but is upset because the property is worth less now than it would be if not for the thousands of hogs being so close.

37.     Around the time the Facility was built, Ms. McKiver recalls that the owner asked her husband to sign a consent form of sorts to allow him to spray hog manure on property directly in front of the Pearl Lloyd Road residential area.  Mr. McKiver refused to sign it.

38.     The driveway for the Facility, marked by a large "No Trespassing" sign, is approximately 10 yards in front of Ms. McKiver's front yard and the closest hog houses are visible from her property, as are additional hog houses in the winter when the trees are bare. With the driveway of the farm and the farm itself being so close, Ms. McKiver sees and hears large trucks entering and exiting on a frequent basis.  Oftentimes when the trucks come in and out during the night, they make noise to the point that it wakes her up.

39.     Ms. McKiver and her family members have been subjected to numerous episodes of nauseating odors from the Facility as well as of flies and gnats.  Likewise, with the coming and going of large trucks so close in front of her home along with the odor, flies and other nuisances, she can no longer enjoy sitting on her front porch to the extent she did before the arrival of Defendant's swine.

40.     Ms. McKiver recalls that, prior to the Defendant's swine coming to the neighborhood, her family would frequently have family gatherings and cookouts on the family property, but ever since the Facility has been there, the cookouts and outdoor gatherings have dwindled significantly due to the odor and flies.

41.     Sometime after the Facility was completed, the county ran utility lines for county water to the homes on Pearl Lloyd Road including hers.  She believes this was due to the poor quality of her well water and close proximity to the Facility.

42.     Prior to the Facility being constructed, there were no hog odors, no significant amount of flies and gnats, and no large trucks passing in front of her home on such a frequent basis. The Defendant's conduct has substantially impacted Ms. McKiver's and her family's ability to fully enjoy their property.

### ii. Delois Lewis.

43.     Plaintiff Delois Lewis was born and raised on and currently lives on her family property on land originally purchased by her father, Dennis McKiver, Sr., now deceased. She resides with her mother, Joyce McKiver, discussed above at 142 Pearl Lloyd Road.

44.     As a child, she can recall many outdoor family gatherings and cookouts on her family property. However, due to the significant nuisance created by the Defendant, these occasions rarely occur any longer. The odor is strong, sickening and unpredictable.

45.     Due to the strong odor emanating from the Defendant's swine, Ms. Lewis keeps incense or candles in her home along with other odor-reducing products such as air fresheners.

46.     Prior to the Defendant's swine being located at the Facility, Ms. Lewis would hang her clothes on the clothesline to dry. Since the Defendant's swine have come, she no longer does this, because if left out too long, the clothes can absorb the odor from the swine. She now uses an electric dryer which increases her and her mother's power bill.

### iii. Dennis McKiver, Jr.

47.     Plaintiff Dennis McKiver, Jr., was born and raised on his family property on Pearl Lloyd Road originally purchased by his father, Dennis McKiver, Sr. in approximately the 1940s. He currently resides on this property which is adjacent to the Facility property and, though they are all extremely close, is the closest of any of his family to the Facility. He has continuously lived on this property since the 1980s, well before the Facility was constructed.

9

48.     During the winter, when the trees are bare, he can see from his house the fields onto which feces and urine is sprayed and the sheds where Defendant's swine are kept.  His home is approximately 420 yards from the nearest hog house at the Facility.

49.     Since the Facility has been there, gnats and flies, along with the odor, have become a real problem, to the point that he rarely spends time outdoors any longer.

### iv. <u>LaJune Jessup.</u>

50.     Plaintiff LaJune Jessup, age 69, is the oldest child of Dennis McKiver, Sr., and lives next door to her stepmother, Joyce McKiver, at 146 Pearl Lloyd Road.  She recalls that her father purchased the land on which she currently resides when she was a young girl, in the late 1940s or early 1950s.

51.     Ms. Jessup moved away for a few years after she got married, but later moved back permanently, years before the Facility was constructed.  She has lived there ever since.

52.     Her experiences with the nuisance created by Defendant's swine are much the same as those of her family members described above.  Ms. Jessup always enjoyed working in her yard and on her lawn; however, she now dreads it due to the recurring sickening odor and significant increase in flies, gnats, and buzzards.

53.     Before the Facility was constructed, she enjoyed raising her windows to let in fresh air, but now, to reduce the impact of the nuisance inside her home, she keeps her windows closed and air conditioning on which raises her electricity bill.  She also uses air-freshening products to reduce the impact of the odor in her home.

### v. <u>Daphne McKoy and her Children, Antonio and Alexandria.</u>

54.     Plaintiff Daphne McKoy and her minor children, ages 11 and 13, live next to Ms. McKoy's sister, LaJune Jessup, and Dennis McKiver, Jr., and two doors down from her mother,

Joyce McKiver and sister Delois Lewis, at 164 Pearl Lloyd Road.

55.     Daphne McKoy, like her siblings, was born and raised on this property and recalls a time before the hogs when she and her family were able to fully enjoy and use their property for social events and outdoor activities. Her ability to enjoy and use her property is significantly diminished by the presence of Defendant's swine so close by, due to the odor and nuisance.

56.     Her minor children, Antonio and Alexandria, are also greatly affected by the Defendant's swine, most frequently while they are waiting for the school bus. Each morning of a school day, the bus picks them up at the end of Pearl Lloyd Road, very close to the entrance of the Kinlaw Facility, often subjecting them to the odors, flies, and other nuisances of the Defendant's swine while they wait. This saddens and upsets Ms. McKoy not only that her children must endure these conditions, but that classmates of her children on the bus ask about the strong odor. It is embarrassing for them that they have to explain that the odor is not coming from their home, but from the Defendant's swine so close by.

57.     Ms. McKoy is further saddened by the fact that, since her children were born after the Facility was constructed and therefore born into these conditions, they do not know the joys of living on this land without the recurrent stench and flies. It is her hope that in the near future her children will be able to fully enjoy the property as she once did.

58.     In addition to the odor and flies as discussed above, Daphne McKoy is continually bothered by the large trucks entering and exiting the Facility, sometimes late at night and early in the morning, often waking them, and spreading more odor and dust.

### vi. Fred Lloyd.

59.     Plaintiff Fred Lloyd, age 69, is the son of the late Pearl and Shirley Lloyd, his father being the namesake of Pearl Lloyd Road. He currently lives alone at 90 Pearl Lloyd Road.

His father purchased the property before he was born. He was raised on this land and has lived there since before the Facility was built.

60.     Prior to the Defendant's swine being placed so close by, there were no problems relating to the recurrent noxious fecal and urine odor or recurrent swarms of bugs. Since then, however, the continual odor and significant increase in flies and gnats have bothered him greatly, as well as the large trucks which come in and out of the Facility right in front of Mr. Lloyd's property, often waking him at night or in the early morning.

61.     Upon his death, he plans to leave his property to his children, but is concerned that the property is not worth what it would be without the swine. His home is approximately 600 yards from the nearest hog house and the entrance is almost directly in front of his property.

### vii. Archie Wright, Jr. and Teresa Lloyd.

62.     Plaintiff Archie Wright, Jr. has lived on his current property for practically all his life. His father, Archie Wright, Sr., purchased it in or about the 1920s and raised his family there. This is the Wright family homeplace and currently living there is Archie, Teresa Lloyd (his girlfriend of over 30 years and the mother of his children), his children, Tammy and Tanechia Lloyd, and his minor grandchildren. His property is located approximately 450 yards from the nearest hog house at the Facility.

63.     Having been born and raised on this property, he recalls the time before the hogs when there was no substantial amount of flies or gnats, and no noxious odor. Since then, however, there has been a strong recurring odor coming from the direction of the Facility. Having grown up on a farm, Mr. Wright knows the typical smells associated with farming and farm animals, but the hog odor coming from the swine is far more rancid. He recalls that the

facility began in approximately 1995 and there have been recurrent episodes of foul odors and nuisance since then.

64. Plaintiff Teresa Lloyd has lived at 427 Wright Lloyd Road since approximately 1989. Prior to that time, she had lived there on an on-and-off basis. With her long-term boyfriend, Archie Wright, Jr., they have two daughters who also live there with their children.

65. Ms. Lloyd, like the others, recalls what the conditions were like before the hogs, and the difference is a significant deterioration in their quality of life. She spends much less time outside now than before the Facility was constructed due to the bugs and the odor.

### viii. Tanechia Lloyd.

66. Plaintiff Tanechia Lloyd was born and raised on her father's property on Wright Lloyd Road and has lived there since 1989 when she moved back home. She now lives on the property in front of her parents, Teresa Lloyd and Archie Wright, Jr., and next door to her sister, Tammy Lloyd.

67. She resides with her fiancé and her children. As her children were born after the Facility was constructed, she is concerned that they will never know a time when the property was not so negatively impacted by the odor, flies, and other nuisance. These conditions were not present when she was a child, when she could enjoy being outside, breathing fresh air, gathering with family, and never had to worry about when the pungent odor from the Defendant's swine would drift onto her property. Now, she and her family worry about and dread this virtually every day.

68. Ever since Defendant's swine have been housed nearby, Tanechia has had concerns that the swine were having a negative effect on her well water. The water had started having a foul odor and taste to the point that she had a new well dug several years ago.

### ix. **Tammy Lloyd.**

69.     Plaintiff Tammy Lloyd lives on Wright Lloyd Road next to her sister, Tanechia Lloyd, and in front of her parents, Archie Wright, Jr., and Teresa Lloyd.  Also there are her two minor children.

70.     Tammy, like her sister Tanechia, grew up on this property and remembers when the conditions were not as they are today, overrun at times by noxious odor coming from the Defendant's swine and the flies and gnats.

71.     Her children were born into this nuisance created by the Defendant, but she hopes that one day they can again fully enjoy the use of their property as she once did.

### x. **Deborah Johnson.**

72.     Plaintiff Deborah Johnson lives a short distance down Highway 53 from Pearl Lloyd and Wright Lloyd roads, at 6784 NC Highway 53 in White Oak.  Her home is situated only a short distance from the entrance to the Facility, placing her in a direct path of the large hog trucks entering and exiting the Facility.

73.     The property on which she currently lives has been family-owned property for approximately the past 60 years.  She purchased this land from her sister in or about 1980 and has been living here ever since.

74.     Similar to the other Plaintiffs, Ms. Johnson is upset by the odor created by Defendant's swine, as well as the episodes of flies since the Facility was built.  In addition, living on Highway 53 so close to this farm, large hog trucks of the Defendant travel past her home many times per day, often late at night or early in the morning, waking her up and causing additional odor and nuisance.

14

### xi. **Ethel Davis.**

75.     Plaintiff Ethel Davis was raised on the property adjacent to her current address at 6777 Highway 53.  In the late 1970s, she moved away for a number of years while her then-husband was in the military, then in or about 1983 she purchased her current property from Gladwin Tatum, moved back home and has remained there ever since.  Her property is separated only by a small tract of woods from the Facility.

76.     Living on Highway 53, Ms. Davis sees many hog trucks passing by her home each day.  At times, she also notices these hog trucks leaking what appears to be hog urine and feces from the trailers onto the road in front of her home.

77.     Ms. Davis is greatly upset by the odors and flies which recurrently come onto her property.  Ms. Davis no longer tends her garden and yard to the extent she used to.  She used to take great pride in keeping a beautiful garden and yard, and still maintains it, but she does not enjoy spending time outside like she did in the past, before the swine behind her home.

### xii. **Priscilla Dunham.**

78.     Plaintiff Priscilla Dunham is the niece of her neighbor, Ethel Davis, and lives on the property where Ms. Davis's late mother lived and where Ms. Davis was raised.  Except for her college years, Ms. Dunham has practically lived in her home her entire life.  She was primarily raised by her late grandmother, who used to own the property.  When her grandmother died in 2000, Ms. Dunham inherited it and continued living at this address (6777 Highway 53), next to Ms. Davis.  Their homes and the Facility are separated only by a small tract of woods.

79.     Ms. Dunham frequently detects a strong odor coming from the Defendant's swine.  Large hog trucks also come by and she has witnessed trucks leaking effluent onto the road in front of her home on occasion, and on a daily basis large hog trucks pass by.

80.     Ms. Dunham's ability to use and enjoy her property has been injured since the Defendant began sending its swine nearby.  She finds the odor almost unbearable at times and recalls family gatherings and cookouts being cut short or canceled because of the odor and flies.

81.     Prior to the Facility's construction, she enjoyed any type of outdoor activity at her home, whether it was yard work, washing her car, or simply enjoying fresh air on her porch, but now, she spends a lot more time inside to avoid the odor from the  swine and flies.

82.     In times before the Facility was constructed, she would raise her windows when the weather was pleasant to allow fresh air into her home.  Now, however, to minimize the effect the odor has on her home, she must keep her windows closed and use various air fresheners.

### xiii.  Carl Lewis.

83.     Plaintiff Carl Lewis grew up a short distance down from the Facility at 7028 Highway 53, but now resides in Fayetteville.  However, he currently owns and operates the Lewis Barber Shop at 6906 Highway 53 in White Oak.  His business is on land which has been in his family for many decades and is less than one-half mile from the nearest hog house.

84.     This property has been in his family for at least two generations.  Carl's barbershop is open for business every Thursday through Saturday, 8:30 a.m. until 5:00 p.m.  In addition to his regular business hours, he is frequently there working on other days as well.

85.     Often, Mr. Lewis can smell the hog odor inside his barber shop because the door opens and closes throughout the day with customers walking in and out.  He has had customers ask him what the foul odor is.  When he explains that there is a hog facility so close through the woods (the Kinlaw Facility), they typically understand right away the reason for the smell.  The foul stench is embarrassing and hurts his business.

16

86.     Mr. Lewis also frequently sees a number of large flies on his windows, and he had no issue with flies like this when he lived at his parents' home at 7028 Highway 53 before the hogs came in. His late parents' home, where his sister now lives, also has this type of fly problem which did not exist prior to the Facility.

87.     Hog trucks also present a nuisance for Mr. Lewis and his business. Large hog trucks pass by his shop many times a day, and at times leak onto the road.

### xiv. Annette McKiver.

88.     Plaintiff Annette McKiver has lived in White Oak most of her life and was born and raised on Pearl Lloyd Road. Her father is the late Dennis McKiver, Sr., referenced above.

89.     Ms. McKiver moved to New York when she was 17 years old for approximately eight or nine years. She then moved back to live with her father around 1974 when her only child, Karen, was age three. After a few years, she bought her current property at 6958 Highway 53. Her daughter also lives on the property with her two college-aged children.

90.     Ms. McKiver remembers the time before the Facility was built, when there was no hog odor, no abnormal number of flies, and no hog trucks passing by on a daily basis. During those years, she and her family regularly had outdoor family gatherings and cookouts, but have had fewer since the Facility was built because of the odor and flies. As a result, she feels far more restricted on her own property.

### xv. Karen McKiver, Brionna McKiver, and Edward Owens.

91.     Ms. McKiver lives beside her mother, Annette McKiver, at 6948 Highway 53 in White Oak which is where she spent virtually her entire life. Most all of her mother's family grew up and live either on Highway 53 close by or on Pearl Lloyd Road.

92.     The only adult years she lived away were when she was in college, 1990-94, and for two years after college when she lived in Fayetteville.  Ever since, she has either lived with or beside her mother on this property with her two children, Brionna McKiver and Edward Owens.  Brionna is 20 and is a student at Fayetteville State University.  Edward is 18 and is a freshman at Virginia University in Lynchburg.

93.     Even though Brionna and Edward are now in college, they are upset by the fact that they had to live around the nuisance of the swine as they grew, and now their mother and grandmother must still endure the hog odor and nuisance.  Aside from Brionna's first two years of life, this is the first time she has lived away from the area around the Facility and she can now compare what it is like to live without the burden of having nearly 15,000 swine within such a short distance of her home.

### xvi. Daisy Lloyd.

94.     Plaintiff Daisy Lloyd is the daughter of the late Dennis McKiver, Sr., and several of her siblings still live close by on Highway 53 and Pearl Lloyd Road.  Ms. Lloyd lives alone in the home she and her husband bought from Shirley and Howard Chasson in or about 1973.

95.     Ms. Lloyd was born and raised on her family's homeplace on Pearl Lloyd Road and has suffered similar injury as the other Plaintiffs.  Like them, her ability to use and enjoy her property has been injured by the episodes of odor emanating from the Defendant's swine, the hog trucks passing by at times leaking onto the road, and the recurrent flies.

### B.      Background on the Facility.

96.     The Kinlaw Facility is a Concentrated Animal Feeding Operation or "CAFO" with permit number AWS090133 issued by the North Carolina Department of Environment and

Natural Resources ("DENR"). It is located at 265 Porky's Lane in Bladen County which is located just beyond Pearl Lloyd Road and Wright Lloyd Road.

97.    Upon in formation and belief, the Facility is owned by Kinlaw Farms LLC, a limited liability corporation of Bladen County established in 1998 and owned by William R. Kinlaw, Hilda Kinlaw, and Richard W. Kinlaw. It is a "feeder to finish" facility with an allowable count of 14,688 hogs. The Facility has 12 hog buildings and three open-air cesspools also known as "lagoons." Kinlaw Farms, however, never owns the hogs it houses. All the hogs are directly owned by Murphy-Brown LLC.

98.    Upon information and belief, the Facility opened its operation in 1995 and, for all pertinent times, is and has been a "contract grower" exclusively for Murphy-Brown and its predecessors including Murphy Family Farms, meaning that Kinlaw Farms LLC contracts with Murphy-Brown to raise its hogs until they are ready to be sent to a processing facility owned by Smithfield Packing, part of the same enterprise that owns Murphy-Brown.

99.    Upon information and belief, Murphy-Brown and its predecessors devised the "Nutrient Utilization Plan" for the Facility which, among other things, specifies that the manure, urine, feces and flush water will be held in the open-air cesspool and sprayed onto the fields and includes detailed rules for such things as the rate at which the manure should be applied to the land surrounding the Facility and the amount.

100.    Upon information and belief, as of 2009, the Facility was estimated to hold 14,688 of Defendant's swine, with a steady-state live weight of 826,200 pounds, generating 27,907 tons and a volume of approximately 7.5 million gallons per year of manure, feces and urine from Defendant's swine.

101.    In addition to the Kinlaw Facility, there is a facility nearby owned by Turnbull Company Farms LLC on Gum Shaw Road which intersects Highway 53 very close to the Plaintiffs.  This facility is licensed to house 2,400 of Defendant's swine which only adds to the nuisance by the additional volume of Defendant's large hog trucks traveling on Highway 53 past the Plaintiffs' homes.

### C.    Background on Hog Manure and Odors.

102.    Hogs generate multiple times more feces and urine per day than a human being. In 2002, the General Accounting Office estimated that 7.5 million hogs in five eastern NC counties produced 15.5 million tons of manure each year.

103.    Furthermore, Murphy-Brown's diet and antibiotic regimen is meant to promote aggressive growth, causing more manure to be generated in less time.

104.    A hog may grow from birth to 250 pounds in about six months or less before it is slaughtered.   A piglet usually feeds from its mother until it is three to four weeks old and weighs about 10 to 15 pounds.  Then its diet is transitioned to feed grain over the next few weeks until it is about 9 weeks old and weighs 40 to 60 pounds.  Then it is known as a feeder pig.  It takes about six months altogether for a pig to reach market weight of over 250 pounds.  A slaughter-weight hog is thus about fifty percent heavier than an average person.

105.    The hog odors can be smelled at extremely low concentrations that cannot be measured with available instruments.

106.     Dietary manipulation can reduce odor.  Murphy-Brown supplies all the feed and sets the ingredients and additives for its hogs and on information and belief has tailored the diet without regard to reducing the odor and nuisance.

**D.** **Other Causes of Nuisance From Flies, Buzzards, Trucks, Dead Boxes.**

107. In addition to and separate from any foul odors, the presence of Defendant's hogs causes periodic swarms of flies and other insects and pests. As reflected in the facts regarding the Plaintiffs and their families, they find that large black flies periodically come onto Plaintiffs' properties. These flies were not prevalent before the thousands of hogs came. The flies impair cookouts and other outdoor activities. Other insects such as gnats also come onto Plaintiffs' property. The flies get stuck to windows and get inside the homes. They land on peoples' skin and on their food and are disgusting and humiliating.

108. These insects and pests are also scientifically found to be "vectors" for disease. Flies for example can carry germs.

109. In addition, ever since the hogs have come, very large trucks crawl up and down the streets outside of the Plaintiffs' homes. These streets are not wide city thoroughfares distanced from the houses, but rather narrow and even unpaved country lanes such as the aforementioned Pearl Lloyd Road. The trucks cause noise, dust, and lights from headlights and they pass even in the middle of the night. Further, when the trucks bring hogs in and out this can create extra odor. And, when the "dead trucks" come for dead hogs, they can create extra foul odor as well as dripping foul substances. These trucks are the opposite of what one would expect to see in such a rural country neighborhood.

110. In addition, the dead hogs themselves are a nuisance. Animals in confinement under high-density circumstances present a ready climate for disease. As a result, many swine facilities have used vaccines and antibiotics not only to promote growth but also to counteract the health effects of crowded conditions. It has been estimated that as much as 80% of all antibiotics administered to CAFO animals are at sub-therapeutic levels, *i.e.*, they are not used to

treat animals that are sick. Unfortunately the crowded often hot conditions still lead to significant mortality rates. The pigs cannot develop resistances to disease like they would living in pastures outdoors, and their systems have extra stress from living in close quarters without any earth to root or dig in, resulting in weakened immune systems. The pigs are susceptible to infection, microbes, parasites and fungi.

111. The mortality rates from the CAFOs as well as periodic epidemics of diseases such as PEDV (Porcine Epidemic Diarrhea Virus) result in there being many dead hogs from time to time placed in "dead boxes." These are nothing more than dumpsters full of dead animals left out in the open often in plain view so that neighbors see rotting animal corpses in the middle of their neighborhoods. These "dead boxes" are unsightly and attract buzzards, flies and vermin, and are a further cause of nuisance. Periodically a "dead truck" picks up the dead hogs to drive them to a rendering plant. For no reason but convenience for the CAFO the dead boxes are often placed in plain view by the street. This increases the nuisance to the neighbors.

### E. Murphy-Brown's Control Over its Hogs.

112. Defendant is a large and sophisticated company and precisely monitors the activities occurring at the facilities holding its hogs. Defendant through standardized procedures and equipment monitors the number of hogs at each site, the amount of feed used, the growth rate, the amount of feces and urine going into the cesspools, and the "freeboard", *i.e.*, the distance between the surface of the cesspool and the top of the earthen rim surrounding it.

113. Defendant has publicized in the past how it exercises detailed control over the operations of the facilities that hold its hogs. Defendant uses trucks to haul its hogs from one site to another depending on what is most efficient and profitable for Defendant. Defendant has also

used tanker trucks to haul manure and flush water from one lagoon to another at different sites for reasons including when the volume that is being generated threatens to flood a lagoon.

114. Murphy-Brown was formed in 2000 from an acquisition by Smithfield of companies owned by Wendell Murphy, Sr. (the founder of the business), the Murphy family, and Murphy businesses including Murphy Family Farms (collectively "Murphy"), as well as Brown's of Carolina. Mr. Murphy is credited with adopting the CAFO design of mechanized farms that had first been invented for poultry raising in other states. However, hogs generate a great deal of manure, and North Carolina is more densely populated than many other agricultural states and the coastal plain land has a shallower water table and more wetlands. Murphy required growers to invest in CAFO equipment if they wanted to hold Murphy hogs and increased the number of hogs until counties like nearby Duplin and Sampson became the most densely-packed hog counties in the entire United States.

115. The close confinement of hogs also means epidemics can spread through hog populations and diseases such as Porcine Epidemic Diarrhea Virus aka PEDV have led to "PED" signs outside many of the facility gates and at roadsides at various times.

116. Recognizing the unsustainable and injurious nature of the "lagoon and sprayfield" system, North Carolina banned further construction of CAFOs that use the design in 1997. This ban was re-enacted in 2007 and remains in effect today. Under this "moratorium," in fact hog producers are free to build new facilities so long as among other things, they will not cause odor to cross onto neighboring land. Upon information and belief, no new CAFOs have been built using the lagoon and sprayfield design, in an admission of their nuisance-causing nature.

117. The 1997 moratorium was enacted only after CAFO construction began to threaten the Pinehurst golf course. The bill was sponsored by North Carolina State House

Representative Richard Morgan who stated that he filed the bill because he was "worried about industrial-style hog farms cropping up near golf courses in Moore County" and stated that his aim was to "draw a distinction between farming and the mass production of swine."

118.    Under the Murphy CAFO design, hogs step, sit and lie on the raw manure and it gets on their bodies closely packed in the sheds.  The hogs squish and push it down through the slats in the floor.  It drips into a holding pond below the floor where it sits like an unflushed toilet.  Large fans at the ends of the sheds ventilate to keep the hogs from suffocating.  The hogs create dust that dries and turns into floating particles, and smells from the feces and urine goes into the air and is blown out by the fans.

119.    After manure collects under the slatted floors, it gets flushed or drained out through pipes into the nearby open-air, uncovered, artificial cesspool filled with millions of gallons of hog urine and feces and flush water.  Because the cesspool is uncovered, it is free to evaporate bad odors into the air.

120.    The manure is also spread on nearby fields.  Often this is done by a "traveling gun" system in which liquid is sprayed up into the air, and mist can drift off.  Other times, a "center-pivot" system is used, which ejects it into the air by means of pressurized spraying.  The use of subsurface injection or "knifing" the effluent into the ground can help lower odor.  Yet on information and belief, Defendant has not required this at most of its swine sites in North Carolina even though it has replaced spray irrigation at sites in one or more other States.

121.    On information and belief, at other sites, Defendant has taken steps to reduce the nuisance.  However, on information and belief Defendant has failed to institute some or all of these measures at the sites that are the subject of this Complaint.

122.   In 2000, due to widespread concerns about pig farm odor coming from lagoons, North Carolina commissioned a multi-year study known as the "Smithfield Agreement."

123.   After years of study under the Smithfield Agreement, a majority of the economic committee members found there was economic feasibility for improvements.  A minority opposed the finding.  The minority report was signed off on by:  Bart Ellis (of Smithfield Foods, Inc.), Dave Townsend and Dennis Dipietre (both of Premium Standard Farms, acquired by Smithfield in 2007), Bundy Lane (a Murphy-Brown contract grower who co-founded Frontline Farmers, a pork industry interest group), and Richard Eason (President of Cape Fear Farm Credit that finances CAFOs for Murphy-Brown growers).

124.   Murphy-Brown is a multi-state corporation, wholly-owned by an even larger multinational corporation which itself is owned by a Chinese-controlled enterprise (formerly Shuanghui, now WH Group) after an acquisition valued at more than $7 billion.  The Smithfield integrated annual report for 2012 describes how Murphy-Brown is "the world's largest producer of pork" and fiscal 2012 sales for Murphy-Brown were $3.1 billion.  Defendant is much larger than and earns far greater revenues and profits from the hog operations than the local growers, who are akin to fast-food franchisees.

125.   Murphy-Brown is part of one "integrated" enterprise, Smithfield, which owns the hogs through Murphy-Brown, owns the processing plants through its Smithfield Packing subsidiary, and controls other aspects of the pork production process.  The relationship between Murphy-Brown and its contract growers is part of "vertical integration" in which Murphy-Brown is the "integrator."

126.   Smithfield has touted how "Smithfield manages every aspect of the pork production process. Vertical integration is a key point of difference and a unique selling

proposition for our products and brands, allowing us to drive changes through the supply chain." Despite its control over the entire process, Defendant has not made changes to end the nuisance.

127.    The growers must follow the orders and rules from Murphy-Brown or risk losing the hogs, which they never even own.  The 2012 annual report describes how "All company-owned and contract farms are subject to random third-party audits and site assessments" and how "Members of our production management staff … visit every contract and company-owned farm at least once a month."  Murphy-Brown constantly sends specialists to the site such as engineers and technicians, inspectors and veterinarians and controls relevant details of operation of the sites.

128.    As of 1995, it was reported that a typical contract grower borrowed anywhere from $200,000 to $1 million to construct hog sheds.  Murphy specified the CAFO design and equipment.  Murphy financed or facilitated the financing for many growers.  While the grower carried the debt for a many-year loan term, under the form contracts, Murphy could pull its hogs out at any time for a variety of reasons.  The CAFOs are "single use" facilities designed for raising hogs and no other purpose.  Wendell Murphy, Sr. has described the situation with words to the effect of "once you pour the concrete, you are committed."

129.    Over the years Murphy has also required some or all growers to accept terms under which if a grower fell into some lower percentage of all the growers on various metrics, such as the lowest 25%, Murphy could cancel the contract. These provisions incentivize the contract growers to work to maximize growth of the hogs at the expense of all other considerations.   Meanwhile, at all times Murphy-Brown still owns the hogs.

130.    Murphy has admitted the control it has over the hog CAFOs and its direct involvement in the swine sites.  In 2011, Wendell Murphy, Sr. described that "The typical

livestock or poultry agreement is that the farmer or contract producer provide the facilities and labor, but in this case, to enhance the idea, to cause more people to come forward, we agreed to supply their materials... the fence and the posts, the feeders, everything."  However in grower bankruptcy proceedings Murphy-Brown has also contended that it had no duty to keep pigs at the site if it wanted to remove them.  These facts further evidence Defendant's control and domination.

131.   Murphy-Brown owns the hogs at as many as two-thirds of all North Carolina sites.  DENR records confirm Defendant's control over the hogs and the odors and nuisance that they cause.  On multiple occasions, when a grower has encountered problems, Murphy-Brown has intervened to contest any efforts by DENR to impose fines or require changes, and has closely controlled and supervised any corrections.

**F.   <u>Evidence of Negligent, Willful and Wanton Conduct.</u>**

132.   Murphy-Brown and its predecessors, in placing tens of thousands of hogs at the facilities, acted negligently and in willful disregard to the harm known to be caused by the hogs. Over the years, Defendant has continued to cause its hogs to create nuisance and injury without taking action to end the nuisance despite repeated episodes of damage and mounting scientific research verifying the harm suffered by the Plaintiffs.

133.   The 2012 Smithfield annual report claims that "Murphy-Brown is committed to … protecting the environment…"  The studies, reports, incidents and complaints that have amassed since Murphy first started the CAFO system clearly show predictable nuisance caused by swine sites to nearby neighbors.  However, Defendant has not stopped the nuisance, even after Plaintiffs have complained and even sent nuisance mediation demands over a year ago.

134. From the early 1990s to present, due chiefly to Defendant and its predecessors' efforts, hog production greatly expanded and CAFOs were placed near community members and Plaintiffs. Production in North Carolina tripled between 1990 and 1995, growing from 5 million hogs produced in 1990 to 15 million in 1995. The hogs at the subject facilities were part of this rapid expansion. Multiple spills, lagoon breaches, episodes of odor and harm have occurred. Numerous reports have confirmed the injury suffered by community members. The Legislature has banned any new CAFOs using the Defendant's old system due to the indisputable evidence of harm and damage to neighbors.

135. Defendant and its predecessors have acted improperly during prior incidents caused by the CAFOs. As an example, on May 8, 1991, a 10-acre feces and urine cesspool ruptured on Murphy's Magnolia No. 1 facility in Duplin County. After the lagoon collapsed, tons of water went into Millers Creek. According to news reports, Wendell Murphy, Sr. knew about the incident within hours and personally visited the site. It took four days to find and patch the leak. But Murphy never notified the State about the spill.

136. Mr. Murphy in a news article dated February 19, 1995 stated that there was "not one shred, not one piece of evidence anywhere in this nation" that hog lagoons were harming the groundwater." In fact, hog CAFOs do harm the groundwater. Studies have reviewed lagoons in the coastal plain of North Carolina and found seepage losses to the surficial aquifer.

137. Mr. Murphy as reported on February 24, 1995 represented that CAFOs increased property values: "Wendell Murphy, founder and chairman of Murphy Family Farms, rejects claims that hog farms devalue nearby property. In fact, he says the opposite is true: 'Property values have gone up, and I mean seriously gone up, as a result of this industry being here.' … 'If somebody has property near us and they say their property is worth less and they have to leave --

tell us about it. We'll buy it.'" Those statements were inaccurate. Numerous studies have shown that swine sites hurt property values. According to subsequent news reports, when one or more CAFO neighbors later sought to take Mr. Murphy up on his offer and to have him buy their properties, Mr. Murphy backed out and refused to do so.

138. In August of 1997, Smithfield was fined $12.6 million for violating the U.S. Clean Water Act. This was reported to be the largest fine ever imposed under the Clean Water Act. Smithfield was found to be dumping into the Pagan River, a tributary flowing into the Chesapeake Bay. The company's failures resulted in more than 5,000 violations of permit limits over five years. These violations caused harm to the water quality of the Pagan River, the James River and the Chesapeake Bay. Further, the Courts found that the company had falsified documents and destroyed water quality records.

139. In April 1999, a spill at Vestal Farms, owned by Murphy, dumped over a million gallons of water in Duplin County. Murphy and the NC Pork Council claimed the spill was caused by vandals. The State found zero evidence to back up Murphy's claim. In fact there was vegetation growing near the lagoon, tree roots weakened the wall and there were erosion issues. Murphy had been warned to clear the trees. The State concluded that excessive seepage through the dike wall was the probable cause. Nearly 2 million gallons spilled into a tributary of the Northeast Cape Fear River. Murphy was fined $40,650.

140. In September 1999, Hurricane Floyd caused flooding in Eastern North Carolina. Many hog farms spilled and thousands of dead pigs floated in nearby areas. This hurricane and other rain events have caused flooding from hog facilities and highlighted the vulnerabilities in our State. However in 2011, Wendell Murphy, Sr. stated the harm caused by the hog facilities in the hurricane was "minimal."

141. In 2003, the non-partisan RTI institute issued a report regarding the nuisance and other bad impacts to North Carolina of the lagoon-and-sprayfield CAFOs. The report found among other things that the sites have a negative impact on "measures of human well-being" and found: "Odor emissions from hog farms are a continuing concern in North Carolina, particularly for residents living in close proximity to farms." It noted how "using data on housing prices in nine counties in southeastern North Carolina … found that proximity to hog farms had a significantly negative impact on housing values and that these effects varied by the size of the operation." Finally it noted "disease-transmitting vectors."

142. Murphy has added special controls at sites in other States and has publically admitted that it was to "reduce the level of odor produced by the farms." Defendant has added controls at some sites in North Carolina such as the Mitchell Norris facility in Bladen County due to odor and has installed a partial lagoon cover at Kenansville Farm in Duplin County "to respond to odor complaints from neighbors." Defendant is aware that the hog sites cause odor and nuisance, but willfully refuses to install improvements where its hogs are stored herein.

143. Murphy-Brown is part of the pork processing conglomerate owned by WH Group, formerly Shuanghui. Shuanghui Group is a meat processing company headquartered in Luohe, Henan, China and the largest meat producer in China. According to testimony before the U.S. Senate in July 2013 and reported translations of the Chinese-language website pages, Shuanghui is a Chinese state-controlled company founded by Chairman Wan Long, whose biography describes him as a member of the Communist Party and a former soldier in the People's Liberation Army and political official. Plaintiffs are concerned that with Shuanghui/WH Group's buying of Smithfield, there may be pressure to increase pig production, exports to China and increase of the nuisance.

144.   The WH Group Global Offering dated on or about April 15, 2014 described that "we are the world's largest pork company" and how they owned "the U.S.'s largest pork company, Smithfield."  Further it stated how "We have strict quality control systems in each segment of our value chain, from production through sales and distribution.  In the U.S., these objectives are grounded in our sustainability program, which focuses on key areas such as … helping communities and value creation."  (p. 185, emphasis added).   In order for these statements to be true, Defendant must remedy the harm caused by its swine.

145.   The WH Group offering also states:  "Looking ahead, we will continue to adhere to our business principles of providing high quality and safe animal protein to consumers globally and promoting social responsibility."  (p. 186).  The document describes how "hog prices in the U.S. from 2010 to 2012 were approximately 40% lower than those in China principally due to lower feed costs and higher productivity…."  (p. 188).  "We believe we can increase our exports to China because of the supply-demand gap in China and the scale of our U.S. operations."  (Id.).  If the company wishes to export pork to China, it must produce the pork in an safe manner so that North Carolina and its residents such as Plaintiffs are not required to bear the externalized costs.

146.   The WH Group offering also states:  "In China, the U.S. and Europe, we operate a platform that seamlessly integrates R&D, production, quality control and distribution."  (p. 191). "In the U.S. and Europe, a growing number of our customers prefer suppliers that are vertically integrated and have stringent controls over supply and a commitment to sustainability."  (Id.).  it states that "we have adopted … stringent supply chain controls."  (p. 192).  "We believe quality assurance, traceability and commitment to sustainability are key purchasing decisions for our customers in the U.S."  (Id.).  "In the U.S., we will continue to promote our sustainability

program, which focuses on … helping communities…..." (p. 195). In order for these statements to be true, Defendant must remedy the harm that it now causes.

147. In contrast to Defendant's assertions that its hogs do not cause nuisance or injury, numerous scientific reports and studies have found that they do. These reports show that Defendant has actual knowledge of the nuisance caused by its swine, or is willfully blind to that fact. They also support the fact that the Plaintiffs suffer adverse effects from the odors such as nausea, congestion, wheezing and difficulty breathing and loss of enjoyment and have reasonable fears regarding the effect of the nuisance upon them and their families, including young children or grandchildren, elderly and disabled family members, and other loved ones.

148. Because Murphy recklessly failed to perform proper studies to determine the potential harmful effects of the swine CAFOs before have them built in the 1980s-early 90s, scholars were obligated to work to assess the health risks after the fact. As merely a few examples of the numerous studies that were produced from 1995 onward:

   a. A 1995 study reviewed the effect of odors from large-scale hog operations on neighbors. The results indicated that persons living near the swine experienced odors and reported significantly more tension, depression, anger, fatigue, and confusion. Persons exposed to the odors also had more total mood disturbance.

   b. Studies from 1996 and later reflect that swine CAFOs are located in communities susceptible to the nuisance and likely to experience detrimental consequences.

   c. A 1997 study of neighbors living within a two-mile radius of a 4,000 sow swine facility found that they reported higher rates of negative effects.

   d. A 1999 report found that health effects of swine sites included "odors" and "flies" among others.

   e. A 2000 study found that hog sites are concentrated in southeast North Carolina in rural communities more susceptible to harm and who report decreased quality of life.

   f. A 2000 study on odors from swine sites found that people living nearby reported more tension, depression, anger, fatigue, confusion, and less vigor.

32

g.  In 2000, the North Carolina Council of Churches noted that hog operations adversely affect "those who live in the surrounding neighborhoods."

h.  A 2002 paper described how CAFOs and their odor disrupt the quality of life for neighbors in rural communities.

i.  A 2005 study reviewed the health effects of residents near industrial hog farms in the Duplin/Sampson County area and found increased psychological distress.

j.  2006 studies surveyed children from schools in North Carolina who were near CAFOs and suggested that swine odor adversely affects the children.

k.  A 2006 study examined the air plume upwind and downwind from a CAFO and recommended buffering swine CAFOs from residential areas.

l.  A 2007 report found that "The encroachment of a large-scale livestock facility near homes is significantly disruptive of rural living."

m.  A 2007 study found that factors like low income, inadequate housing, low health status, and insufficient access to medical care compound the negative impacts that hog farms create.

n.  A study from 2007 noted how "Odour gives a problem when pig farms are located close to residential areas."

o.  A 2008 study investigated residents living within 1.5 miles of industrial swine operations in eastern North Carolina. The study indicated that odor is commonly present and that the odors are related to interruption of activities of daily life.

p.  A 2008 report found that "Recurrent strong odors" and "increased populations of flies are among the problems caused by CAFOs that make it intolerable for neighbors and their guests to participate in normal outdoor recreational activities or normal social activities in and around their homes."

q.  A 2008 study noted that for residents near CAFOs "hog odor limits several leisure time activities and social interactions." The study focused on nuisance in North Carolina, defined to include conduct that "is injurious to health, indecent, offensive to the senses, or an obstruction to the free use of property." The study found that within 1.5 miles of CAFOs, "hog odor limits activities of daily living that participants either 'enjoyed' doing the most or expected to be able to perform inside and outside their homes. It restricts, for instance, activities like cookouts, barbequing, family reunions, socializing with neighbors, gardening, working outside, playing, drying laundry outside, opening doors and windows for fresh air and to conserve energy, use of well water, and growing vegetables."

Case 7:14-cv-00180-BR   Document 1   Filed 08/21/14   Page 33 of 40

r. A 2009 study found that individuals in southeastern North Carolina near hog farms reported high rates of stress and negative mood.

s. In 2008-09, a global swine flu pandemic was caused by H1N1 influenza virus. Research noted that one potential source of the outbreak was swine in CAFOs and that swine flu is more likely to persist in larger farms with higher pig densities. Reports noted how in 1994, Smithfield had established its Perote operations in Mexico and in 1999 expanded its operations. The first reports of swine flu came from Perote. The Perote facility raised upwards of 950,000 hogs in 2008. It was reported that the vector of the outbreak was the clouds of flies that come out of the hog barns, and the lagoons into which the facility spewed tons of excrement. According to a municipal health official, the disease vector was a type of fly that reproduces in pig manure.

t. A 2010 report noted how "CAFO odors can cause severe lifestyle changes for individuals in the surrounding communities and can alter many daily activities. When odors are severe, people may choose to keep their windows closed, even in high temperatures when there is no air conditioning. People also may choose to not let their children play outside and may even keep them home from school…. Odor can cause negative mood states, such as tension, depression, or anger…."

u. In 2011, a study summarized how "Animal manure and sewage sludge" were harmful to neighbors based on studies of 16 eastern North Carolina communities near industrial swine farms.

v. A 2013 study found that "malodors may be associated with acute blood pressure increases that could contribute to development of chronic hypertension."

w. A 2013 article noted that "Swine finishing operations near residential areas can create public nuisance concerns due to the annoyance potential of odor emitted from the houses."

x. A 2013 report described how "On the coastal plain of eastern North Carolina, families in certain rural communities daily must deal with the piercing, acrid odor of hog manure—reminiscent of rotten eggs and ammonia—wafting from nearby industrial hog farms. On bad days, the odor invades homes, and people are often forced to cover their mouths and noses when stepping outside. Sometimes, residents say, a fine mist of manure sprinkles nearby homes, cars, and even laundry left on the line to dry."

y. A 2014 study "odor concentrations … in the ventilation air from the pig rooms" and found the results "indicate an acute need for … odor mitigation technologies."

## COUNT I: RECURRING, TEMPORARY, ABATABLE, PRIVATE NUISANCE

149.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

150.     Plaintiffs, and each of them, are, or during some or all of the pertinent times were, in lawful possession of their properties, and used them, or had the right to use them, as residences or for other legitimate uses.

151.     Defendant, during the pertinent times, owned and materially controlled the hogs in close proximity to Plaintiffs' properties so as to cause a private nuisance.

152.     Plaintiffs' right to use and enjoy their properties has been impaired by recurring foul and offensive odors; hog manure and urine; flies or other insects; buzzards or other scavenger animals; vectors of disease; trucks that cause noise and lights at night and foul smells; dead hogs; and other sources of nuisance.

153.     The nuisance caused by Defendant's swine has substantially impaired Plaintiffs' and use and enjoyment of their property, and has caused anger, embarrassment, discomfort, annoyance, inconvenience, decreased quality of life, deprivation of opportunity to continue to develop properties, injury to and diminished value of properties, physical and mental discomfort and reasonable fear of disease and adverse health effects.

154.     Defendant has engaged in improper or negligent operation of swine sites during some or all of the pertinent times, causing harm to the Plaintiffs.

155.     Defendant's conduct has been unreasonable.  Reasonable persons, generally, looking at Defendant's conduct, the problems caused by it, the character of the neighborhood,

the nature, utility and social value of the use of land, and the extent, nature, and recurrent nature of the harm to Plaintiffs' interests, would consider Defendant's conduct to be unreasonable.

156.    The invasions, harms and injuries complained of herein by Plaintiffs are more than slight inconveniences or petty annoyances, but rather substantial invasions, harms, and injuries to Plaintiffs' comfort, property, and use of their land.

157.    Defendant had actual knowledge during some or all of the pertinent times that the subject hogs were causing a nuisance.

158.    Defendant knew or should have known that foul and offensive odors, hog manure and urine, flies and other insects, and other causes of nuisance from their hogs would recurrently encroach upon and invade Plaintiffs' properties, and substantially impair Plaintiffs' use and enjoyment of their properties.

159.    While knowing that practicable technologies and methods are readily available to abate the nuisances and problems, Defendant has failed to abate the foul and offensive odors and other causes of nuisance.

160.    During the pertinent times, the level of control that Defendant exercised over relevant aspects of the hogs and the facility operations rose to such a level that Defendant stood in a principal-agent relationship with the facility owners and is vicariously liable for their conduct in operating the facility in a manner which caused a nuisance to the Plaintiffs.

161.    Alternatively, during the pertinent times, Defendant's own direct involvement in material aspects of the operation of the facility and management of the hogs renders Defendant independently liable for the nuisance with regard to the Plaintiffs.

162.    Alternatively, during the pertinent times, Defendant employed contract growers to do work which Defendant knew or had reason to know to be likely to involve the creation of a

nuisance, and is therefore subject to liability for harm resulting to Plaintiffs.  *See* Restatement (Second) Torts § 427B ("One who employs an independent contractor to do work which the employer knows or has reason to know to be likely to involve a trespass upon the land of another or the creation of a public or a private nuisance, is subject to liability for harm resulting to others from such trespass or nuisance.").

163.    Defendant's conduct described above constitutes a series of recurring temporary abatable private nuisances, which Defendant has failed to remedy within a reasonable period of time, and for which Defendant is liable.

164.    As a result of Defendant's liability for private temporary recurring abatable nuisance, Plaintiffs are entitled to compensatory damages in an amount to be determined at trial.

165.    In accordance with Fed. R. Civ. P. 9(g), Plaintiffs hereby plead special damages including the diminished value and lost rental value of their homesteads and properties. Plaintiffs show that as homeowners and occupants of their family properties, they are of the opinion that one impact of Defendant's nuisance has been to reduce their property values. Numerous studies and reports have determined that hog CAFOs lower nearby property values. Plaintiffs allege that each of their homes and properties has lost significant value as a result of the proximity of Defendant's hogs and the stench and nuisance that they cause, to be shown at trial.   These damages are in addition to all other allowable damages which the jury may award.

## COUNT II: NEGLIGENCE

166.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

167.    At all pertinent times, Defendant had a duty of reasonable care as to the ownership, maintenance, and control of the hogs that it recurrently sent in groups to swine facilities.

168.    During the pertinent times, the level of control that Defendant exercised over relevant aspects of the hogs and facility operations rose to such a level that Defendant stood in a principal-agent relationship with the facility owners and is vicariously liable for their conduct in operating the facilities in a negligent manner which caused injury to the Plaintiffs.

169.    Alternatively, during the pertinent times, Defendant's own direct involvement in material aspects of the operation of facilities and the management of the hogs renders Defendant independently liable for its breaches of its duty of due care with regard to the Plaintiffs.

170.    Defendant has recurrently breached its duty of due care.  As a direct and proximate result of Defendant's breach of its duty of care, the Plaintiffs have been injured.

171.    During the pertinent times, Defendant knew or should have known that its actions and omissions were causing and contributing to cause harm to the Plaintiffs.

172.    Plaintiffs are entitled to actual damages in a fair and reasonable sum in an amount to be determined at trial sufficient to compensate Plaintiffs for the negligence of Defendant.

## COUNT III: PUNITIVE DAMAGES

173.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

174.    Defendant's above-described recurring conduct, acts, omissions, negligence, and impropriety included aggravating factors giving rise to a claim of punitive damages under Chapter 1D of the North Carolina General Statutes.

175.     Pursuant to N.C. Gen. Stat. § 1D-15(a), Defendant is properly liable for punitive damages in this action in that Defendant is liable for compensatory damages and has committed one or more aggravating acts or omissions justifying an award of punitive damages, including without limitation, recurring acts of egregious and reckless behavior, and specific instances of willful and wanton conduct.

176.     The recurring conduct, acts, omissions, negligence, and impropriety of the Defendant were willful, wanton, malicious, and in reckless disregard for the rights and interests of the Plaintiffs and justify an award of punitive damages.  Accordingly, Plaintiffs demand judgment against Defendant for punitive damages in an amount to be determined at trial.

## COUNT IV: INJUNCTIVE AND EQUITABLE RELIEF

177.     Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs, as if fully set forth herein.

178.     In addition to their claims for monetary damages, the Plaintiffs respectfully request entry of injunctive and equitable relief requiring the Defendant to implement and continue measures to alleviate and abate the nuisance-causing conditions alleged herein.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury of all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray that this Court:

A.     Award the Plaintiffs compensatory damages, in an amount to be determined at trial;

B.     Award the Plaintiffs punitive damages;

C.     Award the Plaintiffs pre-judgment and post-judgment interest and any other costs,

expenses or fees to which they may be entitled by law;

D.     Award the Plaintiffs appropriate injunctive and equitable relief; and

E.     Award the Plaintiffs such other and further relief as is just and proper.

A JURY IS RESPECTFULLY DEMANDED TO TRY THESE ISSUES.

Respectfully submitted, this the 21st day of August, 2014.


By:     s/Mona Lisa Wallace
        Mona Lisa Wallace
        NCSB #9021
        John Hughes
        NCSB #22126
        Wallace & Graham, P.A.
        525 North Main Street
        Salisbury, NC  28144
        Phone: 704-633-5244
        Fax: 704-633-9434
        mwallace@wallacegraham.com
        jhughes@wallacegraham.com