IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
Master Case No. 5:15-CV-0013-BR

IN RE:  NC SWINE FARM )
NUISANCE LITIGATION )
)
)

The video deposition of JAMES A. MERCHANT, M.D., DrPH, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before BRENDA S. TANNEHILL, CSR, at 77 West Wacker Drive, Chicago, Illinois, on February 8, 2017 at the hour of 9:20 a.m.

REPORTED BY:  Brenda S. Tannehill, CSR, RPR, CRR
LICENSE NO.  084-003336

APPEARANCES:

KAESKE LAW FIRM
BY MR. MICHAEL KAESKE
1301 West 25th Street, Suite 406
Austin, Texas 78705
(512) 366-7300
mkaeske@kaeskelaw.com

-AND-

WALLACE & GRAHAM, P.A.
BY MR. JOHN S. HUGHES, IV
525 North Main Street
Salisbury, North Carolina 28144
(704) 633-5244
jhughes@wallacegraham.com

-AND-

BARON AND BLUE
MS. LISA BLUE BARON
3811 Turtle Creek Boulevard, Suite 800
Dallas, Texas 75219
(241) 969-7373
lblue@baronandblue.com

Representing the Plaintiffs;

McGUIRE WOODS, LLP
BY MR. CHRISTOPHER E. TRIBLE
800 East Canal Street
Richmond, Virginia  23219
(919) 755-6600
ctrible@mcguirewoods.com

-AND-

McGUIRE WOODS, LLP
BY MR. MICHAEL F. EASLEY, JR.
2600 Two Hannover Square
Raleigh, North Carolina  27601
(919) 755-6600
mfeasley@mcguirewoods.com

Representing the Defendants.

Also Present:  Mr. Thomas Scheckel, Videographer
Ms. Sophie Flynn

Q. You mentioned a number of different disciplines, and I want to make sure I understand where you see your role in this case.
In what areas do you intend to offer expert testimony in this case if permitted by the Court?
**A. Well, -- excuse me -- certainly in the broad area of public health I will offer opinions. In my area of occupational environmental health, I will offer opinions.**
**I may train epidemiologists with a doctor degree in epidemiology from University of North Carolina School of Public Health -- at least it was then called that -- and also pulmonary and environmental medicine where I had my training at Duke.**
**So all of those areas are areas. Certainly I've done a lot of work in the area of health policy, rural health policy, and I think that is also an area where I will comment.**
Q. Are you a toxicologist?
**A. I'm not a trained toxicologist, but I certainly have worked very actively and collaboratively with toxicologists. They were**

**members of my faculty, and we have collaborated on publications, collaborated on research.**

Q. You've not performed any medical evaluation on any of the plaintiffs in this case?

**A. I have not.**

Q. You've not provided a medical diagnosis for any of the plaintiffs in this case?

**A. I have not.**

Q. You've not reviewed any medical records of any of the plaintiffs in this case?

**A. Doctor records, hospital records, is that what you're talking about?**

Q. Yes, sir.

**A. I have not.**

Q. Am I correct that you don't intend to offer any opinions about the causes of any medical conditions any plaintiff may have in this case?

**A. Well, depending on what you are calling medical conditions. That's a rather vague term. Certainly I will offer opinions regarding health effects, what I refer to in the report as adverse health effects, and certainly the**

A. No.
Q. So you're not going to offer any opinions that any plaintiff has been diagnosed with any disease related to exposure to a hog farm?
A. Well, I haven't seen their medical records regarding that. I do, you know, pay attention to histories, their histories, and I think certainly subjects, patients, are in my experience accurate reporters of what they experience and are accurate reporters in regard to their medical histories, family histories, environmental histories, community exposures, and that is over the years something that I've spent a lot of time doing is listening to people and appreciating as I think one must their own understanding of their health in regard to the environment in which they live or in which they work.
Q. Dr. Merchant, have you ever offered medical causation testimony in any case?
A. I have.
Q. Can you give me some examples?
A. Well, there have been several worker

**compensation examples when I was doing occupational medicine at the University of Iowa.**

**I've also been involved in several asbestos-related cases both as a treating physician and as an expert, an expert witness, in regard to causation of disease arising from asbestos exposure.**

Q. That's helpful, Doctor. Let's use the analogy of your work in asbestos cases.

You have offered opinions as to whether or not any particular plaintiff's medical disease or medical condition resulted from exposure to asbestos; is that fair?

MR. KAESKE: Object to form.

**THE WITNESS: In those cases, I did provide an opinion related to their exposure to asbestos which was not always obvious at the time, but given my experience and as an examining physician or somebody who is knowledgeable about the literature, I was able to provide an opinion as to causation, yes.**

BY MR. TRIBLE:

Q. Are you offering any opinions as to causation in this case?

MR. KAESKE: Object to form.
**THE WITNESS: Well, certainly I will and I have in my report, I believe, rendered, opined and written and make concluding statements that I do have opinions regarding the relationship between exposure and adverse health effect so the answer to that is yes.**
BY MR. TRIBLE:
Q. And are those opinions specific to the plaintiffs in the farms in these cases?
**A. Well, my opinions are very broad, they're relevant to my experience as an epidemiologist and as a physician, as somebody who's done a lot of work in rural Iowa through our Keokuk County Rural Health Study surveying and interviewing in many cases the families and family members who live in this community.**
**So I will always refer back to my experience and how I see this and how my experience frames my answers to your questions in regard to exposures arising from CAFOs in the case at issue.**
Q. You've not interviewed any of the plaintiffs?

**A. I have not.**
Q. You've not spoken with any of the plaintiffs?
**A. I have not.**
Q. You've not reviewed their medical records?
**A. I said I had not.**
Q. You have not performed any medical evaluation on any of the plaintiffs?
**A. And I already said that I had not.**
Q. But I'm correct that you intend to offer medical causation testimony related to the plaintiffs and the farms in this case?
MR. KAESKE: Object to form.
**THE WITNESS: No. I think what I said is I would offer opinions in regard to the relationship between exposure and adverse health effects.**
BY MR. TRIBLE:
Q. And are those opinions based on these plaintiffs and these farms in this case?
**A. Yes.**
Q. What do you consider to be adverse health effects, or what are the adverse health

**with the symptoms and the adverse health effects as I've just described them that arise from exposures to -- CAFO exposures in the vicinity of the neighborhoods in which they live.**

BY MR. TRIBLE:

Q. There was a lot to your answer, Doctor. Let me ask you some followups.

**A. Sure.**

Q. Am I correct that you are not going to offer any causation testimony as to any disease that you would attribute to any plaintiff living near a hog farm?

**A. I'm not because I have not looked at their medical records, I've not examined them, I've not formed an opinion as to any particular disease that any plaintiff may have.**

Q. And you would agree with me that any condition that's identified in the International Classifications of Diseases is a disease?

MR. KAESKE: Object to form.

**THE WITNESS: Well, if it were not, it would not be in the classification sort of by definition.**

Q. What about airway inflammation of the nose through the respiratory tract, is that something that doesn't require a medical diagnosis?
**A. Could you reframe that? I think you had it a bit backwards.**
Q. It's possible, Doctor.
My notes of the answer you gave me a moment ago is you discussed airway inflammation from the nose through the respiratory tract, and you said these can be documented with clinical tests.
**A. That's correct.**
Q. You've not done any clinical testing of any plaintiff in this case?
**A. I have not.**
Q. You have not reviewed the results of any clinical testing of any plaintiff done by anybody else?
**A. I have not.**
Q. Can you offer an opinion that any plaintiff has airway inflammation from their nose through their respiratory tract?
MR. KAESKE: Object to form.

**their histories of symptoms which are incidentally highly consistent even among the plaintiffs but also with the observations documented in the literature so I can't imagine unless they're -- you're looking for a particular microorganism, something like that, one could conceivably justify doing that, but for what we're talking about here, I think one can rely on plaintiff testimony, and I think they've testified quite accurately, even eloquently, as to their adverse health effects.**

Q. Have you ever been licensed to practice medicine in North Carolina?

**A. I was, yes.**

Q. And that was during the 1970s?

**A. 1970s, yes.**

Q. Did you maintain an active license in North Carolina after 1975?

**A. I did for a few years, but when it became clear that I would not be returning to North Carolina, I let it lapse.**

**Excuse me.**

Q. To your knowledge, have you ever provided medical treatment to a patient who

worked on a hog farm in North Carolina?
    **A.   I may have.  I saw lots of different patients in pulmonary medicine.  At the time, -- this is the early 70s -- I do not recall any particular patient who may have worked on a hog farm.**
    Q.   Can you think of any sort of objective medical evaluation that would be helpful to determine whether any plaintiff's symptoms are caused by living near a hog farm?
         MR. KAESKE:  Object to form.
         **THE WITNESS:  Well, I can't -- I mean, one could in a research situation carefully structure it where you are measuring environmental levels, one could do some of the tests such as I've just described to document adverse health effects, but as I've said a couple of times already, that is hardly necessary in this case.**
BY MR. TRIBLE:
    Q.   You haven't done any of that in this case?
    **A.   I have not, no.**
    Q.   Dr. Merchant, how much time -- let me

**neighborhoods, drove through the neighborhoods, observed the plaintiff homes, observed the proximity of the neighbor homes to the CAFOs that were clearly visible and not too far away, and then I did visit and inspect and participated in the inspection of the plaintiff team of three other CAFOs.**

Q. Did you go inside any of the plaintiffs' homes?

**A. Yes, I did -- plaintiff homes?**

Q. Yes.

**A. Oh, I'm sorry. I thought -- no.**

Q. Did you go on the property of any of the plaintiffs?

**A. Yes.**

Q. Can you tell me about that, sir?

**A. Well, I recall that the first CAFO we visited was -- we were actually -- let me refer to my notes because it's all in my report.**

**Yeah, December 13th, we traveled by car, arriving at the Kinlaw farm, the McKiver Group, and we stopped at the entrance. We were stopped at the entrance, actually, but it was next to the -- right next to the front yards of**

certain plaintiffs and got out of the car and were, I think -- I'm not sure I actually stepped in the yard, but I was, you know, literally feet from the yard of the plaintiff who lived closest to that particular CAFO.

And certainly at the Sholar CAFO, we -- because we were not allowed to examine that CAFO, we were told there was some intercurrent respiratory or some other problem among the pigs, but that was very noticeable, even noticeable at the distance in the circular drive that led to the CAFO perhaps an eighth of a mile, something like that.

The wind was blowing from the CAFO. It was a very foul, very noticeable odor, and we were standing in the front yard.

I recall being videotaped in the front yard of one of the plaintiff homes which was perhaps 25 yards behind me.

So yes, I have had those experiences.

Q. Other than the one visit near the plaintiff's property near the Sholar farm, were you on any other plaintiff properties?

A. Well, I described the Kinlaw farm, and

**I can't recall if I actually stepped onto the property, but it was -- if I wasn't on the property, I was just a few feet from the property in the roadway while we waited to be allowed to proceed to the CAFO facility.**

MR. KAESKE: While they waited for me to show up with my donuts from Bernie's.

BY MR. TRIBLE:

Q. From my notes, Dr. Merchant, having reviewed your report, I believe the farms that you did not go on site to were the M&D South Farm, Paul Stanley 7 and the two Joey Carter farms. Does that sound right to you, sir?

**A. What I have in my notes, the Anderson Group, nonfunctioning Anderson Group CAFO, Crooked Run and Willow Creek. That's what I wrote down.**

**I was certainly at the Kinlaw farm which I've described in greater detail and the Sholar farm and then the Greenwood facility, Greenwood II, I believe.**

Q. Did you personally take any air or emissions samples during your visits to any of the farms?

**A. Only with my nose.**
Q. Tell me what you mean by that, sir.
**A. Well, you know, the nose is -- the human nose is perhaps the best sampling instrument around, and I was -- as I have come to recognize the very typical characteristic signature odor of hog CAFOs, and certainly in all three of the CAFOs I visited, I had a runny nose immediately upon arrival and I think exactly the type of thing that the residents who live close to these places describe, but I did not with any instruments, if that's what you're asking me, make any measurements.**
Q. Are you relying on any measurements taken with any instruments on any farm for purposes of your opinions in this case?
MR. KAESKE: Object to form.
**THE WITNESS: Well, certainly on the Sholar farm, the industrial hygienists from Johns Hopkins were there. They did have some direct-reading instruments, and I recall a measurement that was related to me of hydrogen sulfide level of some 120-some parts per billion.**

**So insofar as that was documented and I was there, yes, I made a comment on that on Page 49, 163, 120 parts per billion hydrogen sulfide, and this was in the front yard of Gwendolyn Picket whose home was perhaps 25 yards from the front of her yard which is where I was videotaped.**

BY MR. TRIBLE:

Q. And so did you physically observe that number on a meter?

**A. I think it was related to me verbally.**

Q. So you didn't actually see it; somebody told you they had measured that?

**A. One of the Johns Hopkins industrial hygienists related that to me.**

Q. And who was that, sir?

**A. There were two there, and I can't recall which of the hygienists. They both had direct-reading instruments, and I can't recall which one told me that.**

Q. Did you actually review the underlying data related to that measurement?

**A. I'm not sure what you mean by that.**

Q. Sure.

Q. Your instruments didn't go missing in North Carolina, did they, sir?
**A. I didn't have any.**
MR. KAESKE: Objection.
**THE WITNESS: I didn't have any. I can't speak for the hygienists from Johns Hopkins, though.**
BY MR. TRIBLE:
Q. Prior to your work in this case, have you ever measured emission levels at any hog farm in North Carolina?
**A. I have not.**
Q. And I said "prior to this case." You didn't personally measure any emissions at any of the hog farms in these cases, did you?
**A. I did not.**
Q. The work that you have done related to hog farms has primarily been in Iowa, sir?
**A. That's correct.**
Q. Did you have any kind of communications whatsoever with any of the plaintiffs in this case?
**A. No.**
Q. You attached to your report -- and let

me side track myself for a moment.
In front of you, Doctor, you have what I believe you said is a copy of your report?
**A. That's correct.**
Q. Does that include the exhibits to your report?
**A. Two exhibits, my CV and my reliance list. That's all that's here.**
Q. Dr. Merchant, I'm going to ask the court reporter to mark as Merchant Exhibit 1 one of the exhibits to your report that I don't believe you have in front of you.
(Whereupon, Merchant Deposition Exhibit 1 was marked for identification.)
BY MR. TRIBLE:
Q. Dr. Merchant, the court reporter has handed you what I believe was identified as Exhibit 2 to your report. Are you familiar with that document?
**A. I have certainly seen this document. I think the only -- I'm trying to remember.**
**In my report, I don't know that I list this. I list two exhibits. One is my CV and**

one is my reliance list, and if this is -- I'll have to review the reliance list to see if this document appears.

I don't know that I list this. I have seen it, but I don't know that I list this as an exhibit.

Q. Do you have any memory of reviewing this document for purposes of your work in the case?

A. I think it was sent to me. I did review it. It is, I think, very consistent with certainly my own personal experience dealing with subjects, dealing with patients who live close to CAFOs, and I believe it is an accurate -- as I recall, an accurate testimony of the plaintiffs as to their experiences living close to these CAFOs.

Q. And how do you know it's accurate, sir?

A. I think it's -- I know it's accurate because I have my whole career relied on the testimony of workers, of patients, individuals who live close to usually industrial -- industrial pollution of one sort or another, and invariably, I find their testimony to be

**accurate and very helpful, and it's a big part of anybody's clinical evaluation in the area of occupational and environmental medicine.**

**So I -- and when I see the consistency that I see in this document among these plaintiffs and how consistent it is with my personal experience, both clinical and research experience talking to individuals who work and live close to these animal confinement units, I believe it has a lot of credibility, not only internal consistency but validity related to the literature on this topic.**

Q. Your research and your experience allows you to testify that what the plaintiffs are saying is valid and credible?

**A. I believe so, yes.**

Q. You understand this 16-page document is a compilation of certain portions of testimony of some of the plaintiffs?

**A. Well, it's clearly not all of the plaintiffs. Exactly how it was put together I can't tell, but it clearly is -- there are selected passages from their depositions by page and by line that make up this exhibit.**

Q. You didn't review the actual depositions themselves?
**A. I did not.**
Q. You didn't review any testimony from any plaintiff except what is included in Exhibit 1 in front of you?
**A. That's correct.**
Q. Do you know how much time you spent reviewing Exhibit 1?
**A. Not a lot. Probably 15 minutes.**
Q. And do you know how similar the portions of testimony listed on Exhibit 1 is with the testimony of other plaintiffs that you didn't review?
**A. Well, since I don't have testimony of, you know, all of the plaintiffs, I'm not in a position to comment on that question.**
Q. Did you ask for this document, sir?
**A. Did I ask for this?**
Q. Yes.
**A. I don't recall that I did, but certainly I would have had it not been provided.**
Q. Do you know what criteria was used to determine what portions were sent to you and

what portions weren't?
**A. No.**
MR. KAESKE: It's Number 82 on that list.
**THE WITNESS: 82?**
**I'm advised by Mr. Kaeske that this document is numbered 82, Anderson Excerpt Summary, although it doesn't have a heading. That's why I was unable to spot it.**
BY MR. TRIBLE:
Q. Dr. Merchant, I'd like to ask you some questions now about hog farming in Eastern North Carolina.
The clinical practice you talked about from 1973 to 1975, was that in Chapel Hill?
**A. It was.**
Q. Have you ever done any clinical work in Eastern North Carolina?
**A. No.**
Q. Have you done any research about the history of hog farming in North Carolina?
**A. I wouldn't call it research. I've certainly reviewed lots of documents. I did spend a year visiting as a Gillings visiting**

**professor in 2008, 2009 working with Steve Wing and his students on their research so I'm certainly familiar with the research and exposures in Eastern North Carolina.**

**I have observed them from the air, I've driven through these -- through this area, -- I think it was in Sampson County on one occasion -- heard testimony from individuals who lived close to these CAFOs as to what -- how the CAFOs impacted their everyday lives.**

**So that's been my experience. I wouldn't call that research, but it certainly is, I think, relevant to this case.**

Q. And you said that you've heard testimony. What do you mean by "testimony," sir?

**A. These are -- excuse me -- individuals who live in communities close to -- living close to CAFOs and what their symptoms were, what the impact of living close to CAFOs happened to be, not dissimilar from what's seen here in this exhibit before me. And it was very illuminating to those who met in the community center at that point.**

Q. And was that 2008, 2009?
**A. Yeah, it was Summer of 2009.**
Q. Do you know whether you met with or heard from any of the plaintiffs in this case?
**A. It was not in the area where the plaintiffs were located.**
Q. You said you did a flyover, sir?
**A. Yes.**
Q. Tell me about that, please.
**A. Well, it was a flyover arranged by Steve Wing and facilitated by the Waterkeepers, and Dean Barbara Rimer who's the dean of the School of Public Health and I were invited to travel with Dr. Wing to fly over Duplin and Sampson County.**
**I'm not sure where we ended up. I think it probably was in Duplin County we touched down, and then were taken by car a tour of the CAFOs to smell the smells and observe the dead boxes and observe the flies and all of that, and then we were taken to a community center where we were treated to a home-cooked meal, and the citizens there, the residents there, then provided testimonials one after**

MR. KAESKE: Object to form.
**THE WITNESS: Well, no.**
BY MR. TRIBLE:
Q. Is there a proximity -- can you give me a distance from any of the hog farms involved in this case at which you would not expect any exposure from anyone in the community to any emissions that might occur?
MR. KAESKE: Object to form.
**THE WITNESS: Well, yeah, the literature -- I mean, because I don't have particular data on these CAFOs, I think one must be -- qualify one's response to a question like that, but I think these CAFOs are quite typical of CAFOs in North Carolina, the design. In fact, it was strikingly similar, if not identical, from the Kinlaw farm to the Greenwood farm.**
**The units looked like they came from the same design so I think you're able to -- from the literature, the uniformity of the types of CAFOs does allow one to form some judgment based upon the literature as to what one might expect in proximity to these units, and I think**

**the closer one is to the CAFO and the density of CAFOs in a given area has been found to be important, certainly in our research, wind speed is important, and all of those are factors that go into determining what level of exposure may arise from a particular situation.**

BY MR. TRIBLE:

Q. And let me ask you about some of those factors. So there are factors that will determine whether any particular farm emits any odor at all, correct?

MR. KAESKE: Object to form.

**THE WITNESS: I don't know any -- I don't believe there is any CAFO that does not emit -- did you say odor?**

BY MR. TRIBLE:

Q. Yes, sir.

**A. Odor, I think that is a characteristic of all CAFOs, --**

Q. And is that true --

**A. -- swine CAFOs.**

Q. Is that true for off premises, in other words, is it your opinion that every hog farm emits odor that is detectable in some fashion

off premises?

MR. KAESKE: Object to form.

**THE WITNESS: Well, that depends. It depends on the situation.**

**As I said, wind speed is -- if the wind is blowing the other way, then one may be spared from exposure to hog odor. And so, you know, I think one needs to be a little more precise in terms of what you're asking me.**

BY MR. TRIBLE:

Q. It depends on wind speed?

**A. Wind speed is certainly one of the factors we've found to be important.**

Q. It depends on wind direction?

**A. And wind direction, yes.**

Q. It depends on atmospheric conditions?

**A. Atmospheric conditions, yes, can be -- you know, that can be a factor as well, although it was not a factor that was -- we used in our formation of exposure that we found to be helpful to us in our research in Iowa.**

Q. It can depend on time of day?

**A. Usually, time of day is usually related to wind speed and wind direction so I think time**

**of day per se is not so important.**

Q. Humidity levels?

**A. Humidity levels can make a difference, yes.**

Q. Time of year?

**A. Well, certainly I think time of year is related to temperature, and that can be a factor, yes.**

Q. There are factors that relate to how the farms themselves operate?

MR. KAESKE: Object to form.

**THE WITNESS: Well, as I said, what's striking about these CAFOs is how similar they are. There's very little difference in terms of how they operate, but there could be differences in terms of, you know, the numbers of animals, for instance, that may be in the CAFOs, the age, the weight of the animals. That would be a variable that could certainly influence the environmental emissions.**

BY MR. TRIBLE:

Q. What about tree buffers, are you familiar with tree buffers, sir?

**A. I am familiar with tree buffers.**

Q. And let me make an assumption, and you tell me if I'm wrong because you live in Iowa and I've never been to Iowa.

My assumption is that in Eastern North Carolina, there are a whole lot more trees around hog farms than there are in Iowa. Is my assumption right or wrong?

**A. Well, I think there -- I think that's true, there are more trees around CAFOs.**

Q. Has your research ever evaluated the effect of having trees around CAFOs in terms of transport or dispersion of any emissions?

**A. No.**

Q. Do you have any opinions whatsoever about whether having tree barriers will affect the transport or dispersion of any emissions from a hog farm?

**A. I would very much doubt that they have much of an effect unless it was a very large area, forested area, between the CAFO, and I presume you're getting at where plaintiffs live.**

**In my observation, the trees between the CAFOs and the spray fields in these instances would have negligible effect on any**

**emissions, odors or any other chemical that may arise from these operations.**

Q. You haven't studied that yourself, sir?

**A. What I have done is observed with my own eyes what's there, and if it's called a tree buffer, the tree buffers are perhaps only a few trees wide. They're pine trees, predominantly pine trees with very little foliage.**

**One can see from the spray field or from the CAFO very clearly the plaintiff homes which are quite near so I think in terms of the tree buffer, if that's what you're driving at as a mitigating factor in exposures, I think the impact of that is negligible.**

Q. But again, you've never researched that?

**A. I have not done, nor have any of my colleagues, specific research on the mitigating effects of tree buffers on hog odors.**

Q. That's really not an issue that you experience in Iowa?

MR. KAESKE: Object to form.

**THE WITNESS: Well, it's not necessarily the case.**

**was very common. I have certainly in some instances prepared reports.**

Q. Can you think right now of any hypotheticals that you think are relevant to the opinions that you've formed in this case?

**A. No.**

Q. The reason why I ask, sir, is that one of the purposes of taking your deposition is I want to make sure I understand your opinions in the case. I don't want to be hearing your opinions for the first time at trial when Mr. Kaeske is asking you questions.

Is there any way for me to know what hypothetical questions Mr. Kaeske might ask you?

**A. No.**

MR. KAESKE: You could ask me.

MR. TRIBLE: Do I get to swear Mr. Kaeske as a witness?

MR. KAESKE: You can talk to me any time you want.

BY MR. TRIBLE:

Q. Your communications with Mr. Kaeske about what he may ask you at trial I'm not allowed to ask you about, sir, in federal court,

but you'd agree with me that there's no way for me to know what hypotheticals you might offer at trial if they're not included in your report?

**A. Well, if you were to ask me a hypothetical, I would give you an answer so that's the only thing I can suggest is if there are any hypothetical questions that you wish to ask me at this time, I'm here to respond to those questions.**

Q. But that's something you're responding to my questions. I'm talking about the opinions you would offer as a witness for the plaintiffs in this case being questioned by Mr. Kaeske. There's no way for me to know that, is there, sir?

**A. You mean a hypothetical question that he may ask me?**

Q. Yes, sir.

**A. Is that -- no, I have no way to know that.**

Q. Have you ever designed a study involving a hog farm in North Carolina?

**A. No.**

Q. Have you ever coauthored any

**put this report together.**

Q. Dr. Merchant, I'd like to ask you some questions about the Iowa report to the Governor dated February 2002. It's a lengthy report. There's certain chapters that I'd like to ask you about so what I'll do is I'll mark those chapters as exhibits. If there's something else at any time that you want to look at, let me know, but I know obviously, you're very familiar with this study.

Let me first ask the court reporter to mark as Exhibit 3 the executive summary for the Iowa study.

(Whereupon, Merchant Deposition Exhibit 3 was marked for identification.)

BY MR. TRIBLE:

Q. Dr. Merchant, could you describe how you came to be involved in this study?

**A. Well, I was, as I recall, contacted by the then-president of the University of Iowa, Mary Sue Coleman, and then received -- about undertaking this study which, of course, we would agree to undertake given that it was**

coming from the Governor of Iowa and we were a state institution.

And then I received a letter that invited us to answer five questions which are enumerated in Chapter 1, the Executive Summary, and Richard Ross, the then-acting dean of the College of Agriculture at Iowa State, received a similar letter and we together agreed to undertake this study which I think was a very serious effort on the part of faculty and staff from both universities, and we worked closely together over a period of months to put this report together and to form our consensus conclusions, and the consensus conclusions of everybody involved in this signed off by everybody that's listed in this report is represented in this exhibit, Chapter 1, the executive summary.

Q. And so you signed off on all the opinions that are listed in the executive summary?

A. I and everybody else involved in this report that's listed as -- that participated, yes.

**concerned about adverse health effects arising from exposure to CAFOs.**

Q. Let me ask you some questions about the opinions in the executive summary.

**A. Sure.**

Q. Turning to Page 6, in response to the first question, you say: "One cannot directly extrapolate occupational health risks observed among workers inside CAFOs to community health risks that may arise from CAFO emissions."

Do you see that first full paragraph on Page 6?

**A. Oh, the top of the -- the top of the -- I see that, yes.**

Q. You have done a number of studies of farm workers in Iowa, correct?

**A. We have, yes.**

Q. I believe you told me that was a significant part of the work you've performed during your career.

This statement on Page 6 is true: "One cannot directly extrapolate occupational health risks observed among workers inside CAFOs to community health risks that may arise from CAFO

emissions"?
    **A.   Well, that's correct, and then I go on to say why.**
    Q.   And one of the reasons you say why is in the next sentence: "The aerosols at the point source differ from ambient exposures as they move downwind both in composition and in concentration." Do you see that?
    **A.   That's correct.**
    Q.   That's one of the reasons why you can't directly extrapolate occupational health risks to people who live in a community?
    **A.   That's correct.**
        MR. KAESKE: Object to form.
BY MR. TRIBLE:
    Q.   Going down on Page 6, in further response to the first question, you refer to certain studies in North Carolina and in Iowa on the bottom portion of Page 6. Do you see that, sir?
    **A.   Yes.**
    Q.   Do you remember which studies those were in North Carolina? Does Dr. Schiffman's name ring a bell?

**So to accommodate the pumping and spreading of manure which is necessary, we said that up to seven days with 48 hours notice. That's notice to neighbors, okay? That's relevant. That's important.**

**And we recognize the importance of odor as a nuisance in this instance and we built that into our recommendation.**

Q. And the deep-pit system, that's not used at these farms in North Carolina?

**A. It is not.**

Q. The purpose -- was one of the purposes of having limitations of trying to set a consensus number below which you would not expect adverse health effects?

**A. Well, I think we were doing our best to limit the adverse health effects, particularly odor.**

**I mean, the background to this study is the Vilsack Administration was getting dozens and dozens of odor complaints from neighbors, and so they responded by a couple of responses. One was to have us do this report which then led to some action by the General Assembly.**

THE VIDEOGRAPHER: We are back on the record. The time is 1:30 p.m.

BY MR. TRIBLE:

Q. Dr. Merchant, do you agree with the notion that people vary in their sensitivity and reaction to odors?

**A. I do.**

Q. Can you quantify the variance in any way?

**A. I don't know of any way to do that, but I think it's -- certainly I think we know from our everyday lives that some people are much more bothered by odor or much more bothered by certain odors than others. Certain people are sensitive, indeed sensitized, to particular odors, whereas other people are exposed to the same odors but are not bothered or don't indicate they're bothered. They may smell it, but they may not regard it as an irritant. So there is variability.**

Q. And Dr. Merchant, let me use an example I discussed with Dr. Wing.

Is it possible that you have two people who live in the same household who would

experience odors in different ways?
**A. Yes.**
Q. Even if it's the same odor exposure?
**A. I think certainly variability in terms of one's response to a particular odor differs, and so I could see that that could certainly be a possibility, although if they happen to be in the same house, one would expect the odor to be essentially the same level.**
THE VIDEOGRAPHER: Doctor, if you could slide your microphone just a little bit down towards the bottom of the "V."
MR. KAESKE: Do you want help?
**THE WITNESS: I can get it.**
THE VIDEOGRAPHER: That's good. Thank you.
BY MR. TRIBLE:
Q. Dr. Merchant, is there any way that you're aware of to scientifically or medically evaluate someone's sensitivity to odor?
**A. Well, I think people can certainly do clinical trials.**
**I think certainly the perfume manufacturers have and do employ panels of**

**individuals who perceive odor and then respond so I think the way they do it is with a panel of individuals, and then they can from that derive data that's meaningful to a manufacturer of any perfume or any chemical that may result in a -- you know, an odor which could either enhance or decrease the marketability of that particular product.**

Q. Have you ever used odor panels in any of the research you've performed of hog farms in Iowa?

**A. No.**

Q. And you didn't use any odor panels for your work in this case?

**A. Did not.**

Q. And you didn't do anything to try to evaluate the sensitivity of any plaintiff to any odors they might experience in their communities?

**A. I didn't. I think as we established earlier, I didn't examine or meet any of the plaintiffs.**

Q. Have you ever used or participated in community-based health studies?

**is about CAFOs, we can assume this is about exposure from CAFOs.**

Q. Dr. Merchant, you told me earlier today that you're not offering medical causation testimony as to any diseases in this case; is that right, sir?

**A. I think your question was in regard to the plaintiffs.**

Q. Yes.

**A. And certainly I do have opinions in regard to diseases that may arise from exposures to CAFOs and I've written about that, and that's all included in my report.**

Q. All right. But you're not offering medical causation testimony that any plaintiff has any disease as a result of living near a hog farm?

**A. That's correct.**

Q. Are you offering testimony as to whether any plaintiff has a reasonable fear of developing a disease as a result of living near a hog farm?

**A. I do provide a -- part of my report deals with that.**

**There is, I think, the basis in the literature and certainly based upon their own personal experience reasons for them to be concerned or even fearful that these exposures may adversely affect their health into the future.**

Q. So any opinions that you would intend to offer in this case as to diseases are going to be offered on the basis of whether it's reasonable for a plaintiff to fear development of that disease; is that right, sir?

MR. KAESKE: Object to form.

**THE WITNESS: Well, yeah, I think if you could restate your question a little more precisely because you were -- on one part of the question, you were talking about the world, and the other part, you were talking about the plaintiffs.**

BY MR. TRIBLE:

Q. In this case, sir, unless I otherwise indicate to you, my only interest is these farms and these plaintiffs.

**A. I think then make it clear in the question so my response is equally clear.**

**think they indicate that they have had histories of asthma, but I myself have not examined those records.**

Q. Your opinions as to asthma relate to whether or not it's reasonable for them to have fears or concerns, right?

**A. That's correct. That's correct.**

Q. And you said that plaintiffs don't think in terms of risk; they think in terms of fears and concerns?

**A. Yeah.**

**I think the risk is a concept I think that predominantly poorly-educated rural black folks in rural North Carolina don't think in terms of risk or risk assessments, things of that sort, whereas I think perhaps people in the academic community or professional community who deal with these issues are comfortable in thinking in terms of risk, but I don't think these people think in terms of risk. Rather, they are -- it's just whether they're worried, whether they're concerned, whether they're anxious, you know, whether they're fearful that these exposures may adversely affect their**

Q. You think in terms of risk?
**A. I do think in terms of risk and we do use relative risk in our research. In the context of a research study, that does have meaning.**
Q. What is the relative risk of any plaintiff developing any disease as a result of living near the hog farms in these cases?
**A. Well, that is -- you know, that term can only be used in a population-based research so I don't think it applies in this instance.**
Q. You told me a moment ago that what academics and researchers might call risk, you think the plaintiffs in this case would view it as fears or concerns?
MR. KAESKE: Object to form.
**THE WITNESS: I think that's -- you were the one who introduced the word "risk" in conversation we were having about fears and concerns so I just -- I don't want to confuse what we're talking about, and that's why I went on to elaborate on that point.**
BY MR. TRIBLE:
Q. In order to offer the opinion as to

**Doctor, what should I do because am I going to end up with chronic obstructive lung disease if I don't get away from these hogs, you know, am I likely to have a fatal attack of asthma?" I mean, that's real fear.**

**And so I think I get it, I think I understand it. I've been there, and I've also seen these plaintiffs, seeing their homes in proximity to CAFOs, and I have experienced the characteristic hog odor that emanates from these CAFOs.**

**So I think given my own experience, my own research, what I've read in the literature and then my personal observation of these individuals in these locations gives me 100 percent confidence that these people have fear and concerns that is justified.**

Q. Your personal observation, you've made no personal observation of any of the plaintiffs in this case?

**A. I was talking about --**

MR. KAESKE: Objection.

**THE WITNESS: -- my observation of my patients and my research subjects in Iowa is**

**what I was referring to.**

BY MR. TRIBLE:

Q. Dr. Merchant, can you tell me what is the risk that any plaintiff in this case will develop asthma in the future as a result of living near a hog farm?

**A. No, I can't. I can't give you that. That would take a -- in order to do that would require an epidemiologic study that would be specific to these individuals in this particular location so I can't define that risk.**

**On the other hand, I certainly can opine based upon my personal experience, my research and my observation of this case that these individuals are at increase to exacerbation of asthma should they have asthma, and that is -- I think doesn't require an epidemiologic study but rather is based upon existing literature including a lot of my own as well as observation.**

MR. TRIBLE: Mr. Kaeske is giving me the high sign. I'm close to finishing up this line of questioning if you will bear with me for another few minutes.

**O'Shaughnessy and Altmeir's paper and based upon the DNR survey data of hydrogen sulfide and ammonia in Iowa, a study that arose from the recommendations in the Iowa study, and it took into account these factors.**

Q. So you have used dispersion modeling in your own studies?

**A. We developed dispersion modeling. I have used dispersion modeling in my own studies to illustrate how hydrogen sulfide covers two-thirds of Keokuk County. And I don't cite that graphic here, but certainly in presentations I've made, I have used that graphic that's based upon the -- based upon the dispersion modeling done by O'Shaughnessy and Altmeir.**

Q. You didn't do any dispersion modelling as part of your work in this case?

**A. In this case?**

Q. Yes, sir.

**A. No.**

Q. And you're not relying on any dispersion modelling done in North Carolina, are you, sir?

**A. I am not.**
Q. Did you could turn to Page 64, please, the last paragraph, the paragraph reads: "It is recognized that there is great variability between odors arising from CAFOs and that odorous gases may be transported through interactions with other gases and particulates between the source and the receptor."
MR. KAESKE: Transformed.
MR. TRIBLE: Thank you.
Would you like me to read that again?
MR. KAESKE: No.
BY MR. TRIBLE:
Q. With Mr. Kaeske's correction, did I read that correctly?
**A. Right.**
**That's quoting a study from 1977, Peters and Blackwood.**
Q. And you were citing that study. Is it a true statement that there is great variability between odors arising from CAFOs?
**A. Well, there is certainly variability between odors arising from CAFOs depending upon several factors.**

Q. Have you made any evaluation as to whether there are any other causes for times where any plaintiff in this case might have a runny nose?

MR. KAESKE: Object to form.

**THE WITNESS: You know, when the obvious cause of a symptom like runny nose is so closely at hand and which has been experienced repeatedly over the years and has been documented in the literature to result in that same outcome, I'm hard pressed to think why or, you know, why one would look for or even consider another cause.**

BY MR. TRIBLE:

Q. In other words, if the plaintiffs testify that they smell the odor and that their eyes run, from a medical or science standpoint, you don't have anything to add to that?

**A. Well, I don't think I need to.**

**I think these people are -- you know, they may be poor and they may not be very well educated, but they can certainly recognize an irritant or an offensive odor and link it to what happens to them. I mean, if they're**

**peeling onions, they are likely to realize their eyes begin to run; they make that connection.**
**It doesn't take a doctor, it doesn't take me to do it, it doesn't take the literature. These people are perfectly capable of making this linkage and have and very reasonably so.**
Q. By "these people," you mean the plaintiffs?
**A. The plaintiffs, of course.**
Q. They're capable in your opinion of testifying as to what causes their nose to run or their eyes to water?
**A. Absolutely.**
Q. What causes them headaches or feeling nauseous?
**A. Indeed, yes.**
Q. Are you aware of any other sources of odor in the communities where the plaintiffs live other than potentially hog farms?
**A. You know, we drove around. I asked Daniel Wallace to drive me around the neighborhood, the vicinity of these plaintiffs, and that actually was one of the things I was**

**that in the Pew report.**

**There was a whole technical report on antibiotic resistance. In fact, our number one recommendation in the Pew Commission report was to phase out the use of antimicrobials as growth promotants which is finally beginning to happen.**

**It took a decade, and we're obviously not the only ones or the first ones who made that recommendation, but this whole area of antibiotic resistance is a critically-important public health issue, and CAFOs, swine CAFOs particularly, do play a role in this, and the studies in Eastern North Carolina by Steve Wing and his students have documented livestock-related MRSA as colonized in the individuals sampled who are not these plaintiffs but among individuals who are not unlike these plaintiffs.**

**So this is a piece of the overall exposure that from a public health standpoint one must consider when talking about the health of the public in relationship to CAFOs.**

Q. But you've not done any specific research relating to antibiotic resistance as to

these plaintiffs and these farms?
**A. I have not.**
Q. You've not evaluated it at all?
**A. I have not, not in regard to these plaintiffs.**
Q. In terms of antibiotic resistance, obviously, you are a medical doctor. Is one of the primary issues with antibiotic resistance the overprescription of antibiotics by medical professionals to patients?
**A. That's a big part of it, yes.**
Q. Can you compare how big a part of it that is to use of antibiotics in livestock production?
**A. Well, I can say that the vast majority of antibiotics used in this country -- I think this is still true, but it's decreasing -- is the use of antibiotics in agriculture. It dwarfs the volume of antibiotics used by medical practitioners, and some estimates I think at the time we did our report were in the neighborhood of 75 to 80 percent. Certain scientists had an estimate of 80 percent of all antibiotics used in the United States in their report which was**

**contemporaneous with ours were used for animal agriculture.**

Q. Do you have any information about whether any antibiotics are used in the feed at any of the farms in these cases?

**A. No. I hope they're not, but I have no way of knowing. I've received no information on that.**

Q. Is there a threshold level of ammonia exposure that you need in order to trigger symptoms?

MR. KAESKE: Object to the form.

**THE WITNESS: I think that's a difficult question to answer for a couple of reasons, and one is whether it's a -- if it's a pure ammonia exposure.**

**We did a -- I mentioned the Health Effects Institute. We did a -- funded a study, part of which was undertaken at the EPA Inhalation Control Laboratory in Chapel Hill on chlorine, okay? And it's a similar kind of highly-reactive gas like ammonia that ammonia being so water soluble that if there's any water vapor in the air, it will immediately tie into**

BY MR. TRIBLE:
Q. And let me try to ask it in a more specific way.
In Paragraph 53 of your report on Page 17, --
**A. Okay.**
Q. -- you say that in addition to pulmonary disease, exposure to ammonia also leads to irritation of the eyes, sinuses and skin?
**A. Right.**
Q. Can you tell me what are the threshold levels of ammonia exposure required to cause irritation of the eyes, sinuses and skin?
**A. No. And I think I just explained why that is a question that I can't answer, and to try to answer that question, one would have to do the kind of study that I just described as was done for chlorine.**
**Can we talk a short break here?**
MR. KAESKE: I think that's a great idea.
THE VIDEOGRAPHER: Off the record. The time 4:02 p.m.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is 4:15 p.m.

BY MR. TRIBLE:

Q. Dr. Merchant, Paragraph 58 of your report on Page 19 --

**A. Paragraph 59, which number?**

Q. 58, sir.

**A. 58, okay.**

Q. In the middle of that paragraph, you say that community exposures to particulates have been associated with asthma, bronchitis and impaired lung function.

**A. Right.**

Q. I know we've talked about all three of those diseases earlier, but let me ask you a different question.

Can you tell me what levels of exposure to particulate matter are required to cause asthma, bronchitis or impaired lung function?

MR. KAESKE: Object to form.

**THE WITNESS: In community exposures?**

BY MR. TRIBLE:

Q. Yes, sir.

**A. No.**

Q. Is that for the same reason you told me a moment ago about ammonia?

MR. KAESKE: Object to form.

**THE WITNESS: Well, I think, you know, what we're talking about in this instance is a complex mixture of particulates and we're just talking about the particulates, but that's only part of the overall CAFO exposure. There are also irritant gases and volatile organic compounds, VOCs, as well.**

**So in the context of CAFOs, it's, you know, a particular level. I'm not saying a particular level, I'm just saying particles which settle in the upper airways are associated with asthma and bronchitis. Smaller particles may be absorbed and have systemic effects.**

**So those are -- so I think it's safe to say and I do say that particles between 4 and 10 microns settle into upper airways and less than 2.4 or 5 microns may reach small airways and terminal bronchioles. I think that's a very**

**safe statement, but the exact level, the amount, nobody has that data, nor is it obtainable. Well, possibly it's obtainable, but nobody has undertaken a study to do it apart from possibly Steve Wing.**

BY MR. TRIBLE:

Q. Sir, are you aware of any data that could tell me what level of exposure to particulates causes asthma, bronchitis or impaired lung function?

**A. I think if you look at the Schinasi study, you do get a measure of impact on lung function and other symptoms from levels of exposure to PM2.5, PM10 and endotoxin per unit of exposure you get.**

**So that isn't overall levels of exposure which I understood your question to be, but it's per unit of exposure, you get these sorts of changes. So that's the best data I know of that gets at your question.**

Q. I know you have studied asthma prevalence in children in Iowa. Have you studied asthma prevalence of adults in Iowa?

**A. We have, yes.**

**of the studies or even some differences -- although I don't think they're great -- between how the animals are raised, the emissions are similar and the adverse health effects are remarkably consistent and similar.**

**So that consistency of results over time particularly gives one confidence, and that's why I say in this that I have no reason to question the validity of the results in drawing my conclusions.**

BY MR. TRIBLE:

Q. You talk in your report about corporate responsibility. Have you ever testified as an expert on corporate responsibility?

**A. For corporate responsibility?**

Q. Yes, sir.

**A. Let me see. I have certainly, I think, probably discussed that in some of my testimony before the Congress or before the Iowa legislature over the years, and I think I particularly recall testifying about the cooperation when I was a very young Public Health Service medical officer and a fellow at Duke in student UNC about the responsible**

position and the support and cooperation we got from Burlington Industries on our studies of cotton textile workers.

Highly responsible, very willing to roll up their sleeves, fund our -- not only -- they didn't fund our research, but they made it possible, they facilitated that. They were concerned about their workers. They were genuinely concerned. I've seen -- gone back and read their board minutes since then and seen that reflected in their board minutes.

So that's corporate responsibility. It resulted in regulation of cotton dust. They cleaned up the industry. And without corporate cooperation in that particular study, that wouldn't have happened.

Corporations have a wonderful opportunity to do the right thing. They have huge profits that they can spend to elucidate these problems and they can spend it to solve these problems. The technology is available.

And indeed, the technology to clean up this industry are the byproduct of the Smithfield agreement which occurred in 2000, and

I think the work has extended on for many, many years and has resulted in some very good, very effective control technologies which do -- if they -- which do in an experimental situation appear to solve this problem of odor and do appear to be sustainable and at some level economically feasible.

One of our big concerns -- and we certainly did talk about this in a global sense in our Pew Commission report -- that the industry, the livestock industry -- and this is particularly true of swine -- the livestock industry as currently constituted as currently operated we did not believe is sustainable, and we didn't for several reasons. One is water consumption, another one was environmental pollution. A big one was the community impacts, adverse community impacts that are resulting from these exposures. And that's what we're talking about here.

And finally, consumers, we did not believe, would tolerate adulterated meat products with antibiotics, hormones and other food additives, and that is proving to be the

case.

McDonald's has declared "We're not going to sell any chicken that has antibiotics in our chicken" and that, well, even though we made the recommendation in 2008, suddenly, the FDA, the guidelines in 2013 are going forward with the cooperation of the industry because the industry is falling in line.

They say, "Well, okay, I guess if McDonald's says so, we're going to do it." And that's power of the consumers saying, "We are not going to tolerate tainted products." And so that's corporate responsibility.

And I'm sorry if I'm preaching at you, but yes, I have experience with corporate responsibility and I have seen it on the good side and I've seen it on the bad side, and I think there's a wonderful opportunity for Smithfield as a world leader in pork production to step up and do the right thing and make the investment to clean up this industry. If Smithfield did it, the rest of the industry would fall in line.

And I think as far as I can tell,

**Smithfield has made the determination that it's just easier for us to pollute and get away with it because we're not being made to clean this industry up, and insofar as the public is going to tolerate it, which they are less and less, then this model makes sense, but it's not corporate responsibility.**

Q. Dr. Merchant, you are preaching to me, but that's fine. I asked you a question; you gave me an answer.

Let me go back to my original question.

What standards are you using to determine corporate responsibility? Can you point me to some objective criteria by which you decide whether McDonald's or anybody else is a responsible corporation or not?

**A. Well, I think I've explained that.**

**I think when it is clear that your industry is offending the community in which it is located and is harming those who live in proximity to the facilities in which your animals are raised, then you have an obligation and indeed a duty to society to take steps to remediate that in ways that will result in a**

**example that is relevant here.**
Q. In your answers, you're talking a lot about industry. That's really what you want to testify about here, you want to testify about the hog industry?
MR. KAESKE: Object to form.
**THE WITNESS: Part of this question here is whether this industry is going to undertake to pursue technological sustainable systems, and the Smithfield agreement had five criteria, as I recall, for what was agreed to that met that definition, and the scientists who were doing the research and had done research subsequent to that have, I think, used those five criteria, and in this instance, I call that corporate responsibility.**
BY MR. TRIBLE:
Q. Dr. Merchant, in your report, did you offer any opinions about alternative technologies that you believe Murphy-Brown should implement?
**A. I did not cover that in my report because I'm well aware that Dr. Aneja who has actually participated in that research is**

**testifying to that.**

**I am aware of his reports and reports of others and some of the technologies that have come from that research so -- but it is not the focus of my report.**

Q. Not only is it not a focus; it's not part of your report?

**A. It's not part of my report. I don't believe that I don't believe it, though.**

Q. Well, let me see if I can save us some questions.

You're going to defer to Dr. Aneja's testimony about alternative technologies?

**A. Well, not entirely. I think I'll let my comments that I just made stand for the record.**

Q. And I understand that, sir. What I'm asking is: Are you going to testify in this case about alternative technologies?

**A. I don't plan to. Maybe possibly in a global sense I will.**

MR. KAESKE: Like in the sense that he answered the question that you asked, and to help you make things go along, I am not going to

MR. KAESKE: My drinks come when you're done, which is hopefully soon.
BY MR. TRIBLE:
Q. Have you ever qualified as an expert witness on the issue of warning, sir?
**A. Of warning?**
Q. Yes, sir.
**A. Well, certainly when I testified before the Congress having to do with various federal regulations all of which contained sections having to do with warnings, I guess I probably have.**
Q. Do you consider yourself an expert on warnings?
**A. I think it's insofar as they are part of a comprehensive standard or recommended standard that may be cite and may be put out by National Institute For Occupational Safety and Health, that is a section of these criteria documents so that is something I'm certainly very familiar with, and my role has been mainly in those instances the epidemiologist, the medical officer, but I have a very good, I think, understanding of the importance of**

**warnings.**

Q. Have you ever drafted any warnings that you believe any hog farm should share with neighbors?

**A. I've not drafted any specific warning that hog farms should share with neighbors.**

Q. Have you ever reviewed or edited any warnings that someone else drafted?

MR. KAESKE: Object to form.

**THE WITNESS: I have not, although I do believe I have a very good understanding of what ought to be in such warnings.**

BY MR. TRIBLE:

Q. Are you aware of any hog farm in the country that provides written warnings to neighbors?

**A. You know, when we did our study for Governor Vilsack, we talked about warnings of neighbors and we talked about that earlier today so we certainly did believe those could be done verbally or they could be done in writing. So we have in our recommendations certainly talked about warnings having to do with CAFOs.**

Q. For communities?

**aware that Murphy-Brown has undertaken any kind of strategy to warn the neighbors.**

Q. Do you know how many people who work for Murphy-Brown are the neighbors?

MR. KAESKE: Object to form.

**THE WITNESS: I don't know, but they certainly should be warned regardless of whether they work for Murphy-Brown or not.**

BY MR. TRIBLE:

Q. And I'm just asking how many you understand.

So who gets warned? Is it everyone who lives within a mile, everyone who lives within two miles, everyone who lives within three miles?

**A. I think Murphy-Brown should look at the literature, should carefully consider who is adversely affected based upon the literature which has been testified to by me and many others in this case, Steve Wing, Kendall Thu, and then Murphy-Brown could draw up a reasonable and defensible policy on warning based on those data.**

Q. Well, I'm just asking you what is your

**increased risk. And I think, you know, whether you post it as a public health hazard, there's some judgment as you go into where you draw the line there.**

**So I don't want to -- I think it would be a mistake to ignore the, I think, very, very good public health research that shows childhood asthma risk may be elevated even further, but I think for adults and the majority of individuals, something like a mile and a half would be to me a better -- perhaps a -- if I were the public health officer, okay, writing this notice, I would be more comfortable with that.**

BY MR. TRIBLE:

Q. And your opinions as they relate to public health hazards, are those just for these nine farms, or would the same public health hazards exist in your opinion for anyone who lives within a mile and a half of any hog farm in Eastern North Carolina?

**A. I think any hog CAFO in Eastern North Carolina I would probably apply the same public health hazard recommendation to.**

Q. In your experience, are emissions less the further away you get from the farm?

MR. KAESKE: Object to the form.

**THE WITNESS: The plume, if you're the plume arising from a CAFO, as it passes over distance, the concentration of the pollutants within the plume will dissipate, and some dissipate more quickly than others, but certainly distance is a major factor.**

BY MR. TRIBLE:

Q. So for example, I know you've done work related to occupational exposures. Occupational exposures are different in intensity and duration than any exposures that may happen for people who live a half a mile away?

**A. I think that's true, and we talked about that earlier, that one cannot extrapolate an occupational exposure and say, well, just because workers working in the CAFO get exposed to this, then the people in the community get exposed to the same levels. They certainly may well be exposed and often are exposed to the same types of pollutants but at typically a much lower concentration.**

| Name | Page | Line | Statements |
|---|---|---|---|
| Annie Hayes | 6: | 22-23 | What's the worst part about living so close to the hogs? |
| 6/9/2016 | 7: | 3 | Just the smell and the flies. That's the most. |
| No medical exhibits | 7: | 4 | How would you describe how that makes you feel? |
| | 7: | 5-7 | Well, it makes me sick, the smell do, and the flies is aggravating. That smells it seem like it comes in my throat and it makes me gag. |
| | 7: | 14-15 | Can you describe what the issue is there with the flies? |
| | 7: | 16-18 | As far as me being there? They just around the house all the time. The porch, around the door waiting to get in. |
| | 7: | 19-20 | Are you claiming that you have any medical conditions caused by the hogs? |
| | 7: | 21-22 | I have conditions. I can't say that they're caused by the hogs. |
| | 7: | 23-24 | Do you have any physical effects or symptoms that you think are caused by the hogs? |
| | 7: | 25 | Well, all I'm a say is that that gagging, I know that come from the hogs because if the odor is not there I don't do it. Just when the odor is there. |
| | 8: | 3-4 | Have you ever spoken to your doctor about the physical effects that you think are caused by the hogs? |
| | 8: | 5 | No. |
| | 8: | 6 | Why not? |
| | 8: | 7-8 | Well, I feel like there ain't nothing they can do about an odor. |
| | 8: | 9-13 | At the end of the case the judge is going to tell the members of the jury that substantial interference means significant annoyance or material physical discomfort. Have the hogs substantially interfered with your use and enjoyment of your property? |
| | 8: | 15 | Yes. |
| | 8: | 17-18 | Have they caused you significant annoyance or material physical discomfort? |
| | 8: | 20 | Yes. |
| | 8: | 22-23 | Can you describe that some more for me, please; how the hogs have interfered with your property? |
| | 8: | 24-25 | Well, I'm a kind of person like to be outside. I got grandchildrens. We like to get out in the yard and do things, but now we can't do it like we used to. We have to pick a good day and that's not many. They like to get out in the yard and ride bikes and scooters, and do stuff out there in the yard and I'm always out there with them, but now we have to be inside and that's made a big difference. We have cookouts and stuff, we can't do that anymore. |
| | 161: | 17-19 | When was the most recent time that you had an outdoor gathering at your house with family members or whoever? |
| | 162: | 7-8 | It's been awhile. I know we tried and the flies were so bad we had to move it inside. |
| | 166: | 17-18 | Now, when you're inside does the odor come inside? |
| | 166: | 19 | It have. |
| | 177: | 6-7 | Are you claiming that you have developed any medical condition from living near the farms? |
| | 177: | 9 | No. |
| | 177: | 11-12 | Do you believe that living where you live is a health hazard? |
| | 177: | 13 | Yes, I think it could be. |
| | 179: | 3-4 | How related to your health, are you making any claims in this lawsuit? |

EXHIBIT
Merchant

| Name | Page Line | Statements |
| --- | --- | --- |
| | 179: 5-8 | Not related to my health but I will say that that odor makes me gag, and I know it's that because the odor's not there I don't gag, but if I am walking out there or smell it, it makes me gag. |
| | 179: 9 | How often do you gag? |
| | 179: 10-11 | Every time I smell it. When I'm in the house I don't do it |
| | 179: 19-20 | Now, is that the only symptom that you believe is related to the farms? |
| | 179: 21 | And my headaches. |
| | 179: 22-23 | Headaches. And how -- why do you believe your headaches are associated with the farms? |
| | 179: 24-25 | Because it starts when I -- when the odor is present, they starts. |
| | 180: 1-3 | Is there anything else that you think related to your health that is being caused by the farms being near you? |
| | 180: 4-6 | I can't say that. I mean, I have problems but I'm not going to say it's the hog facilities, because I don't know that. |
| | 180: 9-10 | What other health conditions are you dealing with right now? |
| | 180: 11 | I'm a diabetic and blood pressure. |
| | 180: 14-15 | You don't contend that any of those conditions have been caused by the farms? |
| | 180: 16 | No. |
| | 182: 8-9 | Now, have you ever seen a physician about the gagging or the headaches? |
| | 182: 10 | No. |
| | 183: 1-2 | Now, are you claiming that the farms have caused you any emotional distress or stress? |
| | 183: 3 | Yes. |
| | 183: 4 | Can you explain that to me? |
| | 183: 5-9 | Because they have took away my privilege, some of my privileges like being out in my yard doing what I want to do when I want to. And I can't go out there with my childrens like I want to anymore and that worries me, it bothers me. |
| | 183: 10-11 | And have you seen any doctor about any stress or anything? |
| | 183: 16 | Dr. Lewis, Christina Lewis. |
| | 184: 7 | Did you mention the hog farms? |
| | 184: 8 | No. |
| | 194: 18-19 | Have you -- are you contending the farms have cause you to incur any medical bills? |
| | 194: 20 | No. |
| **Dominique Woodard** | 8: 21-22 | Could you describe what it's like living so close to the hogs? |
| **8/3/2016** | 8: 24-25 | It's very uncomfortable. It's highly annoying. Sometimes I lose sleep. |
| **No medical exhibits** | 9: 3-4 | And what, if anything, bothers you from the hogs? |
| | 9: 8-11 | Not only the smell, but you can also hear the hogs squealing and stuff, like from the plant; flies, there's just a lot of flies; the truck noises, stuff like that. |
| | 9: 15-16 | Are you claiming you have any medical conditions or diseases cause by the hogs? |
| | 9: 17 | No. |
| | 9: 18-20 | have you suffered any physical discomforts from the hogs? |

| Name | Page Line | Statements |
|---|---|---|
| | 10: 1-10 | When you walk outside -- I mean, okay, when you're inside, everything is all good because you know you're in your home, you're in the AC; but once you step outside, whenever it is smelling bad, it will make your stomach turn, it will make you want to just throw up. It gives you headaches. You have to, you know, hold your nose because, you know, it just stinks so bad. It changes my mood, like it makes me not even want to be in the area anymore. It's just terrible. |
| | 12: 17-18 | Have the hogs caused you material physical discomfort? |
| | 12: 19 | Yes. |
| | 201: 6-7 | Now, as I understand it, you're not making any medical claims, is that correct? |
| | 201: 8 | Yes. |
| | 201: 9-12 | All right. Do you believe that when you live at your parents' house, that you're exposed to some things that are hazardous to your health? |
| | 201: 12 | I don't know. I'm not a doctor. |
| | 201: 23-24 | Do you have any fears that living near hog farms could be hazardous to one's health? |
| | 201: 25 | Of course. Who wouldn't? |
| | 202: 1 | What is your basis for that belief? |
| | 202: 5-7 | Whenever you smell all the feces and waste and all that stuff, you're breathing all that stuff in, who knows what that could do to your health. |
| | 203: 18-19 | Do you experience headaches related to odor? |
| | 203: 20-25 | I'm pretty sure everybody in the world gets headaches. I'm not saying that it came -- it comes from, you know, the smell of the hogs, but, you know, during the times whenever I do smell it, I do get headaches. It -- it hurts my head. It also make me nauseous. You know, I also get -- my eyes start to water. It just mess up my whole mood for the day until I get away from the smell. |
| | 204: 3-4 | Do you have headaches when you are not experiencing any odor? |
| | 204: 5-6 | When I'm not experiencing odor? Like I said, people get headaches. I'm human. |
| | 204: 7-8 | Have you ever gone to a doctor about headaches? |
| | 204: 9-10 | Why? When I could just take Tylenol, right? |
| | 204: 13-14 | Have you ever gone to the doctor when you've felt nauseous? |
| | 204: 15-17 | Why? Why would I go to the doctor if I feel like I fixing to throw up or something? I could just drink ginger ale or something. |
| | 204: 18-19 | Have you ever gone to the doctor about your eyes watering? |
| | 204: 20 | I could just wipe my eyes. |
| | 205: 15-17 | Are there any other physical symptoms that you feel like you experience that are related to hogs? |
| | 205: 19-20 | Whenever I'm dealing with hogs? My nose get runny. |
| | 206: 1-4 | Have you ever gone to see a doctor about runny nose? |
| | 206: 6-7 | No. I just grab a tissue, you know, blow my nose, usual stuff. |
| | 206: 8-9 | Do you get a runny nose when you're not experiencing odor? |
| | 206: 10 | Probably when I'm cold. |
| | 206: 22-23 | Are you claiming that the hog farms cause you any emotional distress? |

| Name | Page Line | Statements |
|---|---|---|
| | 207: 3-12 | I could be in my room and then, whenever I go outside to, like, catch the bus and wait out there for the bus, I'm just standing there in the smell and it just brings so much anger over me and it makes me feel really annoyed that I have to sit there and smell that horrible stuff. It's like, there's nothing you can do. You can probably put your shirt over your nose to, you know, prevent it from, you know, going into your nostrils, but don't really help as much. |
| | 208: 10-13 | Have you ever gone to see a therapist or a psychiatrist or a psychologist for stress or emotional distress that you think is in any way related to hog farms? |
| | 208: 14 | Huh-uh, actually no. |
| | 239: 4-5 | Do you have any bodily injury as a result of the hog farms? |
| | 239: 7-9 | How can you get bodily harm from a hog farm that's across the street? How can I get harmed by that? |
| **Edith Saunders** | 8: 2-4 | Can you kind of describe what it was like living in your community before those hog operations started? |
| **8/8/2016** | 8: 6-14 | Yes. It was very comfortable. We had a lot of activities that we, you know, sit outside and we enjoy family picnics and family gatherings, but then the flies and the smell and the buzzards and different things like that, we stopped because we was uncomfortable. It was uncomfortable. The whole neighborhood had a complaint, you know, we used to do a lot of stuff in the neighborhood and we don't do it anymore like we used to. |
| **No medical exhibits** | 8: 16-17 | What type of things did the hog operations prevent you from doing? |
| | 8: 18-25 | Having a lot of our activities. For example, my grandson, when he graduated, we couldn't do his graduation dinner there because of, you know, the flies and the smell, and it was sort of like embarrassing, you know, for the incident. We took it from my home to Wallace where his mother lived, but normally we usually try to do it at -- you know, at my house because it was more convenience for all of my family, so we took it there. |
| | 12: 2-4 | Do you ever experience any physical discomfort when you're outside on your property and smell the odor? |
| | 12: 5-13 | Yes, yes, I have, yes, I do. I have also -- like you want to vomit but you don't, and as a matter of fact, I'm concerned about it when I went to go Goshen Medical, one of my doctors, I had asked her about it if it had -- does she think it had anything to do with the smell because I had hog farms across from my home, but she didn't seem to know much about that, so she was the only one that I discussed it with as far as doctor-wise. |
| | 12: 14-15 | Do you think hogs ever interfere with your sleep or wake you up at night? |
| | 12: 16:25 | Yes, sir. As a matter of fact, they come -- most of the time they wake us up, it's about like quarter to 2:00, 2:00, 3:00 in the morning. You can hear the hog trucks come in going out. And my bedroom window is right to the street where the hogs come out. Trucks come out<br>with the hogs and the light comes right through my<br>bedroom, right through my bedroom, and it looked like a bright, you know, big -- you know, like somebody just sitting there with the lights on. |
| | 88: 19-20 | Do you have any basketball hoops or anything in the yard like that? |

| Name | Page Line | Statements |
|---|---|---|
| | 89: 1-13 | No.... the children were always complaining about the smell, the flies. You know, even my three-year-old, my little three-year-old granddaughter, she comes outside and she even noticed the smell, "Grandma, what's this smell? It stinks out here." |
| | 92: 9-11 | And have you ever expressed to Santana any concerns that you may have regarding her daughter's health while on your property? |
| | 92: 12-15 | Yeah, because I -- I talked about my health, baby -- granddaughter health and anybody else. You know, breathing the smell in, yes, I have. Have concern about it. |
| | 92: 19-20 | When did you talk to Santana about it? |
| | 92: 23-25 | Especially when Blythe was smelling -- she said, "Grandma, it stinks out here," and that was one of the concerns. |
| | 94: 5-8 | And when did you first start -- start having those symptoms that you talked to [a doctor] about that you were asking whether they were related to hog farms? |
| | 94: 9-23 | I've had, you know, the symptoms a while, but I just thought maybe it was contributing to that because a lot of times, I notice if I, you know, was in the house or something, I -- you know, I didn't have the cough and stuff, so I was just concerned about it. Like when I go outside and the smell would be so strong, and I'm -- I guess, coughing, is probably because, you know, you're smelling the scent and that problem make you cough, to my knowledge. And so I kind of got a little concerned, and she was my regular, you know, yearly checkup doctor, so I just happened to bring that -- you know, bring that question up to her to see if maybe -- you know, have a concern about it. |
| | 109: 9-10 | Are you claiming any personal injury that the farms have caused you? |
| | 109: 11 | No. |
| | 109: 12-13 | And you're not claiming that the hog farms have caused you any medical conditions? |
| | 109: 14 | No. |
| | 109: 15-18 | And when you do experience some of the symptoms that we've talked about, how long have you been outside before you begin to experience those -- those symptoms? |
| | 109: 19-25 | A lot of times when I'm walking around in the yard or doing something, you know, and it's not all the time, that whenever I do smell the smell or whatever, it's not all the time that I, you know, I cough or something like that. I do get nausea, you know, a lot, and not every time do I do that, but occasionally, you do -- I do. |
| | 110: 10-12 | But sometimes I think you said -- sometimes the smell will be there and you won't have those symptoms; is that correct? |
| | 110: 13 | Oh, yes, absolutely. |
| | 184: 10-12 | Has your granddaughter ever had any physical reaction when you've been outside and smelled an odor? |
| | 184: 13-14 | No more than, "Grandma, it stinks out here." |
| | 185: 8-9 | Now, are you suing about any of the concerns you have about your health? |
| | 185: 10 | No. |
| | 185: 11-14 | And are you suing about any of the concerns or fears and medical conditions any of your family members or anyone coming on to the property may experience? |
| | 185: 16 | No. |

| Name | Page Line | Statements |
|---|---|---|
| | 185: 18-22 | I think you mentioned coughing and nausea. Are there any other physical symptoms that you've experienced other than coughing and nausea when you've experienced odor on the property? |
| | 185: 23 | No. |
| | 186: 11-12 | Are you claiming that the hog farms have caused you any emotional distress? |
| | 186: 14 | No, sir. |
| | 187: 14-16 | And you're not claiming any -- that any medical bills were incurred because of hog farms, are you? |
| | 187: 17 | No, sir. |
| | 192: 15-17 | When your children were growing up on Highway 11, did any of them have any physical symptoms related to hog farms? |
| | 192: 18-22 | Not -- not no -- not no physical symptoms, no, that sent them to the ER. They might have gotten a little sick or feel a little bad, a little nauseous from the smell. But other than that, no. |
| | 192: 23-25 | Did any of your children ever complain to you about being nauseous related to odor? |
| | 193: 1 | Yes, yes. |
| **Eunice Anderson** | 5: 19-20 | And what kind of nuisance are you claiming that the hog farm has caused? |
| **8/4/2016** | 5: 21-24 | The odor ... and the flies. |
| **No medical exhibits** | 9: 16-17 | Did those hog operations change your community in any way? |
| | 9: 19-24 | Yes, it did, very much so. You couldn't plan picnics because you didn't know when the odor was going to come. You couldn't go out to sit. I couldn't take my mother outside to get sunshine because of her condition. I couldn't sit outside myself because of the odor. |
| | 10: 18-20 | When you're outside on your property, and you -- and the odor is present, do you ever experience any physical discomfort? |
| | 10: 21-25 | Yes. Headaches. Sometimes, you know, if the odor is real bad, my stomach -- feel like it start, I guess, turning, and I find myself -- sometimes I regurgitate or do something of that sort. And sometimes breathing would be kind of hard, you know, with the odor like it was, and it was just a nuisance. |
| | 11: 3-4 | Now, did you ever talk to any of your medical providers about the hogs? |
| | 11: 5 | No. |
| | 11: 6 | Why not? |
| | 11: 8-11 | Because I knew they couldn't do anything about it, so why talk to them. You know, they wouldn't know anything about the hog farm or the odor that was coming from the hog farm. |
| | 13: 23-24 | Have they caused you significant annoyance or material physical discomfort? |
| | 13: 25 | Yes. |
| | 183: 15-16 | How often do you smell any odor if you're outside? |
| | 183: 17-22 | As I told you, usually the odor -- if one of those big trucks come along, they're going to leave an odor wherever they go, whenever they go -- come through. Or if it rains, or cloudy, you smell the odor. So those are the -- those are the times that I usually smell it. |
| | 228: 3-5 | And none of the medical conditions we just discussed, you're not claiming that hog farms in any way caused those, are you? |
| | 228: 6 | No. |
| | 228: 7-8 | Are you claiming that the hog farms cause you any physical symptoms? |

| Name | Page Line | Statements |
|---|---|---|
| | 228: 10-15 | Well, I don't guess you call it after you stay out -- if you stay out long enough it can cause it to affect your breathing. Would that be -- I don't know whether that's physical or not, the breathing part, staying out and breathing in that odor. |
| | 228: 17-19 | How long do you have to be out there before you feel like you have difficulty breathing? |
| | 228: 20-24 | Less -- 30 minutes or more. I don't know if that would be physical. Just make you sick on the stomach and we start, you know, regurgitating. I don't know whether that's physical or not. |
| | 228: 22-23 | And you say you experience nausea? |
| | 228: 24 | Yes. |
| | 229: 13-14 | When was the last time you vomited? |
| | 229: 15-16 | Well, that's been a good little while ago. |
| | 234: 21-23 | Are you claiming that the hog farms have caused you in any way to have emotional distress? |
| | 235: 9-17 | Are you saying am I claiming that any emotional distress? I would say, yes. You know, if I'm out having a cookout and all of a sudden it start smelling and all my guests want to know what's going on on the outside, it causes my emotions, I become disturbed, and maybe I become distressed about it. But it's not something that I think is going to affect me over a period of time. |
| | 236: 4-5 | And do you fear for the health of others living in the area related to hog farms? |
| | 236: 6-10 | Yes. Well, the health of others -- I don't know about the health of others. But I fear -- I would I hate to know that they're going through the same symptoms that I have gone through or are going through. |
| | 236: 11-13 | For the people that come visit you, do you fear for their health when they're on your property? |
| | 236: 14-16 | Well, if they were going to be there over a period of time, like a long period of time, but just for a few hours, no, I don't fear. |
| | 237: 17-19 | So are any fears about your health or fear of health effects of hog farms on others, are those part of your lawsuit? |
| | 237: 20-21 | No. No. The lawsuit is about my discomfort. |
| | 262: 13-14 | And are you claiming that you've incurred any medical bills because of hog farms? |
| | 262: 15 | No. |
| **Evelyn Woodard** | 6: 12-13 | And can you describe where the hogs are in relation to your property? |
| **8/4/2016** | 6: 14 | Right across the streets. |
| **No medical exhibits** | 6: 15-16 | Were you living on that land before the hogs came? |
| | 6: 17 | Yes. |
| | 6: 18-19 | Could you tell the jury what the worst part about living so close to the hogs is? |
| | 6: 21-22 | The odor, the flies, the trucks. |
| | 6: 24-25 | And were those types of things that you've just said, were those a problem on your property before the hogs came in? |
| | 7: 2 | No. |
| | 7: 11-12 | And how did the hogs coming into your community change your community? |

| Name | Page Line | Statements |
|---|---|---|
| | 7: 16-22 | Well, we got -- I see flies, buzzards, hog trucks that'll go down the road. You smell that scent for at least about 10 to 12 minutes. Can't hang out clothes. The children complaining about they can't go outside half of the time because they -- they friends say that, you know, they rather sit in the house because of the odor. |
| | 7: 23-24 | Are you claiming you have any medical conditions or diseases cause by the hogs? |
| | 7: 25 | No. |
| | 8: 3-4 | Have you ever spoken to your doctor about the hogs? |
| | 8: 5 | No. |
| | 8: 6-7 | Have you ever suffered any physical discomforts from the hogs? |
| | 8: 13-16 | When that odor is real bad, I, you know, get nauseated, you know, and then my -- your -- my eyes run, nose run, throat itches. And then I be stressed out a lot, and it make me sad. |
| | 8: 23-25 | How is it that you know that the physical discomforts that you've just described are caused by the hogs? |
| | 9: 1-7 | Well, like I said, you know, I can go outside, some -- you know, when the odor's not bad, I don't have that problem. But when that odor is real bad, my eyes start running, I feel sick on the stomach, and throat itching, scratchy, you know, and then you got to get back inside to try to revive yourself. |
| | 10: 16-17 | Have [the hogs] caused you significant annoyance? |
| | 10: 19 | Yes. |
| | 96: 4-5 | Have you ever been at Ms. Hayes' home and smelled the hog odor? |
| | 96: 8-12 | Yes ... It was kind of strong, because I said, boy, you can smell that stuff way down here. And she said, yeah, because she live further down, you know, off the highway. And I said, boy, it strong today. She said, yeah, it strong. |
| | 114: 2-3 | And where were you when you observed the odor on the 13th? [reviewing her odor diary] |
| | 114: 4-7 | In Shatinah's bedroom. I was trying to -- I got -- I had the window lifted up and then all of a sudden that odor started rushing in so I put it back down. |
| | 158: 11-13 | Can you please describe the physical symptoms that you believe are caused by the hog farms? |
| | 158: 14-18 | My nausea, you know, when -- like I said, when the odor is real bad, it just feels like I'm tasting it. It feels like it's going in my mouth, you know, and it makes me feel bad, sick on the stomach. |
| | 159: 20-22 | Can you tell me about other physical symptoms that you experience that's caused by the hog farms? |
| | 159: 23-25 | Like when I'm -- like -- like I said, when the odor is bad, my head start hurting, my nose go to running, eyes running and burning. |
| | 163: 19-21 | how would you describe the odor that caused your eyes to run and burn last week? |
| | 163: 22 | It was high, strong. |
| | 163: 23-24 | Will a milder odor cause your eyes to run and burn? |
| | 163: 25 | No, not like that strong odor. |
| | 164: 1-3 | What about a runny nose? Is only strong odor associated with it, or can a milder odor cause your nose to run? |
| | 164: 4 | A stronger odor. |
| | 164: 10-12 | What about the nausea, will only a strong odor cause that, or can a milder odor cause the nausea as well? |
| | 164: 13 | The strong odor. |

| Name | Page Line | Statements |
|---|---|---|
| | 166: 11-12 | Let's start with the fear. Tell me about the fear that you experience. |
| | 166: 13-15 | You know, like I said, you don't know what kind of disease they might carry in the long run. You can't pinpoint nothing, you know. |
| | 167: 14-15 | When's the last time that you got very upset for that reason? |
| | 167: 16 | Been about a month ago. |
| | 167: 17-18 | And what was happening then that caused you to get very upset? |
| | 167: 19-25 | I had put a bedspread out on my ... porch ... after I washed it to let it dry out because it's kind of heavy to go in my dryer, and I had to wash it all over again. And then I ended up carrying it to the laundromat .... |
| | 168: 6-7 | Can you describe the anxiety that you experience? |
| | 168: 8-14 | Hearing them big trucks slowing down, you know, stopping all time of night. And one day I was -- me and my husband was turning in our driveway and the whole trailer came from up under one of them Murphy-Brown trucks. And if he was going a little bit faster when he lost that trailer, we would have been probably dead around about now. |
| | 170: 20-23 | Has any doctor ever told you that the physical symptoms you just described, nausea, headaches, runny nose, runny eyes and cough were caused by the hog farms or hog farm odor? |
| | 170: 24 | No. |
| | 175: 2-4 | Did you ever talk to a doctor or a mental health professional about the anxiety that you experience because of the hog farms? |
| | 175: 5-7 | I had asked the doctor, you know, could that noise cause it, and they said they really didn't know. |
| | 185: 9-10 | And when [the hog trucks] leak, how does that prevent you from enjoying your home? |
| | 185: 11-14 | If it didn't leak and get on down the road, [the odor] will last for about, I'd say about a good ten minutes; but if that stuff leaking, it lasts a good little while. |
| | 186: 1-3 | Other than the odor, are there other ways that the hog trucks interfere with your enjoyment of your home? |
| | 186: 4 | That noise. |
| | 191: 14-18 | Do you believe that you've had any medical bills that were caused by the hog farms, for example, medical bills for the physical symptoms you talked about earlier or medical bills for fear and anxiety that you talked about earlier? |
| | 191: 19 | No. |
| **Jerry Boney** | 6: 11-12 | Can you describe where the hogs are in relation to your property? |
| **8/23/2016** | 6: 13 | Yeah, back of my house. |
| **No medical exhibits.** | 6: 24-25 | What's the worse part about living so close to the hogs? |
| | 7: 1 | That smell. |
| | 8: 7-9 | Mr. Boney, are you claiming that you have any medical conditions or diseases that are caused by the hogs? |
| | 8: 10 | No. |
| | 8: 11-12 | Have you ever spoken to your doctor about the hogs? |
| | 8: 14-16 | Now, are you claiming that you have any -- that you've suffered any physical discomfort, though, from the hogs? |
| | 8: 17-19 | Nothing but the smell, I be cutting grass back there and you can smell it. My eyes run water. |
| | 8: 13 | No, sir. |
| | 10: 12-13 | Have they caused you significant annoyance? |
| | 10: 15 | Yes, sir. |

| Name | Page Line | Statements |
|---|---|---|
| | 88: 12-14 | In your lawsuit, are you claiming that the farm has caused you to suffer any medical condition or physical injury? |
| | 88: 16-15 | It might get me down the line, but I don't ever know. |
| | 88: 17-20 | But in terms of what your lawsuit's about, I think you told them that you're not claiming that the hog farm has caused you any physical injury or medical condition? |
| | 88: 22-23 | Cutting grass, used to burn my eyes back there. |
| | 112: 4-5 | Have you ever talked to Dr. Blair about hog farms? |
| | 112: 6 | No. |
| | 112: 7-9 | Have you ever asked ... him or her whether any of the medical conditions you have are related to hog farms? |
| | 112: 10 | No. |
| | 112: 11-13 | And that one time when you had the burning eyes, did you ever go see Dr. Blair about that? |
| | 112: 14 | No. |
| | 127-28: 25-2 | And you're not claiming that you've incurred any medical bills as a result of the hog farms, are you? |
| | 126: 3 | No. |
| **Earnestine Phillips** | 9: 2-3 | How did the hogs coming in change your mother's community? |
| **(for Mae Mazyck)** | 9: 7 | It smells. It stinks. |
| **8/29/2016** | 9: 18-19 | Do you know if your mother has any medical diseases that she believed were caused by the hogs? |
| **No medical exhibits** | 9: 21 | I don't know. |
| | 9: 23-24 | To your knowledge, does she ever suffer from any physical discomforts related to the hogs? |
| | 10: 1-4 | Yes. She has nausea. She -- sometimes she can't sleep. She has headaches. Just overall discomfort. It makes her irritable. |
| | 57: 10 | Have you asked her about the lawsuit? [i.e., did Ms. Phillips, the deponent and guardian, ask Ms. Mazyck, the incompetent Plaintiff). |
| | 57: 11-20 | I asked her, you know, what did it entail, you know, because I'm taking over so many ... things for her .... I learned that the reason she doesn't go out as much as possible sitting on the front porch is because the smell makes her sick, nauseated. |
| | 58: 3-4 | [Tell me about] [a]ny complaints she has at all, whether or not it affects her health. |
| | 58: 5-11 | Well, she complain about the flies. She complain also about the fact that she can't hang clothes on the line. I'm trying to remember what else. She complains, of course, about her garden, because she had her garden and she stopped keeping her garden because of weeding and having to spend time out there. |
| | 58: 15-16 | What did she tell you about the smell? |
| | 58: 17-18 | She just said the smell makes her feel sick, nauseated, like she wanted to regurgitate. |
| | 113: 16-18 | Are there any other symptoms that she's had that you believe are associated with the farms? |
| | 113: 20-24 | I can't say anything -- anything medically associated with anything. I just -- I just know when she feel nauseous, usually when she feel nauseous, it's after inhaling the stench. |
| | 116: 13-15 | Have you talked in any of those medical appointments with doctors about living near hog farms? |
| | 116: 16 | No. |
| **Nicholas Woodard Jr.** | 6: 4-5 | Was your family living on that land before the hogs came? |
| **6/1/2016** | 6: 6 | Yes. |

| Name | Page | Line | Statements |
|---|---|---|---|
| **No medical exhibits** | 6: | 7 | How close do you live to the hogs? |
| | 6: | 8-9 | It's right diagonal from my street -- from my house. |
| | 6: | 18-19 | What's the worst part for you about living so close to the hogs? |
| | 6: | 20-24 | The odor. Sleepless nights dealing with the hogs. I mean, the trucks going in at night, banging, making a ruckus. It's hard for me to sleep, harder to try to do my groundwork in my community. It's just awful. |
| | 7: | 11-12 | Now, you're not claiming any medical conditions caused by the hogs, correct? |
| | 7: | 13 | No, sir. |
| | 7: | 14-15 | But do the hogs ever cause you physical effects or discomfort? |
| | 7: | 17 | Discomfort, yes. |
| | 7: | 19-20 | How do the hogs cause you physical discomfort? |
| | 7: | 21-25 | As far as I have a head infection -- sinus infection. I mean when the odor is real, real bad, it tends to flare up. I mean sneezing, coughing. I mean nausea. I mean the odor itself can trigger my allergies. |
| | 8: | 1-2 | And how do you know that it's the hogs that are causing this flare-up that you're talking about? |
| | 8: | 3-4 | Because of the odor of the hog farm on the facility. |
| | 9: | 19-25 | Now, at the end of the case, the judge is going to tell the members of the jury that "substantial interference" means a significant annoyance or a material physical discomfort. Have the hogs substantially interfered with your use and enjoyment of your property? Have they caused you significant annoyance or material physical discomfort? |
| | 10: | 2-12 | Yes. As far as when coming up, getting picked on because the odor itself, kids be picking on me saying, "Oh, you stink. Oh, you stink." I try to tell them, I mean, "It's the odor outside, it's the odor outside," constantly when I'm coming up. And then I remember one time my family was putting a get-together for my mom. She had breast cancer. I mean, some people had left because we ain't had that much room in our house to be a host for the -- for our mother's breast cancer awareness party. |
| | 113: | 15-16 | Have you seen any doctor, other than a Marine Corps doctor, since you got out of high school? |
| | 113: | 17 | No, sir. |
| | 116: | 17-18 | You never had some doctor test you and say, "This is what you're allergic to"; is that right? |
| | 116: | 19 | No, sir. |
| | 116: | 20-23 | But you do know there are some things that may cause you to have what we all think of as like allergic reactions?· Your nose may get runny or something like that, headache or something? |
| | 116: | 24 | Yes. |
| | 116: | 25 | And you know from your body that you can have those even when you're nowhere near the hog farm? |
| | 117: | 2 | Yes. |
| | 117: | 3-8 | And you're saying sometimes you have them and you're also near the hog farms? Or you tell me what you're saying. You know you can have them when you're nowhere near the hog farms. Tell me how you believe they can in any way be related to the hog farms. |

| Name | Page Line | Statements |
|---|---|---|
| | 117: 10-24 | As far as, you know, the spraying, the strong odor, I mean, when the strong odor hits my nose, I mean, well, you can't smell fresh air. I mean, the odor's right there in your face. It's like breathing. [Witness makes sound.] I mean, it's right there in your face. It's like then you go outside, you feel perfectly normal. I mean, it happens from time to time. I mean, when the odor gets bad, it gets bad, that's when my allergies really kick in like that. But when it's less of it, I can endure it. But when it gets heavy and it's in my face like an atomic bomb, you know, I'm going to be able to sneeze, cough, and have a stuffy nose.· You know, that's all I know for right now. |
| | 118: 10-12 | You say at times when it gets bad. What is it that you're around or what's going on when it gets bad? |
| | 118: 13-21 | I mean, like I said, when it's bad, it's bad. I mean, it's -- when -- you know, you can't tell when it hits you. All you know, it's there. And then once you get a whiff of it -- you know, a little smell doesn't bother me. But when it's heavy, heavy, and it's going constantly -- not constantly on and off, but it's, you know, there and it's heavy, I mean, I'm pretty sure it's going to mess with you any kind of way. |
| | 201: 20-23 | As a part of your lawsuit, are you attempting to receive compensation for any physical injury to you, any health condition that you contend is caused by living in a community that has hog farms? |
| | 202: 2-7 | As far as that goes, I mean, trying to -- it's an annoyance. I mean, yeah, I mean, dealing with the smell from time to time, I mean, yes, it's an annoyance, it's undearable. If you were to experience it, you would be complaining about it too and trying to do the same thing I'm doing right now. |
| | 202: 12-14 | But you have not gone to any doctor indicating that you have a concern from your health as a result of where you live; is that right? |
| | 202: 15 | No, sir. |
| | 202: 16-18 | And no physician, no doctor has ever told you that your health is at any risk as a result of living near hog farms, correct? |
| | 202: 19 | No, sir. |
| | 203: 9-11 | Your lawsuit does not contend that your physical health is at risk as a result of living near hog farms, correct? |
| | 203: 13 | Yes [agreeing]. |
| **Nicholas Woodard Sr.** | 6: 14-15 | Can you just briefly state ... what problems, if any, the hogs have caused? |
| **8/2/2016** | 6: 17-25 | Well, the hogs have caused -- at night, sometimes you can hear the banging of the trucks coming in to get the dead -- the dead hogs, and in the morning times and the evening times, you can't tell when it's going to be.· They're always banging when they do come. It's something about those trucks that really wakes you up when you're asleep. They scare you when you're up during the daytime. |
| **No medical exhibits.** | 7: 1-12 | [continuing] And then you have the feed trucks. The feed trucks come around the curve -- I live around the curve. They come in, and they'll put on the jake brake and slow down around the curve, and that's annoying. Then you have the smell. The smell occurs any time. Then you have the buzzards. The buzzards come in like airplanes. They all over the place. Then you have the mosquitoes. Then you have the flies. Then you have, sometimes, the dogs. |
| | 9: 20-21 | Mr. Woodard, are you claiming to have any medical conditions caused by the hogs? |

| Name | Page Line | Statements |
|---|---|---|
| | 9: 22 | No. |
| | 10: 4-5 | have the hogs ever caused you to feel uncomfortable? |
| | 10: 6 | Oh, yes. |
| | 10: 9 | Can you describe that for me? |
| | 10: 11-25 | Well, when you wake up every morning -- when they start squealing, you know. These pigs squeal, and I can hear them all the way from my house. And they squeal and they squeal and they squeal and they squeal. Then this truck will come in early in the morning at 4 o'clock, sometimes 3 o'clock, sometime 2 o'clock, and you hear something like a bomb go off. And it wakes you up out of your sleep and you think somebody's shot you. Then you'll hear a -- you'll hear a generator. You'll hear a generator going sometimes all night long. Then you hear a truck squealing because he missed the turn. Then sometime you will hear a dog barking because he's running behind a hog. And then sometime you'll be outside and you'll get a flood of nothing but funk rushing all the way through the whole community. And then sometime you will see nothing but buzzards running all over the neighborhood. |
| | 11: 13-14 | Are there any other physical discomforts caused by the hogs? |
| | 11: 16-22 | Well, like I say, if I'm out there, my nose will start running. Sometime I want to throw up from the smell. My eyes start running. And then sometime you can't even breathe because there's some kind of ammonia in that funk. And that funk got something in it that makes you just -- you can't even hardly breathe. |
| | 110: 12-13 | What's your wife like to do around the house? |
| | 110: 16-25 | She used to like to sit on the porch, but she don't sit on the porch no more. Every now and then, she'll sit on that porch, but it's got to be when it ain't stinking because it really messes with her. That scent -- that scent messes with her so that she sometimes gagging. And, you know, it's something to see. And she used to like to be in that yard messing with her -- what you call those things? Her plants. And now, she don't even want to do -- she be with the plants that's inside the house now. |
| | 336: 18-20 | No doctor's ever told you that anything related to hogs could be a health hazard to you, have they? |
| | 336: 21 | No. |
| | 336: 22-24 | Now, are you actually claiming that you've suffered any physical injury associated with the hog farms? |
| | 337: 1 | No. |
| | 346: 13-14 | You're not seeking reimbursement for any medical bills? |
| | 346: 15 | No. |
| | 348: 7-8 | And when you say the funk, do you mean the odor? |
| | 348: 9 | Yes. |
| | 366: 7-13 | Now, when you were asked by counsel if you claim you have any physical symptoms related to the hogs, you said no. But earlier, on direct, you discussed with me the various physical discomforts you experience related to the hogs. Are those physical discomforts related to the lawsuit? |
| | 366: 15 | Yes. |
| | 366: 19-20 | What are the physical discomforts you're claiming in this lawsuit? |

| Name | Page Line | Statements |
|---|---|---|
| | 366: 23-25 | Well, most of the time when I smell that smell, it smell like ammonia. And it makes me -- makes me have shortness of breath and my eyes water, and then my nose will water. And then also I sneeze a lot. You know, I sneeze. And I lose my breath sometime. And I just -- most of the time, when I'm trying to get in the house, you know, it's -- that's the way it is, if it's that real, real heavy -- heavy funk or stink. |
| | 367: 8-10 | Are those all the physical symptoms you're claiming you experience related to the hog farms? |
| | 367: 12 | Yes. |
| **Shatinah Woodard** | 6: 4-6 | Now, to your knowledge, was your family living at 6061 Highway 11 before the nearby hog operations started? |
| **8/3/2016** | 6: 7 | Yes. |
| **No medical exhibits** | 6: 8-9 | And where do you live with respect to where the nearby hog operations are located? |
| | 6: 10-11 | I stay right between Crooked Run and Willow Creek. |
| | 6: 12-14 | Now, can you describe what it's like living in your community by the nearby hog operations? |
| | 6: 15-25 | It's really ridiculous especially with the odor. I remember times especially during school, waking up in the morning, having to see the trucks go by, the buzzards, smelling the pigs and also seeing the flies. I have a one-year-old son. His first birthday was April 8, and we were planning to have his birthday party in the yard, but we didn't know if the smell was going to come or go. We really didn't know what was the conditions going to be like that day. Family gatherings, we really don't have that many of those because of the smell. Family members from up north, they will come down. They wouldn't even want to come to our house because of the smell because of the hog farms. They knew what they were going to be getting into, so they just didn't come our way. They would go to families like Wallace, Wilmington, away from the hog farms, basically. |
| | 8: 23-25 | Now, are you claiming that any medical condition that you may have was caused by the hogs? |
| | 9: 1 | No. |
| | 9: 2-3 | Have you ever spoken to any of your medical providers about the hogs? |
| | 9: 4 | No. |
| | 65: 1-3 | Are there other activities you can think of that the odor interferes with when you're on your property and you're out? |
| | 65: 4-14 | I remember one time we had an Easter egg hunt. I guess it was when I was in middle school, and we had, like, a lot -- well, not a lot -- a couple of my friends over and their little brothers and sisters, and they couldn't like go ·outside and catch -- find the eggs because of the smell, it was like really, really bad. We couldn't do like what we wanted to do. Our plans got ruined, basically, so we had to improvise and bring the kids in, and they had to find eggs in the house. |
| | 122: 15-18 | Every time you go outside and, you know, you're getting in the car or you'd be waiting for the bus, if there was even a slight hint of odor, will that make your eyes water? |
| | 122: 19-21 | No, ma'am. It has to be like strong, like a little -- like it's present, like you could smell it and like my eyes will start watering. |

| Name | Page Line | Statements |
|---|---|---|
| | 127: 8-9 | Have you ever reported the nausea to any of your doctors? |
| | 127: 10 | No, Ma'am. |
| | 128: 1-3 | Are there any other physical symptoms that you think the odor or the hog farms cause otherwise? |
| | 128: 4-9 | Well, hard breathe -- well, trouble breathing, like it would just take, like, my breath away if I, like, smell -- if it be, like, really, really strong. I just have to actually stop and like catch my breath. That's how bad it is. |
| | 131: 7-12 | In your fact sheet you listed stress, anxiety, mood alteration, worry, and fear of other problems. Can you tell me about the stress, anxiety, mood alteration, worry -- can you tell me about generally how the hog farms caused that and what you experienced? |
| | 131: 13-23 | Yes, ma'am. I remember this one time where I was happy, I mean, like everything was going right that day, and then I go outside and my attitude just goes to 100 or whatever because of the smell like hit me out of nowhere. The stress. Yes, it puts a lot of stress on you, especially being, you know, in school, having kids that will pick on you for little stuff. Like, "Oh, well, you smell like the hog farm today. You smell like hog -- the odor is on your clothes," this, that, and the third. |
| | 132: 10-12 | Are there other ways you experience stress or anxiety or mood alteration or worry because of the hog farms? |
| | 132: 13-15 | You worry about if you can go outside and do stuff. If the smell is present, you don't want to be entangled with all that. |
| | 145: 9-11 | Do you think that any of the medical bills you've had were because of the hog farms in some way? |
| | 145: 12 | I don't think so. I don't really know. |
| **Talley Saunders** | 7: 23-24 | And were you and your family living on the property before the nearby hog operations started? |
| **8/5/2016** | 7: 25 | Yes. |
| **No medical exhibits** | 8: 1-2 | Where is your property located with respect to where the hog operations are? |
| | 8: 3-4 | My property is located right across the road going into Crooked Run Farm. |
| | 8: 15-16 | What type of things did the hog operations prevent you from doing on your property? |
| | 8: 17-23 | Well, like, I'm an outside person, I love to sit on the outside and, you know, have cookouts occasionally, but it sort of limit that situation that, you know, I enjoy doing anymore because of, you know, the odor and the flies. It's just a difficult experience than what it was, you know, before the hog farm. |
| | 8: 24-25 | Now, have you ever suffered or experienced any physical discomfort when you're outside and the odor is present? |
| | 9: 2-5 | The only thing outside, you know, feel nauseated sometime, and difficult, you know, like breathing, trying to hold your breath, not inhale, you know, some of the odor. |
| | 9: 6-7 | Are you claiming that any medical condition that you may have was caused by the hogs? |
| | 9: 8 | No. |
| | 9: 9-10 | Have you ever talked to any of your medical providers about the hogs? |
| | 9: 11 | No, I haven't. |
| | 9: 12 | Why not? |

| Name | Page | Line | Statements |
|---|---|---|---|
| | 9: | 13-15 | Well, I felt like it wouldn't do any good, you know, by the hog farm being there, and I never talked to my doctor about that. |
| | 76: | 13-15 | And you talk about -- in fact, I take it when it's the worst, you said earlier that you can feel nauseous? |
| | 76: | 16 | Uh-huh. |
| | 76: | 17-18 | It's never caused you to actually throw up, right? |
| | 76: | 19-20 | No. I just felt weak on your stomach, didn't throw it up. |
| | 77: | 3-5 | In terms of when the odor is the worst, you said you wear a mask. What kind of mask do you wear? |
| | 77: | 6-8 | It's a mask, just to keep -- you know, just a regular mask, it's got a ventilator on it, you know, that you buy from Walmart or whatever. |
| | 112: | 3-5 | Is the -- and you're not asking for any -- you're not claiming that you have any illness so that you would need medical bills paid -- |
| | 112: | 6 | No. |