**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**Case No. 7:14-CV-00180-BR**

| | | |
|---|---|---|
| **JOYCE MCKIVER, et al.,** | **)** | |
| | **)** | |
| **Plaintiffs,** | **)** | |
| | **)** | **MEMORANDUM IN SUPPORT OF** |
| **v.** | **)** | **MOTION TO EXCLUDE** |
| | **)** | **DR. THOMAS N. HUBBARD** |
| **MURPHY-BROWN LLC,** | **)** | |
| | **)** | **Fed. R. Evid. 403, 702** |
| **Defendant.** | **)** | |

**DEFENDANT MURPHY-BROWN LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY OF DR. THOMAS N. HUBBARD**

Thomas N. Hubbard is an economist and professor of management at Northwestern University's Kellogg School of Management. (Ex. 2, Expert Report of Thomas N. Hubbard at 2 ("Expert Report").) As an economist, Hubbard qualifies as an "expert" triggering this Court's gatekeeping function under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* Fed. R. Evid. 702, Advisory Committee Note to 2000 Amendments (explaining that *Daubert* applies to all technical or specialized testimony, including "testimony concern[ing] economic principles").

Hubbard's specialty is "industrial organization, a field that examines how firms compete and how firms are organized," and he "ha[s] a particular interest in the economics of vertical integration." (Ex. 2, Expert Report at 2). Even so, none of his academic research or publications involve agriculture. (Ex. 3, Hubbard Dep. Tr. at 6:17–7:15.) He is admittedly not an expert in the swine industry. (*Id.* at 147:11–13.) The Court should exclude his testimony because his opinions are irrelevant and unreliable.

## ARGUMENT

Federal Rule of Evidence 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

"[D]ue to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quotation marks omitted). Rule 702 accordingly assigns district courts a "gatekeeping responsibility to 'ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 597 (brackets omitted)). "The main purpose" of the reliability inquiry "is to protect juries from being swayed by dubious scientific testimony." *Id.* at 231. Vigorous cross examination alone "does not ensure the reliability of the expert's testimony; such testimony must still be assessed before it is presented to the jury." *Id.* The Fourth Circuit thus recently reversed the admission of testimony by a plaintiff's expert where the district court "did not use *Daubert*'s guideposts or any other factors to assess [its] reliability," and "did not make any reliability findings." *Id.* at 230. "[A]lthough a trial judge has broad discretion to determine reliability in light of the particular facts and circumstances of the particular case," the Court of Appeals explained, "such discretion does not include the decision to abandon the gatekeeping function." *Id.* (quotation marks and citations omitted).

Hubbard purports to "provide economic analysis and opinions as to the vertically integrated nature of the hog production operations and how it relates to Plaintiffs' claims." (Ex. 2, Expert Report at 2–3.) His goal is to opine regarding "the nature, utility and social value of the Defendant's operation." (*Id.* at 5.) Hubbard specifically offers two major opinions: First, that the local community retains a smaller *proportion* of the value created from the swine industry than do other parts of the global supply chain. Second, that Murphy-Brown LLC's ("Murphy-Brown") vertical integration has some effect on externalities from swine manure and odor. The Court should exclude both opinions because they are neither relevant nor reliable.

Moreover, even if Hubbard's opinions met Rule 702's bare minimum relevance and reliability requirements, the Court should still exclude his testimony under Rule 403 because "its probative value is substantially outweighed by" the danger of unfair prejudice. Rule 702 "does not require the admission of all proffered expert testimony; the district judge has broad discretion to decide whether such testimony ought to be admitted as helpful to the jury." *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 323 (4th Cir. 1982). Expert testimony that passes Rule 702 still warrants exclusion if it fails to meet the requirements of Rule 403. *Id.* at 323–24 (excluding expert testimony that risked confusing or misleading the jury); *see also Daubert*, 509 U.S. at 595 (noting that expert witness testimony is subject to exclusion under Rule 403). Rule 403 thus supplies an additional basis for excluding expert testimony, "independent of *Daubert*." *United States v. Sherlin*, 67 F.3d 1208, 1217 (6th Cir. 1995); *see also United States v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994). For all the reasons discussed below, Hubbard's opinions about the swine industry's local value and vertical integration are so flawed that the risk of undue prejudice substantially outweighs whatever arguable probative value they may have.

Finally, the Court should also exclude Hubbard's irrelevant and inflammatory xenophobic references to Murphy-Brown's Chinese corporate great-grandparent, its listing on the Hong Kong stock exchange, and the fact that Murphy-Brown serves customers in China.

## I. Hubbard's opinions about the swine industry's supposedly small benefits to the local community are unhelpful, irrelevant, and unreliable.

Hubbard claims that "very little" of the total economic value created by the North Carolina swine industry "accrues to growers or their employees." (Ex. 2, Expert Report at 9.) In his opinion, "much more" of that value accrues to Murphy-Brown and its corporate great-grandparent, WH Group. (*Id.*) "Most of the beneficiaries associated with the operations of Smithfield [Murphy-Brown] Hog Production Division," Hubbard opines, "are consumers or owners who are not proximate to the hog grower facilities that are the focus of this case." (*Id.* at 10.) These opinions do not meet Rule 702's admissibility standard because they are irrelevant and scientifically unreliable.

### A. Without further economic analysis, Hubbard's opinions are inadmissible because they would not help the jury assess the social utility of Murphy-Brown's business.

Rule 702(a) provides that the proposed expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Often described as "fit," this helpfulness requirement "goes primarily to relevance. Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. To be relevant, the proposed expert testimony must have "a valid scientific connection to the *pertinent* inquiry as a precondition to admissibility." *Id.* at 592 (emphasis added). "[T]he question always

is whether a particular expert can help resolve the particular issue in the case at hand." 3 Mueller & Kirkpatrick, Federal Evidence § 7:9 (4th ed.) ("Mueller & Kirkpatrick").

To determine whether Kinlaw Farm constitutes a nuisance, the jury must "weig[h] the gravity of the harm to the plaintiff against the utility of the conduct of the defendant." *Pendergrast v. Aiken*, 293 N.C. 201, 217, 236 S.E.2d 787, 797 (1977). Among the relevant factors, the jury must consider the "nature, utility and social value of defendant's operation, [and] the nature, utility and social value of plaintiffs' use and enjoyment which have been invaded." *Watts v. Pama Mfg. Co.*, 256 N.C. 611, 618, 124 S.E.2d 809, 814 (1962). Weighing the costs and benefits, the jury must consider the overall "interests of the community." *Id.*; *see also* N.C. Pattern Jury Instructions—Civil 805.25.

Hubbard's testimony would not help the jury with this analysis, however, because lay jurors are not qualified to take the next step and apply his general theories and hypotheses to the case at hand. His testimony thus does not "advanc[e] the jury's understanding to any degree." 29 Wright & Miller, Federal Practice & Procedure § 6265.1 (2d ed.). "[V]ague theorizing based upon general principles" is not admissible without data or calculations showing how those principles apply to the facts in question. *Pro Service Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1216 (8th Cir. 2006). Hubbard admittedly did no economic analysis of the social utility of the swine farm at issue to the surrounding community, or even of swine farming in general. (Ex. 3, Hubbard Dep. Tr. at 81:24–82:6; *see also id.* at 106:21–107:9.) He did not analyze "whether their operations generate social value on balance for North Carolina." (*Id.* at 113:6–8; *see also id.* at 84:2–6.) And Hubbard admits that he "ha[sn't] quantified" the actual social value of swine farming "in any way." (*Id.* at 94:11–12; *see also id.* at 292:7–11.) For example, he has not attempted to calculate the value of a swine farm carrying a permit compared to similar land in

the community without such a permit, which Hubbard admitted would be one way of estimating the value of swine farming to the community. (*Id.* at 155:7–156:7.) Nor did he examine any data regarding the earnings multiples swine farmers receive when they sell their land. (*Id.* at 166:10–17.) As a result, even if Hubbard's general opinions about the local community's share of the swine industry's worldwide value were reliable (and they are not), those opinions remain unhelpful—and thus irrelevant—because they do not give the jury the tools needed actually to weigh the social utility of the swine farming operations at issue.

To be sure, Rule 702 sometimes permits experts "to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case." Fed. R. Evid. 702, Advisory Committee Note to 2000 Amendments. But such "generalized testimony" must still "address a subject matter on which the factfinder can be assisted by an expert" and must "'fit' the facts of the case." *Id.* Unless the jury is itself is able to apply generalized expert testimony to the facts of the case at hand, such testimony does not fit the case. Even if an abstract economic theory *might* have something to say about a particular case and *could* be applied to its facts, if the jury cannot do the application on its own, testimony about the theory alone is unhelpful and thus irrelevant. *See Pro Service*, 469 F.3d at 1216 (explaining that testimony about general principles, though "sound," may nevertheless be inadmissible without data "show[ing] how the general principles would operate" in the case at hand). Hubbard's general testimony does not fit the facts of this case because lay jurors are unqualified to take the next step and use his testimony to conduct the required social-utility analysis. Since Hubbard expressly did not apply his opinions or even attempt to estimate the *size* or *value* of the swine industry's benefits captured by the local community, his abstract, theoretical opinions are unhelpful. His opinions would leave the jury adrift with no idea what to do with them. That is

not a proper use of expert testimony. Indeed, without further analysis, Hubbard's testimony also warrants exclusion under Rule 403, because it will confuse and mislead the jury, and waste time. "Evidence that is likely to be misunderstood by laypersons unfamiliar with the subject matter is aptly described as 'misleading' and may be excluded for this reason." 1 Mueller & Kirkpatrick § 4:14.

### B. Hubbard's opinions about the swine industry's value to the community are unreliable because he ignores the tax revenue and economic multiplier effects the industry generates.

Hubbard's opinions about the swine industry's economic value to the local community are scientifically unreliable because he ignores two important sources of value. *First*, Hubbard did not consider or attempt to quantify the local and state tax revenue generated by the swine industry, even though he admitted that "some of [the swine industry's economic value] might flow to the city government or to the local community . . . in the form of higher taxes." (Ex. 3, Hubbard Dep. Tr. at 67:13–16.) Profits from swine farming, Hubbard conceded, "may flow to local governments in the form of taxes, and then those, in turn, may finance other activities associated with a community." (*Id.* at 100:2–7.) It is textbook Economics 101 that tax revenue makes up part of the social value a market generates. (*See* Ex. 7, N. Gregory Mankiw, *Principles of Microeconomics* 161–63 (5th ed. 2009).) As economics professor Dr. Nicholas Piggott explained, "[h]og production is a critical contributor to county tax revenues in Southeastern North Carolina. Thus, any potential contraction in the hog industry is going to mean a loss in County Tax revenue and, in some counties, a substantial loss." (Ex. 5, Expert Report of Dr. Nicholas E. Piggott at 7.) According to Dr. Piggott, "the production of meat and poultry products through the 225,459 jobs it provides, generating $48.25 billion in economic activity, and paying $1.76 billion in taxes, provides significant improvements in welfare to the communities and counties in which they reside and for the North Carolina economy in general."

(*Id.* at 15.) Any reliable opinion about the swine industry's value to eastern North Carolina thus must take into account these substantial local benefits. Hubbard admittedly did not.

*Second*, Hubbard did not consider the economic "knock-on" multiplier effects of the swine industry, meaning the secondary economic activity generated by and servicing the swine industry. (Ex. 3, Hubbard Dep. Tr. at 103:11–105:12.) According to Dr. Piggott, swine production "leads to 'ripple effects' in the local economies in Duplin, Bladen, Sampson, and Pender Counties and across the state. . . . When workers make money in the hog industry they increase their purchases of goods and services." (Ex. 5, Piggott Expert Report at 8.) As a result, "a $1 million increase in Murphy-Brown's cash receipts for hog production will result in a $1.45 million (=$1 million×1.45) increase in value-added within North Carolina." (*Id.* at 9.) "Clearly, the hog farms raising Murphy-Brown-owned hogs are the backbone of generating significant economic activity in Duplin, Sampson, Pender and Bladen Counties and, therefore, greater utility and social benefits. These positive benefits spill over to surrounding counties via the 'ripple effect' and generate additional economic activity and, therefore, greater utility and social benefits to the state of North Carolina." (*Id.* at 10.)

Consistent with Dr. Piggott's analysis, Hubbard admitted that a proper evaluation of the swine industry's value to the surrounding community must consider "any knock-on effects associated with it." (Ex. 3, Hubbard Dep. Tr. at 109:14–22.) Hubbard's failure to consider those effects thus completely undermines the reliability of his opinion regarding the swine industry's local value. Indeed, Hubbard's failure to account for the multiplier effects is especially egregious because he admitted that a "significant" percentage of the jobs in the relevant counties is tied to the swine industry. (*Id.* at 296:6–9.) *See Whittaker v. Van Fossan*, 297 F.2d 245, 246

(4th Cir. 1961) (holding that expert's testimony was inadmissible because "he failed to take into account every relevant factor").

## II. Hubbard's opinions about the alleged link between vertical integration and odor externalities are irrelevant and unreliable.

Hubbard also claims that Murphy-Brown's vertically integrated "organizational structure . . . does not provide [Murphy-Brown] or its parents incentives to make [its] decisions [about raising swine] in a way that accounts for the harm these decisions can impose on local residents," namely the externalities allegedly caused by "odor, flies, noise, and so on." (Ex. 2, Expert Report at 5, 19; *see generally id.* at 17–20.) According to Hubbard, Murphy-Brown's decisions "do not currently reflect the harm they impose on others," and are thus not "economically efficient." (*Id.* at 22.) These opinions are irrelevant and scientifically unreliable as well.

### A. Hubbard's opinions are irrelevant because they make no difference to the jury's social-utility analysis and are unhelpful and equivocal to boot.

Hubbard's opinions linking the supposed swine-odor externalities to Murphy-Brown's vertically integrated corporate structure are irrelevant for three reasons. *First*, considering how Murphy-Brown's corporate structure might relate to odor externalities does not matter to the jury's task: to "weig[h] the gravity of the harm to the plaintiff against the utility of the conduct of the defendant." *Pendergrast*, 293 N.C. at 217, 236 S.E.2d at 797. Whether swine odors qualify as an economic "externality" and how externalities might relate to corporate structure have absolutely no bearing on this balancing inquiry. For even if swine odors are an externality, that would not warrant any discount from the swine farms' social utility because the jury is already counterbalancing the impact of any odors on Plaintiffs on the other side of the scale. Any additional subtraction on the positive side simply because odors are an "externality" would

improperly double count the social cost of swine farming. Labeling the swine odors an "externality" thus has no significance to the jury's nuisance analysis.

*Second*, Hubbard's abstract theoretical testimony about externalities is unhelpful and thus irrelevant for the reasons discussed above: He did not attempt to quantify the size of the purported odor externalities at issue here. (Ex. 3, Hubbard Dep. Tr. at 63:21–23, 116:7–14.) As noted, lay jurors are not capable of applying his theoretical opinions about externalities to calculate their size and then conduct the weighing of social utility that nuisance law requires without the guidance of expert testimony explaining how the purported externalities affect the analysis. Hubbard's analysis does not go far enough to be useful to the jury and, thus, should be excluded.

*Third*, and finally, Hubbard's opinion about the link between odor externalities and Murphy-Brown's vertical integration is too equivocal to be admissible. As Hubbard explained his opinion in his deposition, Murphy-Brown's corporate structure only "ha[s] the *potential* to create externalities for others around them." (*Id.* at 58:24–59:9 (emphasis added).) Hubbard ultimately cannot say whether or not Murphy-Brown's vertical integration actually does cause any such externalities at all. It simply *might*. "A perfectly equivocal opinion does not make any fact more or less probable and is irrelevant under the Federal Rules of Evidence." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002); *see also United States v. Frazier*, 387 F.3d 1244, 1266 (11th Cir. 2004) (excluding "imprecise and unspecific" expert opinion that failed to specify whether conclusion "was a virtual certainty, a strong probability, a possibility more likely than not, or perhaps even just a possibility").

**B. Hubbard's opinions about swine-odor externalities are scientifically unreliable.**

Hubbard's opinions about swine-farming externalities are also scientifically unreliable for four reasons. *First*, he did not account for the possibility that the statutes and regulations

governing swine farming may already force growers and Murphy-Brown to internalize any potential externalities from swine odor. Hubbard admitted that he did not review or even consider the relevant North Carolina statutes governing swine farm siting, or those regulating how many swine can be on a farm, or those designating which parties are responsible for controlling odors and manure management. (Ex. 3, Hubbard Dep. Tr. at 27:20–29:17.) In his view, these laws "do[n't] bear directly on [his] opinions." (*Id.* at 28:8–20.)

But Hubbard later admitted that "of course what the law requires . . . shapes incentives" because "you have to at least satisfy the law." (*Id.* at 32:16–19.) He accordingly conceded that "the regulatory environment could provide such incentives"—meaning economically optimal incentives—for swine farmers to fully internalize any social costs of swine-farm odor. (*Id.* at 298:11–12.) Likewise, Hubbard admitted that Murphy-Brown's contract provides growers a strong incentive to comply with the legal duties that come with their permits because the contract may be terminated otherwise. (*Id.* at 60:5–12.) Yet Hubbard did not consider the potential swine farm externalities allowed under the North Carolina permitting regime. (*Id.* at 61:4–9.) And he admitted that the permitting regulations "bea[r] some relevance to" to the externalities question. (*Id.* at 61:10.) Without accounting for the effect the legal regime has on swine farming's potential externalities, Hubbard's opinion regarding those externalities is unreliable because it does not consider "all independent variables that could affect [his] conclusion." *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1041 (8th Cir. 1999) (excluding testimony of agricultural economist regarding the cause for drop in cattle prices because he failed to consider all variables considered by economists).

*Second*, Hubbard's opinion does not account for the possibility that customer demand for more sustainable, environmentally friendly pork already incentivizes Murphy-Brown and its

growers to internalize any potential odor externalities. Hubbard acknowledged, for example, that market pressure drove Murphy-Brown to make swine growing more animal friendly by "phas[ing] out the use of gestation crates." (Ex. 2, Expert Report at 21.) According to Hubbard, Murphy-Brown and its parent companies have "an economic incentive to make and fund these changes because it expects these changes to lead to greater demand, higher revenues, and higher profits associated with the pork it sells." (*Id.*) But if that is true, then why would Murphy-Brown not have a similar economic incentive to account for any environmental costs of swine farming? Plaintiffs' other economist, Dr. C. Robert Taylor, certainly believes that the company, "in the long run, would benefit" from implementing allegedly better waste-management technologies because the company could fetch a higher price by marketing its pork as "environmentally friendly." (*See* ECF No. 365-14, *In re NC Swine Farm Nuisance Litig.*, No. 5:15-CV-13-BR, Expert Report of C. Robert Taylor at 50 ¶¶ 160, 163; *see also id.* at 53 ¶ 169.) If so, then Murphy-Brown and its growers should have a strong incentive to internalize their potential externalities. Since Hubbard's opinion does not consider the role environmentally conscious customers play in forcing the swine industry to internalize its externalities, his opinion "d[oes] not incorporate all aspects of the economic reality of the [swine growing] market." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000).

*Third*, Hubbard has not analyzed the viability of any alternative manure management technology because he is admittedly "not an expert in hog waste technology." (Ex. 3, Hubbard Dep. Tr. at 124:4–16, 125:24–126:3.) As a result, Hubbard has no idea whether, even if swine farmers and Murphy-Brown had perfectly efficient economic incentives to internalize the social costs of swine odor, the resulting odors would be any different at all. *See Hardin v. Ski Venture*,

*Inc.*, 50 F.3d 1291, 1296 (4th Cir. 1995) (excluding portion of expert's proposed testimony beyond his area of expertise).

*Fourth*, and finally, Hubbard has no actual evidence of any link between swine farm odor and Murphy-Brown's "vertically integrated" corporate structure. Hubbard's opinion thus rests on nothing more than abstract economic theory. He admitted that he has no evidence that any odor or emissions from the swine farms at issue have changed over the years in relation to the increasing vertical integration and concentration of the swine industry. (Ex. 3, Hubbard Dep. Tr. at 184:13–22.) And he likewise could not testify that Smithfield Food, Inc.'s acquisition of Murphy Farms, Inc. made the externalities any worse. (*Id.* at 186:9–13.) On the contrary, as Murphy-Brown employee Dr. Terry Coffey testified, Murphy-Brown has since made "a number of changes over time as a part of the continual improvement of the utilization of the feed that would . . . reduce the manure output" and its components, "like nitrogen and phosphorus, that could contribute to odor. (Ex. 4, Coffey Dep. Tr. at 15:12–25.) Plaintiffs are well aware of these changes, but Hubbard did not consider them in formulating his opinion.[1] Hubbard further admitted that he never compared the contracts Murphy-Brown enters into with its growers with those involving other integrators to see if Murphy-Brown's vertical integration actually makes a difference to the farms' operations. (Ex. 3, Hubbard Dep. Tr. at 42:13–44:6.) That comparison "could be relevant" to his economic analysis, Hubbard testified, but he simply did not undertake it. (*Id.* at 20:16–25.) The complete lack of supporting data makes Hubbard's abstract economic opinions unreliable. *See* Fed. R. Evid. 702(b) (requiring expert testimony to be "based upon

[1] Indeed, Plaintiffs' emissions expert Dr. Viney Aneja did not even review the information concerning feed formulations or feed conversion produced by Murphy-Brown. (Ex. 6, Aneja Dep. Tr. at 44:5–8.) Nor did Aneja review Dr. Coffey's deposition or any of Murphy-Brown's written discovery responses explaining its feed changes. (*Id.* at 70:13–23). Aneja admitted that he knew about these changes but made no attempt to ascertain their effect on odor. (*Id.* at 70:20–71:7.)

sufficient facts or data"); *Nease*, 848 F.3d at 231 (excluding expert testimony because it had no basis in data).

What's more, Hubbard undermined his entire opinion by admitting that there is no reason to expect that any potential swine-waste externalities would be worse simply because of the acquisition of Smithfield Foods, Inc. (Murphy-Brown's corporate grandparent) by WH Group: "[T]here's no real reason to expect . . . their incentives with respect to" the odors "to be any different," he testified. (Ex. 3, Hubbard Dep. Tr. at 188:16–189:5.) Hubbard even admitted that he is not "able to identify whether the odor has improved or gotten worse as a result of any change in ownership of any of the companies in the supply chain." (*Id.* at 211:9–13.) When pressed, moreover, Hubbard conceded that he was "unable to identify any manner in which that change of beneficiaries has impacted the local community either for positive or for negative." (*Id.* at 215:21–24.) As these concessions reveal, there is no reliable basis in data *or* economic theory for any positive correlation between Murphy-Brown's vertically integrated corporate structure and the size of any potential externalities from swine farming. The Court should accordingly exclude Hubbard's opinion.

## III. The Court should exclude Hubbard's irrelevant and inflammatory xenophobic references to China.

Hubbard's expert report also includes several references to China that are irrelevant and inflammatory. His report discusses the Chinese parent company that acquired Smithfield Foods, Inc. and its listing on the Hong Kong stock exchange. (Ex. 2, Expert Report at 6.) It also discusses Murphy-Brown's exports of pork to customers in China. (*Id.* at 10–11, 22.) The Court initially refused to strike the complaint's similar references to Chinese pork exports because, at that early stage, it was "not clear they have no possible bearing upon the subject matter of the litigation." *In re NC Swine Farm Nuisance Litig.*, No. 5:15-CV-13-BR, 2015 WL 3948309, at

*3 (E.D.N.C. June 29, 2015). But it is now clear that Murphy-Brown's connections to China have no bearing on the nuisance social-utility analysis, as Hubbard's own report and testimony reveal. The Court should exclude his xenophobic references to China under Rule 702 because they are irrelevant to the jury's task and unfairly prejudicial. China makes no difference to Hubbard's analysis or opinion. In his view, most of the profits and pork produced by the North Carolina swine industry leave the State. Hubbard could easily make that point by generically referring to Murphy-Brown's "out-of-state shareholders" and "exports outside North Carolina." Specifically mentioning China adds nothing and just invites xenophobic prejudice. The Court should thus also exclude Hubbard's references to China under Rule 403 because they pose "a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." *PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 124 (4th Cir. 2011) (quotation marks and ellipsis omitted).

**CONCLUSION**

For these reasons, this Court should grant Murphy-Brown's motion to exclude the testimony of Thomas N. Hubbard.

Dated: February 19, 2018

Respectfully submitted,

/s/ Mark E. Anderson
Mark E. Anderson (N.C. Bar No. 15764)
McGUIREWOODS LLP
434 Fayetteville Street
Suite 2600
Telephone: (919) 755-6600
Facsimile: (919) 755-6699
Email: manderson@mcguirewoods.com

Eugene E. Mathews III (Va. Bar No. 36384)
Tennille J. Checkovich (Va. Bar No. 68028)
(*By Special Appearance*)
McGUIREWOODS LLP
Gateway Plaza
800 E. Canal Street
Richmond, Virginia 23219
Telephone: (804) 775-1000
Facsimile: (804) 775-1061
Email: mmathews@mcguirewoods.com
tcheckovich@mcguirewoods.com

*Attorneys for Murphy-Brown LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**Case No. 7:14-CV-00180-BR**

| | |
|---|---|
| **JOYCE MCKIVER, et al.,** | **)** |
| | **)** |
| **Plaintiffs,** | **)** |
| | **)** |
| **v.** | **)** |
| | **)** |
| **MURPHY-BROWN LLC,** | **)** |
| | **)** |
| **Defendant.** | **)** |

## CERTIFICATE OF SERVICE

I do hereby certify that on February 19, 2018, I caused a true and correct copy of Defendant Murphy-Brown LLC's Memorandum of Law in Support of Its Motion to Exclude the Testimony of Thomas N. Hubbard to be filed using the CM/ECF system, which sent notification of such filing (NEF) to all CM/ECF registered attorneys indicated on the NEF, including counsel for Plaintiffs.

/s/ Mark E. Anderson
Mark E. Anderson (N.C. Bar No. 15764)
McGUIREWOODS LLP
434 Fayetteville Street
Suite 2600
Telephone: (919) 755-6600
Facsimile: (919) 755-6699
Email: manderson@mcguirewoods.com