**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**Case No. 7:14-CV-00180-BR**

| | | |
|---|---|---|
| **JOYCE MCKIVER, et al.,** | **)** | |
| | **)** | |
| **Plaintiffs,** | **)** | |
| | **)** | **MEMORANDUM IN SUPPORT OF** |
| **v.** | **)** | **MOTION TO EXCLUDE** |
| | **)** | **DR. C. ROBERT TAYLOR** |
| **MURPHY-BROWN LLC,** | **)** | |
| | **)** | **Fed. R. Evid. 403, 702** |
| **Defendant.** | **)** | |

**DEFENDANT MURPHY-BROWN LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE TESTIMONY OF DR. C. ROBERT TAYLOR**

C. Robert Taylor is an agricultural economist and professor at Auburn University. (*See* ECF No. 365-14, *In re NC Swine Farm Nuisance Litig.*, No. 5:15-CV-13-BR, Expert Report of C. Robert Taylor at 2 ("Expert Report").) As an economist, Taylor qualifies as an "expert" triggering this Court's gatekeeping function under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* Fed. R. Evid. 702, Advisory Committee Note to 2000 Amendments (explaining that *Daubert* applies to all technical or specialized testimony, including "testimony concern[ing] economic principles"). The Court should exclude his testimony because his opinions are irrelevant and unreliable.

## ARGUMENT

Federal Rule of Evidence 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

"[D]ue to the difficulty of evaluating their testimony, expert witnesses have the potential to be both powerful and quite misleading." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999) (quotation marks omitted). Rule 702 accordingly assigns district courts a "gatekeeping responsibility to 'ensure that an expert's testimony both rests on a *reliable* foundation and is *relevant* to the task at hand.'" *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (quoting *Daubert*, 509 U.S. at 597 (brackets omitted)). "The main purpose" of the reliability inquiry "is to protect juries from being swayed by dubious scientific testimony." *Id.* at 231. Vigorous cross examination alone "does not ensure the reliability of the expert's testimony; such testimony must still be assessed before it is presented to the jury." *Id.* The Fourth Circuit thus recently reversed the admission of testimony by a plaintiff's expert where the district court "did not use *Daubert*'s guideposts or any other factors to assess [its] reliability," and "did not make any reliability findings." *Id.* at 230. "[A]lthough a trial judge has broad discretion to determine reliability in light of the particular facts and circumstances of the particular case," the Court of Appeals explained, "such discretion does not include the decision to abandon the gatekeeping function." *Id.* (quotation marks and citations omitted).

Taylor offers two major opinions. First, Taylor claims that Murphy-Brown LLC's ("Murphy-Brown") vertical integration and market power exacerbate the odors associated with swine farming by depressing grower pay. Second, Taylor claims that Murphy-Brown could implement better manure management technology instead of the current lagoon-and-sprayfield system. The Court should exclude both opinions because they are neither relevant nor reliable.

Moreover, even if Taylor's opinions met Rule 702's bare minimum relevance and reliability requirements, the Court should still exclude his testimony under Rule 403 because "its probative value is substantially outweighed by" the danger of unfair prejudice. Rule 702 "does not require the admission of all proffered expert testimony; the district judge has broad discretion to decide whether such testimony ought to be admitted as helpful to the jury." *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 323 (4th Cir. 1982). Expert testimony that passes Rule 702 still warrants exclusion if it fails to meet the requirements of Rule 403. *Id.* at 323–24 (excluding expert testimony that risked confusing or misleading the jury); *see also Daubert*, 509 U.S. at 595 (noting that expert witness testimony is subject to exclusion under Rule 403). Rule 403 thus supplies an additional basis for excluding expert testimony, "independent of *Daubert*." *United States v. Sherlin*, 67 F.3d 1208, 1217 (6th Cir. 1995); *see also United States v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994). For all the reasons discussed below, Taylor's opinions about vertical integration, market power, grower pay, and alternative technology are so flawed that the risk of undue prejudice substantially outweighs whatever arguable probative value they may have.

Finally, the Court should also exclude Taylor's irrelevant and inflammatory references to China and the minority population in southeastern North Carolina. These references serve only to stoke xenophobia and racial tension, inviting decision on an improper basis.

## I. Taylor's opinions about Murphy-Brown's vertical integration and market power are irrelevant and unreliable.

Taylor claims that Murphy-Brown's vertical integration and market power exacerbate the odors associated with swine farming. He specifically opines that Murphy-Brown exercises "monopsony" power over swine growers in southeastern North Carolina because the company is "the only significant pork packer" in the region. (Expert Report at 18 ¶ 46.) According to Taylor, Murphy-Brown qualifies as a monopsony (a "buyers-side monopoly") because it "is essentially the only game in town." (*Id.* at 18 ¶ 46, 20 ¶ 54.)

"Vertical integration and horizontal concentration of hog and pork production," Taylor says, have "magnified [the industry's] non-market environmental effects," known in economics as "externalities." (*Id.* at 30 ¶ 94.) As a result, "the true cost of pork" to society "may be higher with integration and consolidation" of the industry. (*Id.* at 41 ¶ 133.) In other words, Taylor claims that Murphy-Brown's vertical integration and large market share have exacerbated the potential externalities caused by swine-farm odor. Why? Because Murphy-Brown allegedly uses its market power to keep grower pay low, which "makes it impossible for the average grower . . . to be able to keep Murphy-Brown hogs from creating a nuisance." (*Id.* at 30 ¶ 92; *see also id.* at 31 ¶ 97.) According to Taylor, "under the present [Murphy-Brown] contract it is generally not economically feasible for contract growers to adopt" better manure management and odor controlling technologies. (*Id.* at 49 ¶ 155.)

The Court should exclude these opinions because they are both irrelevant and unreliable.

### A. Without further economic analysis, Taylor's opinions are inadmissible because they will not help the jury assess the social utility of Murphy-Brown's business.

Rule 702(a) provides that the proposed expert testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Often described as "fit," this helpfulness requirement "goes primarily to relevance. Expert testimony which does not relate to

any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591. To be relevant, the proposed expert testimony must have "a valid scientific connection to the *pertinent* inquiry as a precondition to admissibility." *Id.* at 592 (emphasis added). "[T]he question always is whether a particular expert can help resolve the particular issue in the case at hand." 3 Mueller & Kirkpatrick, Federal Evidence § 7:9 (4th ed.).

To determine whether Murphy-Brown's swine business constitutes a nuisance, the jury must "weig[h] the gravity of the harm to the plaintiff against the utility of the conduct of the defendant." *Pendergrast v. Aiken*, 293 N.C. 201, 217, 236 S.E.2d 787, 797 (1977). Among the relevant factors, the jury must consider the "nature, utility and social value of defendant's operation, [and] the nature, utility and social value of plaintiffs' use and enjoyment which have been invaded." *Watts v. Pama Mfg. Co.*, 256 N.C. 611, 618, 124 S.E.2d 809, 814 (1962). Weighing the costs and benefits, the jury must consider the overall "interests of the community." *Id.*; *see also* N.C. Pattern Jury Instructions—Civil 805.25.

Taylor's testimony would not help the jury with this analysis, however, because lay jurors are not qualified to take the next step and actually apply his general theories and hypotheses to the case at hand. His testimony thus does not "advanc[e] the jury's understanding to any degree." 29 Wright & Miller, Federal Practice & Procedure § 6265.1 (2d ed.). "[V]ague theorizing based upon general principles" is not admissible without data or calculations showing how those principles apply to the facts in question. *Pro Service Auto., L.L.C. v. Lenan Corp.*, 469 F.3d 1210, 1216 (8th Cir. 2006). As Taylor admits, he "ha[s] not done a full-blown economic analysis of benefits and costs" of the swine industry "in any county or the state." (Ex. 2, Taylor Dep. Tr. at 102:6–10; *see also id. at* 98:9–18 (same), 36:3–6 (same).) Nor has Taylor performed an economic analysis of the benefits to the surrounding community of any of the

specific farms at issue and the multiplier effect of their economic activity. (*Id.* at 95:25–97:7, 98:20–99:9.) He has absolutely no idea how many dollars stay in eastern North Carolina as a result of swine farming, or the number of local jobs tied to the swine industry and their financial impact on the community. (*Id.* at 236:25–237:18.) Taylor did not even attempt to estimate these figures using the available economic models. (*Id.*)

Likewise, on the other side of the scale, Taylor did not "determine in any particular community in this case, the relative contributions of any potential negatives from any particular farm or types of farms or groups of farms." (*Id.* at 91:15–22.) He thus never attempted to quantify the size of the purported externalities from swine farming and odor, nor did he analyze the Plaintiffs' damages or the damage to the surrounding community. (*Id.* at 27:7–23.) Taylor admitted that, as an economist, he *could* have done such an analysis, he just did not. (*Id.* at 27:25–28:13.) He did not even attempt to measure the effect of swine odor on surrounding property values as a proxy for the size of the externalities. (*See id.* at 26:9–14, 255:24–256:11.) As a result, even if Taylor's opinions about the connection between Murphy-Brown's vertical integration and market power on odor externalities were reliable (which they are not), his opinions remain unhelpful—and thus irrelevant—because they do not give the jury the tools needed actually to weigh the social utility of Murphy-Brown's operations against the "gravity of the harm to the plaintiff[s]." *Pendergrast*, 293 N.C. at 217.

To be sure, Rule 702 sometimes permits experts "to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case." Fed. R. Evid. 702, Advisory Committee Note to 2000 Amendments. But such "generalized testimony" must still "address a subject matter on which the factfinder can be assisted by an expert" and must "'fit' the facts of the case." *Id.* Taylor's general testimony does not fit the

facts of this case because he did not take the next step and conduct the required social-utility analysis and the jurors are unable to do so without the assistance of an expert. Since Taylor expressly did not analyze the *size* of the potential externalities from swine-farm odor, or how much is supposedly attributable to Murphy-Brown's vertical integration and market power, his opinions are unhelpful.

### B. Taylor's opinions about Murphy-Brown's monopsony power are unreliable because they are not based on an accepted economic methodology.

"With respect to reliability, the district court must ensure that the proffered expert opinion is based on scientific, technical, or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Nease*, 848 F.3d at 229 (quotation marks omitted). In *Daubert*, the Supreme Court laid out five factors that district courts may use to assess the reliability of expert testimony: "(1) whether the particular scientific theory 'can be (and has been) tested'; (2) whether the theory 'has been subjected to peer review and publication'; (3) the 'known or potential rate of error'; (4) the 'existence and maintenance of standards controlling the technique's operation'; and (5) whether the technique has achieved 'general acceptance' in the relevant scientific or expert community." *United States v. Crisp*, 324 F.3d 261, 265–66 (4th Cir. 2003) (quoting *Daubert*, 509 U.S. at 593–94).

Taylor's opinions about Murphy-Brown's monopsony power are unreliable for several reasons. *First*, and foremost, he has not used a methodology for assessing market power actually accepted by economists. Taylor concludes that Murphy-Brown has monopsony power because the company accounts for "an estimated 90% of all hog production in North Carolina (NC) and approximately 65% of the permitted hog CAFOs in NC." (Expert Report at 6 ¶ 14.) But raw market share alone is not generally accepted among economists as a reliable metric of market power. As Plaintiffs' own economist Dr. Thomas Hubbard testified, fewer firms in an industry

does not necessarily imply that they have market power. That is an outdated, "disparaged way of thinking about things." (Ex. 3, Hubbard Dep. Tr. at 240:1–6.) What matters for purposes of judging market power, Hubbard explained, is "outcomes . . . and not the structure." (*Id.* at 240:7–9.)

Market share "should not be equated with monopoly power. Blind reliance upon market share, divorced from commercial reality, could give a misleading picture of a firm's actual ability to control prices or exclude competition." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980); *see also* William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937, 947 (1981) ("inferences of power from share alone can be misleading"). "While as a matter of economics, market power can be related to market shares and markups, neither of these measures is a particularly reliable indicator of whether market power is substantial enough to constitute monopoly power." 1 Antitrust Economics for Lawyers § 5.05. Recognizing market share as a flawed metric, economists generally rely on the Lerner index as a more "precise economic definition of market power." Landes & Posner, *supra*, at 938. But Taylor never calculated the Lerner index for the swine market in North Carolina or otherwise. (Ex. 2, Taylor Dep. Tr. at 139:1–12.) He accordingly admitted that he has not conducted a scientifically valid monopsony study of Murphy-Brown's market. (*Id.* at 132:15–19, 133:6–9.) As a result, Taylor's opinions regarding Murphy-Brown's market power should be excluded based on this admission alone. *See Wilder Enterprises, Inc. v. Allied Artists Pictures Corp.*, 632 F.2d 1135, 1143–44 (4th Cir. 1980) (excluding economist's expert testimony because he did not rely on data of a type relied on by other economists).

*Second*, Taylor relies on shaky studies with minimal probative value and ignores studies that contradict his conclusions. Taylor claims that "economists have found evidence of

monopsony or oligopsony power in acquisition of slaughter hogs in several notable studies." (Expert Report at 18 ¶ 48.) But these studies are outdated and irrelevant. The USDA-GIPSA and Zheng-Vukina studies that Taylor relies on were published in 2007 and 2009, respectively, and thus were based on even older data. (*Id.* at 19 ¶ 48 nn. 67–68.) And the MacDonald-Key study examined the *poultry* industry rather than the swine industry. (*Id.* at 19 ¶ 49.) What's more, Taylor admitted that he was not aware of—and thus did not consider—the most probative study of all: the one economic study that actually analyzed the North Carolina swine market and found *no* monopsony power. (Ex. 2, Taylor Dep. Tr. at 133:10–18.) That North Carolina study "found no statistically significant presence of the integrator's monopsony power on the market for contract grower services." Atsushi Inoue & Tomislav Vukina, *Testing for the Principal's Monopsony Power in Agency Contracts*, 31 Empirical Economics 717, 733 (2006), *available at* https://ag-econ.ncsu.edu/wp-content/uploads/2015/11/testing.pdf. Even Dr. Hubbard contradicted Taylor's opinion, testifying that "Smithfield [Murphy-Brown] isn't the only game in town." (Ex. 3, Hubbard Dep. Tr. at 120:25–121:1.) In light of all this "unanswered evidence weighing against the scientific validity" of Taylor's conclusions, his opinions are not reliable. *United States v. Powers*, 59 F.3d 1460, 1471 (4th Cir. 1995) (excluding opinion because expert did not address contrary evidence).

*Third*, Taylor's analysis does not account for the offsetting market power growers have under the current regulatory regime. Although Murphy-Brown cannot simply start its own competing growing operations because of the North Carolina moratorium on new swine farms utilizing lagoon-and-sprayfield effluent management systems, Taylor did not consider the value scarce permits have to current growers. (Ex. 2, Taylor Dep. Tr. at 120:5–121:2.) Yet he admitted that Murphy-Brown must rely on the growers who own the limited supply of permits

and that the moratorium on new permits (fixing supply) gives growers "serious market power." (*Id.* at 120:11–15, 141:21–142:2.) Without considering the growers' own market power, Taylor has no reliable basis for concluding that Murphy-Brown can use its alleged market power to hold down grower pay. His opinion should accordingly be excluded "because it d[oes] not incorporate all aspects of the economic reality of the [swine growing] market." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1057 (8th Cir. 2000) (excluding economists opinion on antitrust liability).

*Fourth*, Taylor likewise failed to consider how often North Carolina growers actually switch between integrators, an obvious indictor of competition in the swine market. (Ex. 2, Taylor Dep. Tr. at 111:22–112:5.) Taylor claims that "it is a very small number that switch." (*Id.* at 130:24.) But this is pure speculation. He has absolutely no basis for this conclusion. Taylor admitted that he has no data regarding how many growers switch integrators in North Carolina, and he has not interviewed growers or integrators about switching. (*Id.* at 130:19–24, 148:1–21.) He further admitted that he has no information on the costs to a grower of switching, what barriers might prevent it, or what changes or upgrades a new grower might require. (*Id.* at 144:10–16.) Nor is he aware of any swine grower whose contract ended and was not immediately picked up by another integrator. (*Id.* at 148:1–7.) "Maybe one can change," Taylor later conceded, "but all of them can't suddenly change." (*Id.* at 147:14–15; *see also id.* 258:10–17.) But the threat of mass switching is not necessary to keep the swine raising market competitive. If growers at the margin can switch integrators, the market should reach a competitive equilibrium. Taylor's concession reveals that his market-power opinions are based on neither data nor sound economic analysis and should be excluded. *See* Fed. R. Evid. 702(b)

(requiring expert testimony to be "based upon sufficient facts or data"); *Nease*, 848 F.3d at 231 (excluding expert testimony because it had no basis in data).

*Fifth*, and finally, Taylor's opinions do not consider the offsetting downward effect Murphy-Brown's supposed market power would have on the quantity of swine raised, decreasing the amount of swine-farm odors. A monopsonist exercises its market power "by limiting aggregate purchases. Monopsony injures efficient allocation by *reducing* the quantity of the input product or service below the efficient level." Lawrence A. Sullivan & Warren S. Grimes, *The Law of Antitrust: An Integrated Handbook* 137–38 (2000) (emphasis added). "[B]oth monopolists and monopsonists reduce economic activity in a market below the socially optimal level." (Ex. 4, N. Gregory Mankiw, *Principles of Microeconomics* 406 (5th ed. 2009).) As a result, if Murphy-Brown were truly a monopsony, as Taylor claims, then the company would in theory use its market power to contract with fewer growers or contract with growers to produce fewer swine that would otherwise be economically efficient and socially optimal.

So even if Taylor were correct that Murphy-Brown uses its market power to squeeze grower pay, making it harder for growers to mitigate the alleged externalities from swine farm odor, the lower number of swine raised would cut against that effect, *reducing* the externalities. Since Taylor did not consider these offsetting effects of Murphy-Brown's alleged monopsony power on the externalities of swine farming, he has no idea whatsoever how they shake out. He cannot reliably say whether odor externalities would actually be worse in a more competitive swine market. An economist's opinion is not reliable unless he considers "all independent variables that could affect [his] conclusion." *Blue Dane Simmental Corp. v. American Simmental Ass'n*, 178 F.3d 1035, 1041 (8th Cir. 1999) (excluding testimony of agricultural economist); *see also Whittaker v. Van Fossan*, 297 F.2d 245, 246 (4th Cir. 1961) (holding that

expert's testimony was inadmissible because "he failed to take into account every relevant factor"). Taylor's opinion is unreliable because he failed to consider the effect Murphy-Brown's alleged monopsony power would have in reducing the overall number of swine raised.

"Talking off the cuff—deploying neither data nor analysis—is not an acceptable methodology." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) (Easterbrook, J.). At bottom, Taylor's opinion about Murphy-Brown's market power is "no more than a hypothesis, and it thus is not knowledge, nor is it based upon sufficient facts or data or the product of reliable principles and methods applied reliably to the facts of the case." *Nease*, 848 F.3d at 232. Accordingly, he Court should accordingly Taylor's opinion that Murphy-Brown exercises monopsony power.

**C. Taylor's opinions about grower pay are unreliable because they are not based on sufficient facts and data.**

Taylor claims that swine growers "make very little money" and achieve "[l]ow net returns." (Expert Report at 24 ¶ 68, 25 ¶ 70.) The Court should exclude this opinion because it lacks any reliable basis in facts or data. Taylor bases his conclusion about swine-grower pay on a study using data from the University of Minnesota's FINBIN database. (*Id.* at 24 ¶ 68(b).) *See also* https://finbin.umn.edu/. This database includes data from several states, but mostly Minnesota. (Ex. 2, Taylor Dep. Tr. at 163:11–14.) FINBIN includes no North Carolina data, and Taylor did not analyze any such local data. (*Id.* at 126:24–127:2.) Nor has Taylor compared the returns on swine farming to the potential returns for a different business in eastern North Carolina. (*Id.* at 153:1–11.) He even conceded that other agricultural options would not be profitable, including corn, soybeans, tobacco, and cotton. (*Id.* at 156:1–157:3.) And Taylor further admitted that he did not interview growers to determine their actual return and how they are able to support their families. (*Id.* at 162:8–21.) Without local data or even anecdotal

evidence, Taylor cannot draw any reliable conclusions about how much profits swine growers make in North Carolina. *See* Fed. R. Evid. 702(b) (requiring expert testimony to be "based upon sufficient facts or data"); *Nease*, 848 F.3d at 231 (excluding expert testimony because it had no basis in data).

What's more, Taylor could not explain why, if the swine growing business truly makes little to no profit, none of the available permits have fallen out of use. (Ex. 2, Taylor Dep. Tr. at 168:2–21.) The full use of available permits fundamentally contradicts Taylor's opinion about low grower pay, demonstrating that it is unreliable and inadmissible. *See Powers*, 59 F.3d at 1471 (excluding opinion because expert did not address contrary evidence).

### D. Taylor's opinion is missing a crucial link because he cannot opine that higher grower pay would lead to different manure management practices.

Even assuming that Taylor's opinions about Murphy-Brown's market power and grower pay are reliable, which they are not, his bottom-line conclusion about the link to odor externalities certainly is not. "[*A*]*ny* step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. *This is true whether the step completely changes a reliable methodology or merely misapplies that methodology*." Fed. R. Evid. 702, Advisory Committee Note to 2000 Amendments (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)). "Thus, even if the expert employs reliable general principles developed by reliable methods, evidence may be excluded under Rule 702(d) if the specific application of those principles to the facts of the case is suspect." 29 Wright & Miller, Federal Practice and Procedure § 6268.2 (2d ed.). Taylor admitted that he has no reason to believe that growers would change how they operate their farms at all even if Murphy-Brown significantly increased grower pay—say, by another $30,000 per year. (Ex. 2, Taylor Dep. Tr. at 247:6–17.) Taylor's ultimate opinion about swine farming odor externalities is thus connected to his opinions about

Murphy-Brown's market power and grower pay by nothing more than his own "*ipse dixit*." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). The Court should thus exclude his opinion because "there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

## II. Taylor has no reliable basis for his opinion that alternative manure management and odor control technologies are economically viable.

According to Taylor, "[t]here is a wide range of technology available for reducing or eliminating some of the undesirable external costs of hog production." (Expert Report at 44 ¶ 147.) In his view, "[a]lternatives to the present lagoon and sprayfield system, such as lagoon covers or Super Soils, could be implemented by Smithfield [Murphy-Brown]." (*Id.* at 44 ¶ 149.) Given Murphy-Brown's profits, Taylor opines, "there is room for [Murphy-Brown] to improve waste management technology and increase grower pay and remain profitable." (*Id.* at 49 ¶ 156.) "Changes do not cost too much money for Murphy-Brown," he says, "because it is a part of a highly profitable global enterprise." (*Id.* at 49 ¶ 157.) Murphy-Brown's parent company would simply "soak up the loss." (*Id.* at 41 ¶ 134.) Taylor further opines that "[Murphy-Brown], in the long run, would benefit" from implementing these allegedly better manure management technologies because the company could fetch a higher price by marketing its pork as "environmentally friendly." (*Id.* at 50 ¶¶ 160, 163; *see also id.* at 53 ¶ 169.)

The Court should exclude these opinions because they fall outside Taylor's expertise and are completely unreliable. *See Hardin v. Ski Venture, Inc.*, 50 F.3d 1291, 1296 (4th Cir. 1995) (excluding portion of expert's proposed testimony beyond his area of expertise). For starters, Taylor is admittedly not an expert in swine farm odor. (Ex. 2, Taylor Dep. Tr. at 41:4–6.) All he purports to know is that the alternative technologies reduce the odor to some unspecified degree, but do not entirely eliminate it. (*Id.* at 215:23–24.) Taylor thus conceded that it falls outside his

expertise to determine whether, if implemented, any alternative technologies would actually reduce the individual Plaintiffs' specific complaints about odor. (*Id.* at 179:24–180:2, 215:2–8.) Taylor likewise admitted that assessing what manure management technology was "reasonable" for a specific farm was beyond his expertise: "That involves information from other disciplines, experts in other fields to get the complete picture." (*Id.* at 225:9–11.) As a result, he has "not done a complete analysis of the economic viability of any alternative technology, either as to the North Carolina hog industry in general or as to any specific farm." (*Id.* at 82:5–16; *see also* 78:20–79:25, 80:6–7.) In fact, Taylor does not even know if swine farms could *legally* use something other than a lagoon-and-spray system. (*Id.* at 89:8–21.) He admitted that most swine farmers likely assume alternative manure management technology "would automatically get rejected." (*Id.* at 202:25–203:1.) Taylor's opinions about the economic viability of alternative odor control technology are thus completely baseless.

What's more, Taylor failed to consider contrary evidence supporting the obvious alternative explanation that the technology is simply not economically viable. *See Powers*, 59 F.3d at 1471 (excluding opinion because expert did not address contrary evidence). An expert's opinion is not reliable if he does not "adequately account[t] for obvious alternative explanations." Fed. R. Evid. 702, Advisory Committee Note to 2000 Amendments. "[I]f an expert utterly fails to consider alternative causes . . . a district court is justified in excluding the expert's testimony." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001); *see also Bryte ex rel. Bryte v. American Household, Inc.*, 429 F.3d 469, 476–77 (4th Cir. 2005) (excluding state fire investigator's expert testimony because he failed to exclude all or even most of other possible sources of fire).

Taylor conceded that, in light of the North Carolina moratorium capping the number of lagoon-and-sprayfield swine farms, alternative manure management technology would in theory create an economic advantage for growers if the technology was truly viable. (*See* Ex. 2, Taylor Dep. Tr. at 202:4–204:6.) But Taylor could not explain why, if the alternative technology was truly profitable, it had not been more widely tried by swine farmers. (*Id.*) Nor could he explain why, if the technology was truly viable, the federal and state subsidies available for upgrading lagoons to newer technology have gone unused. (*Id.* at 206:3–208:24.) Indeed, Taylor acknowledged that Murphy-Brown grower Joey Carter tried some of the alternative manure management and odor control technologies, but they did not work. (*Id.* at 77:16–78:24.[1]) Yet he did not investigate Carter's failed attempt or factor that failure into his opinion. (*Id.*) As a result, Taylor's testimony should be excluded because he "simply proclaimed without any support that the alternative designs" for manure management and odor control systems were economically viable and superior to the current lagoon-and-sprayfield system. *Nease*, 848 F.3d at 234.

## III. The Court should exclude any irrelevant and inflammatory references to China or the minority population in southeastern North Carolina.

Taylor's expert report also includes several references to China and the minority population in southeastern North Carolina that are irrelevant and inflammatory. In several places, Taylor discusses Murphy-Brown's Chinese corporate great-grandparent WH Group and the large pork exports to China. (*See* Expert Report at ¶¶ 20–23, 32–34.) The Court initially refused to strike the complaint's similar references to China because, at that early stage, it was

[1] Taylor submitted one global report for all of the five discovery pool cases. While this example specifically pertains to the *McGowan* case and Joey Carter Farms, it also directly pertains to the inadequacy of Taylor's opinion as he did not consider the obvious alternative explanations.

"not clear they have no possible bearing upon the subject matter of the litigation." *In re NC Swine Farm Nuisance Litig.*, No. 5:15-CV-13-BR, 2015 WL 3948309, at *3 (E.D.N.C. June 29, 2015). But it is now clear that Murphy-Brown's connections to China have no bearing on the nuisance social-utility analysis, as Taylor's own report and testimony reveal. The Court should exclude his xenophobic references to China under Rule 702 because they are irrelevant to the jury's task and unfairly prejudicial. China makes no difference to Taylor's analysis or opinion. Regardless, he could easily refer generically to Murphy-Brown's "out-of-state shareholders" and "exports outside North Carolina." Specifically mentioning China adds nothing and just invites xenophobic prejudice. The Court should thus also exclude Taylor's references to China under Rule 403 because they pose "a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." *PBM Prod., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 124 (4th Cir. 2011) (quotation marks and ellipsis omitted).

Taylor also opines that "large, modern CAFOs are often located in lower-income communities that may also have a higher minority population, such as southeastern North Carolina." (Expert Report at 43 ¶ 140; *see also* 43 ¶ 142.) The Court should likewise exclude these references under Rules 702 and 403 because they are irrelevant and unfairly prejudicial. *Cf. Finch v. N.Y. State Office of Children & Family Servs.*, 499 F. Supp. 2d 521, 539 (S.D.N.Y. 2007) (striking references to plaintiffs' race and allegations that defendants' policies have an "overwhelming discriminatory impact on low-income Hispanic and African-American families and communities" where allegations were immaterial to claims); *Wynes v. Kaiser Permanente Hosps.*, No. 2:10-CV-702, 2010 WL 3220137, at *9 (E.D. Cal. Aug. 13, 2010) (striking allegations of racial and ethnic discrimination as well as references to the ethnicity and race of

individual plaintiffs as "not pertinent to the issues in dispute" where plaintiffs did not assert a cause of action for race discrimination). The race of the residents surrounding Murphy-Brown's swine farms makes no difference to the nuisance balancing test. Like Taylor's references to China, his discussion of the minority community serves only to stoke racial tension and invite decision on an improper basis.

## CONCLUSION

For these reasons, this Court should grant Murphy-Brown's motion to exclude the testimony of C. Robert Taylor.

Dated: February 19, 2018.

Respectfully submitted,

/s/ Mark E. Anderson
Mark E. Anderson (N.C. Bar No. 15764)
McGUIREWOODS LLP
434 Fayetteville Street
Suite 2600
Telephone: (919) 755-6600
Facsimile: (919) 755-6699
Email: manderson@mcguirewoods.com

Eugene E. Mathews III (Va. Bar No. 36384)
Tennille J. Checkovich (Va. Bar No. 68028)
(*By Special Appearance*)
McGUIREWOODS LLP
Gateway Plaza
800 E. Canal Street
Richmond, Virginia 23219
Telephone: (804) 775-1000
Facsimile: (804) 775-1061
Email: mmathews@mcguirewoods.com
tcheckovich@mcguirewoods.com

*Attorneys for Murphy-Brown LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**SOUTHERN DIVISION**
**Case No. 7:14-CV-00180-BR**

| | |
|---|---|
| **JOYCE MCKIVER, et al.,** | **)** |
| | **)** |
| **Plaintiffs,** | **)** |
| | **)** |
| **v.** | **)** |
| | **)** |
| **MURPHY-BROWN LLC,** | **)** |
| | **)** |
| **Defendant.** | **)** |

## CERTIFICATE OF SERVICE

I do hereby certify that on February 19, 2018, I caused a true and correct copy of Defendant Murphy-Brown LLC's Memorandum of Law in Support of Its Motion to Exclude the Testimony of C. Robert Taylor to be filed using the CM/ECF system, which sent notification of such filing (NEF) to all CM/ECF registered attorneys indicated on the NEF, including counsel for Plaintiffs.

/s/ Mark E. Anderson

Mark E. Anderson (N.C. Bar No. 15764)
McGUIREWOODS LLP
434 Fayetteville Street
Suite 2600
Telephone: (919) 755-6600
Facsimile: (919) 755-6699
Email: manderson@mcguirewoods.com