**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**No. 7:14-cv-00180-BR**

| | |
|---|---|
| **Joyce McKiver, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **Murphy-Brown LLC,** | ) |
| | ) |
| **Defendant.** | ) |
| ______________________________ | ) |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION TO EXCLUDE OR LIMIT EXPERT TESTIMONY OF JENNIFER L. CLANCY**

Plaintiffs hereby file their brief in support of their motion requesting that the Court limit or exclude the expert opinions of the defense expert, Jennifer L. Clancy.

## I. SUMMARY

Plaintiffs designated Dr. Shane Rogers as their livestock agricultural engineering expert to perform inspections and sampling at Defendant's industrial hog operations. Of course, this is one the principal issues to be tried in this case, and Dr. Rogers presents a significant threat to the fallacy created by Defendant. Dr. Rogers was present at all of the site inspections, and Defendant was abundantly aware of his importance in this litigation. Prior to the expert disclosure deadline, Defendant argued that it would need an expert to controvert Rogers—Defendant coordinated Jennifer Clancy's presence at all of the inspections as well, often mere feet away from Rogers.

But Defendant did not designate Clancy as an expert in its case-in-chief. To try to gain an extra case-in-chief expert, Defendant chose instead to improperly designate Clancy as a *rebuttal* expert witness. Making matters worse, just a few days prior to Clancy's deposition, Defendant

served an untimely "supplemental" expert report for Clancy, roughly twice the length of her principal report.

Defendant's expert discovery abuse aside, Clancy's opinions regarding Pig2Bac—a fecal indicator marker Rogers relied on in concluding that Defendant's hog operations were the source of the nuisance to Plaintiffs—should be excluded. Clancy has never researched or tested for Pig2Bac, has never stepped foot on a hog operation prior to this litigation, and does not even know how to operate the applicable equipment or properly take samples. Defendants cannot demonstrate a link between Clancy's experience in microbiology and field-testing to her opinions that Pig2Bac is not a definitive indicator of pig fecal DNA.

Moreover, Clancy's opinion that Pig2Bac is not a definitive indicator of pig fecal DNA is demonstrably false based on an incorrect premise, which itself demonstrates Clancy's lack of qualifications to opine as to Pig2Bac. And perhaps most importantly, as to whether Pig2Bac is present at Defendant's hog operations, Clancy does not offer an opinion either way. The extent of Clancy's opinion is that "there may not be" Pig2Bac at Defendants' hog operations, which is really no proper opinion at all and would only serve to confuse the jury.

And as for Clancy's criticisms of Rogers' sampling protocol, the Court should exclude Clancy's opinions because: (1) rather than analyzing the samples gathered by Rogers and provided to Defendant per the Court's protocol, Clancy simply destroyed them; and (2) her opinions are based not on *Daubert* or Rule 702, but marketing materials by a defense consulting firm.

## II.
## FACTUAL AND PROCEDURAL BACKGROUND

On October 2, 2016, after weeks of negotiating with Defendant and in anticipation of the approaching then-existing expert designation deadline of November 30, 2016, Plaintiffs filed a

motion to compel site visits. (DE #179). Attached as an exhibit to that motion was the Declaration of Plaintiffs' expert Shane Rogers, Ph.D., in which he explained as follows:

- "From a science and engineering perspective, the hog sheds are the ***origin*** of the neighbors' claims of nuisance." (DE #179-15 at ¶ 20(a)(1) (emphasis added)).

- "[Samples] will also provide a baseline mass as excreted of several constituents such as total and volatile solids, nutrients, oxygen demanding materials, and others that are needed to understand ***emissions that may be related to odors and other nuisance issues within the plaintiffs' complaint***." (DE #179-15 at ¶ 20(c)(ii) (citations omitted) (emphasis added)).

- "By taking swabs and sending them for laboratory analysis, we can use microbial source tracking ('MST') methods that are designed to improve the identification of ***sources*** of fecal contamination." (DE #179-15 at ¶ 20(c)(vi) (emphasis added)).

- "[T]he samples requested and outlined above are not unusual or out of the scope of typical samples taken to demonstrate lagoon and spray system performance, develop and qualify manure management plans, and investigate potential air quality and other issues ***that could be related to the complaints of the Plaintiffs***." (DE #179-15 at ¶ 25 (emphasis added)).

- "This access to facilities and samples is necessary to document site conditions ***so that I can offer an opinion as to whether those conditions may relate to the negative experiences of the Plaintiffs***, and other opinions in my scope of expertise." (DE #179-15 at ¶ 26 (emphasis added)).

On October 13, 2016, Defendant responded to Plaintiffs' motion to compel site visits and specifically alleged "undue burden created by requiring Murphy-Brown's experts to engage in irrelevant and unnecessary sampling and testing to mirror Plaintiffs' experts." (DE # 201 at 2 n.1). Defendant also contended that Plaintiffs' requests would "requir[e] Murphy-Brown's experts to mirror Plaintiffs' experts in irrelevant and disproportionate sampling." (DE #201 at 3). Defendant further expressly acknowledged Rogers' explanations in support of the motion to compel site visits and Defendant's resulting need for experts to controvert Rogers' forthcoming expert opinions.

On October 19, 2016, the Court granted the motion to compel site visits in a 27-term order, which further required the parties to meet and confer regarding "a detailed inspection protocol" and agree to "split" or "parallel" sampling (DE #214). That same day, the Court amended the scheduling order to extend the deadline to designate case-in-chief experts—a total of eight per side—to January 6, 2017. (DE #215). The Court further ordered the parties to simultaneously disclose any rebuttal expert witnesses—limited to two experts per side—by February 3, 2017. (DE #215). Those deadlines were later extended by agreement to January 20 and February 17, 2017, respectively.

Between November 21 and December 16, 2016, Rogers performed site inspections at seven of the eight subject sites at issue in the discovery pool cases.[1] During those inspections, Rogers and his team collected samples for DNA testing for the presence of the genetic sequence known as Pig2Bac, a DNA signature that is unique to pig feces. Mieszkin[2] 2009, p. 3045 (Attached as Ex. 2). Pig2Bac is a microbial source tracking fecal indicator marker developed to identify hog feces based on a DNA marker found in the gut of hogs. Mieszkin 2009, p. 3045 (Ex. 2); Boehm[3] 2013, p. 6825 (Attached as Ex. 3); Heaney[4] 2015, p. 676 (Attached as Ex. 4). Pig2Bac is "highly specific and sensitive" *i.e.*, if hog feces are present in the sample being tested, Pig2Bac will very likely be detected. Mieszkin 2009, pp. 3045 (Ex. 2); Boehm 2013, pp. 6818-20 (Ex. 3).

---

[1] Rogers and his team did not perform an inspection at the Crooked Run facility because it was not stocked with hogs at that time. Report of Shane Rogers, Ph.D., Jan. 20, 2017, p. 6 (Excerpts attached as Ex. 1)

[2] Mieszkin, S., et al, Estimation of Pig Fecal Contamination in a River Catchment by Real-Time PCR Using Two Pig-Specific Bacteroidales 16S rRNA Genetic Markers, App. And Env. Microb., May 2009, Vol. 75, No. 10.

[3] Boehm, A., et al., Performance of forty-one microbial source tracking methods: A twenty-seven lab evaluation study, Water Research 47 (2013).

[4] Heaney, C., et al, Source tracking swine fecal waste in surface water proximal to swine concentrated animal feeding operations, Science of the Total Environment, 511 (2015).

Importantly—particularly for purposes of the instant motion—there are two different tests for Pig2Bac: (1) "binary" and (2) "quantitative" PCR (polymerase chain reaction). Boehm 2013, pp. 6818, 6821 (Ex. 3). The binary test has been shown in one test to be cross-reactive for certain feces other than hog feces. Boehm 2013, pp. 6818-20. Conversely, the *quantitative* PCR has been shown in multiple studies to be 100% specific, *i.e.*, no false positives from feces other than hog. Mieszkin 2009, p. 3045; Boehm 2013, pp. 6822-23; Heaney 2015, p. 680. In sum, if Pig2Bac is detected in a sample using quantitative PCR, there is hog feces in the sample. And the record reflects that Rogers used quantitative PCR, not binary. Dep. of Shane Rogers, Ph.D., Feb. 21, 2017, pp. 417:16-419:12 (Excerpts attached as Ex. 5).

On behalf of Defendant, Dr. Jennifer Clancy was also present at those site visits, ostensibly to perform independent inspections and sampling (which Defendant did not do), but ultimately for the purpose of observing Rogers' team as it conducted the inspections and sampling. Dep. of Jennifer Clancy, Ph.D., March 23, 2017, p. 17:17-25 (Excerpts attached as Ex. 6). Clancy took notes, photos, and videos and asked questions during the sampling. Clancy Dep. at 18:5-16. Clancy observed all of the tests and sampling performed by Rogers' team during the inspections. Clancy Dep. at 20:2-18. Pursuant to the Court's order and the inspection protocol, Rogers' team supplied Defendant with split or parallel samples of all the sampling performed by Rogers' team. Clancy Dep. at 105:12-106:3.

On January 20, 2017, Plaintiffs designated Rogers as a case-in-chief expert witness to give testimony that, based on sampling from Defendant's hog operations and Plaintiffs' properties, the subject CAFO sites are the origin(s) or source(s) of the substantial interference—*i.e.*, odor from hog waste—with Plaintiffs' use and enjoyment of their properties. Rogers further opined that based on the Pig2Bac analysis of the samples taken during the site inspections, Pig2Bac's presence at

the highest concentrations at the swine houses and lagoons evidence them as sources of Pig2Bac in the environment and surrounding homes. Rogers Report at 71. Defendant chose not to designate Clancy or disclose a case-in-chief expert witness of its own on this issue.

On February 17, 2017, Defendant designated Clancy as a "rebuttal" expert witness "on environmental sampling and analysis," including "study design; sample collection, handling, and transport; method selection and sample analysis, data management, and data analysis; and data interpretation" in relation to sampling and testing done to show the source or origin of the substantial interference with Plaintiffs' use and enjoyment of their properties. On that same day, Defendant served five substantially identical 28-page "expert rebuttal reports"—one for each of the discovery pool cases—on behalf of Clancy.

In her principal report(s), Clancy summarizes her opinions as follows:

1. "The data relied upon for all of Dr. Rogers's opinions do not meet the level of scientific defensibility necessary to draw his conclusions."

2. "Dr. Rogers has erroneously concluded that Murphy-Brown farms are the source of significant odors and harmful pollutants impacting the lives of plaintiffs."[5]

Notably, in her principal report, Clancy opined that "the presence of Pig2Bac only means that pig DNA might be present—but not necessarily so." Clancy Report at 24 (Ex. 7).

On February 21, 2017, Defendant deposed Rogers. Following Rogers' deposition, and merely days before Clancy's deposition, Defendant served a 42-page "supplemental" Clancy expert report for each of the discovery pool cases, claiming ostensibly to address "additional or different opinions" than were contained in Rogers' expert report.

[5] Report of Jennifer Clancy, Ph.D., Feb. 17, 2017, p. 27 (Excerpts attached as Ex. 7).

On March 23, 2017, Plaintiffs deposed Clancy. During her deposition, Clancy conceded that her supplemental report was not based on any new facts she had received since preparing her principal report. Clancy Dep. at 159:18-22. Clancy also testified that Rogers' conclusions—that the detection of Pig2Bac is a definitive indicator of pig fecal DNA—were unsupportable. Clancy's opinion was based on her incorrect belief that Pig2Bac is not a 100% specific indicator of hog feces. Clancy Dep. at 176:22-177:4. In reaching her erroneous opinion, Clancy conflated the quantitative analysis for Pig2Bac—which Rogers performed—with the binary analysis for Pig2Bac—which Rogers did not perform. Clancy's error is unsurprising given her admitted lack of any prior research or experience with Pig2Bac.

## III.
## ARGUMENT & AUTHORITIES

### A. Clancy's opinions regarding Pig2Bac as an indicator of pig fecal DNA must be excluded.

#### 1. Clancy is not qualified to render an opinion regarding Pig2Bac.

While the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact, *see Wheeler v. John Deere Co.*, 935 F.2d 1090, 1101 (10th Cir. 1991)(lack of perfect fit will go to the weight not the admissibility of expert testimony), an expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, "only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert." *Ancho v. Pentek Corp.*, 157 F.3d 512, 518 (7th Cir. 1998) (internal quotations omitted) (quoting *United States v. Benson*, 941 F.2d 598, 604 (7th Cir. 1991)). As *Daubert* and *Kumho Tire* make clear, "the [trial court's] gatekeeping inquiry must [therefore] be 'tied to the facts' [and issues] of the particular 'case.'" *Kumho Tire Co. v.*

*Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).

Applying the above principles to Clancy's Pig2Bac opinions, she does not qualify as an expert on Pig2Bac. As stated in her original report, Defendant seeks to have Clancy testify as an expert as follows:

> Sensitivity and specificity are another issue that must be considered in using DNA data to draw conclusions about contamination in the environment. The Pig2Bac marker used in this study to demonstrate contamination of Plaintiffs' properties has been shown to have high sensitivity, but reduced specificity, cross-reacting with dog and human feces, as well as septage (Boehm et al, 2013).
>
> In terms of Pig2Bac, this means that when pig DNA is present it should be detected (sensitive), but that DNA other than that from pigs, including dogs and humans, will be detected as false positives (poor specificity) on many occasions. For this reason, a negative result indicating no presence of pig DNA is extremely accurate. However, a positive result showing the presence of Pig2Bac only means that pig DNA might be present—but not necessarily so.

Clancy Report at 23-24 (Ex. 7). This statement is demonstrably false, based on ignorance of Plaintiffs' testing methodology, and proves Clancy's lack of expertise regarding Pig2Bac.

Clancy is an environmental microbiologist "with specific expertise in water microbiology." Clancy Report at 2. Aside from testifying as an expert in this case, however, she has had no professional experience with respect to, *inter alia*: (1) studying industrial hog operations—in Eastern North Carolina or elsewhere; (2) sampling or research at any industrial hog operations; (3) writing about sampling at industrial hog operations; (4) presenting a paper regarding sampling at industrial hog operations, or industrial hog operations generally; or (5) being consulted about sampling at industrial hog operations. Clancy Dep. at 56:17-57:12. Even in this case she admitted

that she has not actually conducted any science in forming her opinions, much less relating to Pig2Bac specifically. Clancy Dep. at 58:11-14.

Clancy further testified that she has never researched Pig2Bac, has never tested for Pig2Bac, has never run a quantitative PCR assay for the detection of Pig2Bac, has never even operated the PCR equipment Rogers used in his testing, and in fact is not competent to run the test for quantitative PCR. Clancy Dep. at 47:4-48:11. In fact, the first time Clancy has ever visited an industrial hog operation was for purposes of this litigation. Clancy Dep. at 35:6-12. And Clancy testified that she has not conducted a meaningful review of the literature on air quality at industrial hog operations. Clancy Dep. at 34:23-35:4.

Clancy has never tested for and, outside the context of litigation, has never done any research on Pig2Bac. Clancy Dep. at 154:1-7. She did not know the EPA recommended way of extracting the DNA from a water sample to do a QPCR analysis for Pig2Bac. Clancy Dep. at 158:21-59:3. But for this litigation, she has never stepped foot on an industrial hog operation.

Defendant has failed to offer sufficient evidence to qualify Clancy to testify relating to Pig2Bac. Clancy may have qualifications in environmental microbiology and laboratory testing. However, there is no explanation for how these qualifications are linked with knowledge, experience, or expertise to opine regarding Pig2Bac as a definitive indicator of pig fecal DNA and its link to hog feces. Accordingly, Clancy should be precluded from testifying to such opinions. *See In re: Pella Corp. Architect & Designer Series Windows Mktg., Sales Practices & Prod. Liab. Litig.*, 214 F. Supp. 3d 478, 498 (D.S.C. 2016) ("On the current record, the quantity [of] Louis's prior experience with IS–4 is unknown at best, and scarce at worst, while the quality of such experience—to the extent it has been disclosed—must be discounted because it was gained in a litigation context."); *see also Yates v. Ford Motor Co.*, No. 5:12-CV-752-FL, 2015 WL 3448905,

at *5 (E.D.N.C. May 29, 2015); *In re C.R. Bard*, 948 F.Supp.2d 589, 611 (S.D.W.Va. 2013). (excluding expert opinion of urogynecologist due to plaintiffs' failure to show any expertise in the area of warnings or labels for medical devices).

**2. Clancy's opinion that Pig2Bac is not a definitive indicator of pig fecal DNA is based on a false assumption and demonstrably incorrect statement of fact.**

In her reports and deposition, Clancy opined that Rogers allegedly erroneously relied on the detection of Pig2Bac as a definitive indicator of pig fecal DNA—and thus pig feces—because the Pig2Bac marker "has been shown to have high sensitivity, but reduced specificity, cross-reacting with dog and human feces, as well as septage."[6] However, Clancy's opinion that the Pig2Bac marker is subject to cross-reaction is based on the demonstrably incorrect assumption that Rogers used a "binary" analysis, rather than a "quantitative" analysis.

Published peer-reviewed studies agree that Pig2Bac has 100% specificity, *i.e.*, Pig2Bac bacteria only comes from pigs. *See* Heaney 2015, p. 680 ("The two Bacteroidales markers with 100% specificity for swine fecal pollution, Pig-1-Bac and Pig-2-Bac…") (Ex. 4). In her deposition, Clancy testified that Pig2Bac is *not* 100% specific. Clancy Dep. at 176:22-177:4 (Ex. 6). In reaching that erroneous conclusion, Clancy confused the quantitative analysis for Pig2Bac with the binary analysis for Pig2Bac.

Specifically, Clancy relies *solely and incorrectly* on an excerpt from a Boehm 2013 article to the effect that "[t]he QPCR method Pig2Bac showed high sensitivity, but reduced specificity (Figure 3), cross-reacting with dog and human feces, as well as septage." Boehm 2013, p. 6820 (Ex. 3). *See* Clancy Dep. at 177:7-178:4. The record undeniably reflects that this excerpt is from a discussion of a "binary analysis" not a "quantitative analysis." Boehm 2013, pp. 6818, 6820.

[6] Clancy Report at 23 (Ex. 7); Clancy Dep. at 177:12-16 (Ex. 6).

For the binary analysis, the Boehm article concluded as to pigs: "PF163, PigmtDNA, PhyloChip, and Bacteroidales TRFLP all performed well with both sensitivities and specificities greater than 80% for all performing laboratories (Figure 3; Table 3). The QPCR method Pig2Bac showed high sensitivity, but reduced specificity (Figure 3), cross-reacting with dog and human feces, as well as septage." Boehm 2013, pp. 6819-20.

But as to "quantitative analysis," Pig2Bac was found to be *both specific and sensitive*. Boehm 2013, p. 6823; table 5, p. 6824. The Boehm article provides as follows:

> Only one quantitative pig method was tested and it was both sensitive and specific (Figure 5d; Table 4). The Pig2Bac method measured gene abundances well above 50 copies per CFU ENT in all target challenge samples (Table 5). The assay cross-reacted with a single non-target sample (pigeon) in one laboratory at a low level, below those observed in the pig challenge samples.

Boehm 2013, p. 6822. Notably, this result showing the accuracy of quantitative Pig2Bac was based on information from five different laboratories. *Id. and see* p. 6824 table 5. In fact, one of the five laboratories surveyed was the same lab used by Dr. Rogers—Source Molecular.

Boehm concluded that Pig2Bac is one of the most reliable indicators of fecal pollution from hogs: "Based on a quantitative analysis, the *best performing methods* were HF183Taqman and BacH (human), Rum2Bac and BacR (ruminant), LeeSeaGull (gull), and Pig2Bac (pig)…." *Id.*, p. 6812, emphasis added (Ex. 3). Elsewhere in the article, Boehm repeated the conclusion:

> The present study found that numerous library-independent methods developed in subsequent years, including those for detecting human, cow, gull, ruminant, pig, and horse feces, are both sensitive and specific…. A few methods evaluated in the present study produced only presence-absence information (conventional PCR, community analysis, canine scent tracking approaches), but most also produced quantitative information. When examined from both a presence-absence and quantitative perspective, some methods (HF183Taqman, Pig2Bac, and BacR in particular) performed better when evaluated quantitatively.

Boehm 2013, p. 6823 (Ex. 3).

Expert testimony based on false assumptions and fictional or random data is inadmissible. *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n. 13 (3rd Cir. 2000); *Soldo v. Sandoz Pharms. Corp*., 244 F.Supp. 2d 434, 526 (W.D. Pa. 2003); *Nelson v. Sandvik Mining & Const., Inc*., No. 10-CV-5778-RBL, 2012 WL 6056547, at *3 (W.D. Wash. Dec. 6, 2012) ("[The expert's] opinion that the connection was designed by Sandvik is not an expert opinion; it is a (demonstrably incorrect) statement of fact."); *In re Elec. Books Antitrust Litig*., No. 11 MD 2293 DLC, 2014 WL 1282298, at *7 (S.D.N.Y. Mar. 28, 2014) ("Because Kalt's analysis is based on demonstrably false assumptions regarding the agency date for Penguin's withheld titles and fails to control for other expected causes of price decreases, it is inadmissible.").

Clancy's opinion that Pig2Bac microbial source tracking is not sensitive and not specific is based on the false assumption and demonstrably incorrect statement of fact that Pig2Bac is not 100% specific under the quantitative analysis underlying Rogers' opinions. It is apparent by comparing her deposition testimony to the text of the Boehm article that Clancy was either inadvertently confusing, or intentionally conflating, binary and quantitative analyses. The analysis performed by the laboratory herein was quantitative as the results themselves show:

**Source Molecular**

Leader in Microbial Source Tracking

4985 SW 74th Court, Miami, FL 33155 USA
Tel: (1) 786-220-0379, Fax: (1) 786-513-2733, Email: info@sourcemolecular.com

**Pig Bacteroidetes ID™**
Detection of the fecal Pig gene biomarker for Pig fecal contamination by quantitative Polymerase Chain Reaction (qPCR) DNA analytical technology

**Submitter:** Wallace and Graham PA
**Date Received:** November 16, 2016
**Date Reported:** November 23, 2016

| SM # | Client # | Analysis Requested | DNA Analytical Results |
|---|---|---|---|
| SM-6K16001 | ARjc4 (Jimmy Carr) | Pig Bacteroidetes ID | Present |
| SM-6K16002 | Gigp13 (Gwendolyn Pickett) | Pig Bacteroidetes ID | Present |
| SM-6K16003 | ANmm4 (Mae Mazyck) | Pig Bacteroidetes ID | Absent |
| SM-6K16004 | Mgwm16 (Woodell McGowan) | Pig Bacteroidetes ID | Present |
| SM-6K16005 | Mkjm15 (Joyce McKiver) | Pig Bacteroidetes ID | Present |

In her deposition, Clancy admitted the Boehm excerpt she had referenced was only for binary, not quantitative analysis. Clancy Dep. at 179:5-19 (Ex. 6). Clancy is unqualified and simply wrong. Her Pig2Bac opinions are inadmissible.

**3. Clancy's opinions regarding the presence of Pig2Bac at Defendant's hog operations are so imprecise and unspecific as to confuse the jury, and likely mislead it.**

In her deposition, Clancy testified variously that:

- "there may not be" Pig2Bac in the air at Defendant's operations;[7]
- "There's nothing I saw that was definitive in terms of data that would—that would convince me that there was absolutely Pig2Bac in the air";[8] and
- "I would not say there is Pig2Bac in the air."[9]

[7] Clancy Dep. at 9:25-10:5.
[8] Clancy Dep. at 9:15-22 *See also* Clancy Dep. at 6:17-21 (does not know if Pig2Bac was present).
[9] Clancy Dep. at 10:16-23.

The reliability of Clancy's opinion that "[t]here may not be" Pig2Bac present at Defendant's hog operations is fatally undermined in at least two respects. First, the very meaning of her basic opinion regarding the presence—or not—of Pig2Bac is uncertain. Black's Dictionary defines "may" as "[t]o be a possibility." Black's Law Dictionary 1000 (8th ed.). Clancy's opinion is that *it is a possibility* that Pig2Bac *may not* be present at Defendant's hog operations. But opinions merely expressing "possibilities" are not sufficient to support the admissibility of expert testimony. *Dunn v. Sandoz Pharm. Corp*., 275 F. Supp. 2d 672, 681 (M.D.N.C. 2003); *see also Saldana v. Kmart Corp*., 260 F.3d 228, 234 (3d Cir. 2001) ("the mere possibility that something occurred in a particular way is not enough, as a matter of law, for a jury to find it probably happened that way"); *see also Taylor v. Consol. Rail Corp*., No. 96–3579, 1997 WL 321142, at *6 (6th Cir. June 11, 1997) (holding that an expert must state his opinion as a probability, not a mere possibility in order for it to be admissible); *Soldo*, 244 F. Supp. 2d at 526. ("Opinions merely expressing 'possibilities' do not suffice to support the admissibility of expert testimony."). As one district court reasoned:

> A possibility is an abstraction. A possibility is a vague quantity, if in fact it represents any quantity at all. The word epitomizes vagueness. Black's Law Dictionary defines possibility as: 1. An event that may or may not happen. Indeed, as too many people agree: anything is possible. A possibility is a contingency that never completes itself. Hardly the stuff of admissible evidence.

*United States v. Thanh Quoc Hoang*, 891 F. Supp. 2d 1355, 1362 (M.D. Ga. 2012), aff'd, 560 F. App'x 849 (11th Cir. 2014).

In *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc), the court criticized an expert's testimony similar to Clancy's as "imprecise" and "unspecific," and explained that, in light of such imprecision, the jury "could not readily determine whether the 'expectation'

[alluded to by the expert] was a virtual certainty, a strong probability, a possibility more likely than not, or perhaps even just a possibility." *Id*. at 1266. In that case, the defendant, accused of kidnapping a woman out of a Wal–Mart parking lot and later assaulting her, called a forensic investigator, Tressel, to testify that in his opinion Frazier did not rape the victim in the car. Tressel opined that if Frazier had assaulted the victim, Tressel would have expected that hair or seminal fluid would have been recovered. As the Court of Appeals explained in affirming the trial court's exclusion of the opinion for lack of helpfulness:

> Turning finally to the third requirement for admissibility of expert opinion—whether it will assist the trier of fact in understanding the evidence—the district court also concluded that Tressel's opinion regarding "expectation" would not aid the jury. Again, because Tressel's opinion was imprecise and unspecific, the members of the jury could not readily determine whether the "expectation" of finding hair or seminal fluid was a virtual certainty, a strong probability, a possibility more likely than not *or perhaps even just a possibility*. As a result, Tressel's imprecise opinion easily could serve to confuse the jury, and might well have misled it.

*Id*. (emphasis added)

Clancy's Pig2Bac opinion suffers from the same infirmity. Notably, the court of appeals in *Frazier* offered a spectrum of what might be described as the weight or the precision or the value of Tressel's opinion. It begins with the strongest type of opinion—absolute certainty, and works step-wise downward to the weakest. And the weakest opinion is a possibility—the only Pig2Bac opinion Clancy offers. This possibility opinion must be excluded because it does not help the jury, and could easily serve to mislead it.

**B. Clancy's criticism of Rogers' sampling analysis underlying his conclusions should be excluded.**

**1. Clancy has no basis to opine on Rogers' sampling analysis because Clancy did not perform an analysis on the samples provided to her, but instead destroyed them.**

Clancy was "retained by Murphy-Brown to provide my expert opinion on environmental sampling and analysis." Clancy Report at 2. At Defendant's insistence, Plaintiffs spent a great deal of time at the site inspections collecting extra samples for Defendant to have, *i.e.*, engaging in "split" or duplicate sampling. Defendant forcefully and at times obstructively insisted on being provided with those samples so that it could analyze them per its own protocols, all to show that the methods Plaintiffs used to do their own analysis were unreliable or that results were inaccurate.

However, Defendant failed to do anything with the samples it was provided. Instead, incredibly, Defendant simply threw them away. Clancy Dep. at 335:5-337:11; 340:5-7 ("Q. Every sample that you were provided you destroyed; is that correct? A. Yes."). And Clancy specifically testified that she "certainly could have analyzed" the samples. Clancy Dep. at 340:16-23 (Ex. 6). This approach is inconsistent with a disciplined use of the scientific method, and Clancy's opinions on Rogers' sampling and analysis should be excluded. *See Coleman v. Union Carbide Corp.*, No. CIV.A. 2:11-0366, 2013 WL 5461855, at *40 (S.D.W. Va. Sept. 30, 2013) ("The conclusions reached by Mr. Horsak are, of course, not a concern at this juncture. His incomplete methodology, however, is, *and while his conclusions pointing to the Alloy Plant are testable, he chose not to test them*. That approach is inconsistent with a disciplined use of the scientific method." (emphasis added)); *see also Abdishi v. Morris*, No. 98 C 1310, 2001 WL 1135812, at *11 (N.D. Ill. Sept. 26, 2001) ("Plaintiff had an opportunity to conduct testing on samples of recalled cigarettes. Defendant's counsel prepared a stipulated product testing protocol that was signed by Plaintiff's

counsel in November 1999. . . . Plaintiff made a 'legal or tactical decision' not to test the cigarettes. Thus, the absence of any proof of the results of testing is the direct result of Plaintiff's tactical decision."). Clancy admitted that she "could have assembled a team and conducted those types of sampling events"[10]:

> Q. Here's the point: If you wanted to go out and answer the question of whether there is Pig2Bac, hydrogen sulfide, ammonia, volatile organic compounds, endotoxins, *Salmonella*, *E. coli*, *Staphylococcus aureus*, MRSA, *Campylobacter*, and *Enterococcus* in the air of the hog operations that you visited, you could assemble a team using the same equipment, similar equipment, taking the same type of samples, sending them to a lab of your choice, whether it be your lab or another, using methodology that you think is appropriate, whatever that methodology might be, and get results to determine whether those things are in the air of those operations. You could go do that any time in the last two months, correct?
>
> MR. HENNEKE: Objection to form.
>
> A. Yes.
>
> BY MR. KAESKE:
>
> Q. Okay. You have not done that?
>
> A. I have not done that.

Clancy Dep. at 26:23-27:17 (Ex. 6).

Notably, Defendant's destruction of the samples and failure to devise its own sampling and analysis plan that would produce what Clancy would consider "good data" is directly contrary to the "article by Flory" upon which Clancy bases her criticisms of Rogers' conclusions. *See* http://www.qaallc.com/gooddata.html (Attached as Ex. 8) ("A complete data quality assessment

[10] Clancy Dep. at 22:16-17.

often results in rejection of a major fraction of the data, and we have rejected all of the data in some cases. Alternately, if your case requires the obtention of laboratory data to support your case, *you would do well to devise a sampling and analysis plan that will produce 'good data*.'" (emphasis added)).

Alternatively, Plaintiffs request that the Court give a "missing witness" instruction based on Defendant's destruction of the samples and instruct the jury that they are permitted to infer that the results of testing those samples would not have been favorable to Defendant. *See United States v. Bran*, 950 F. Supp. 2d 863, 875 (E.D. Va. 2013) ("It is settled that "the rule regarding missing witness instructions is that if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable.").

**2. Clancy's criticisms of the "scientific defensibility" of Rogers' data are based not on the rules of evidence or *Daubert,* but rather marketing statements by a defense consulting firm.**

Clancy's criticisms of what she perceives to be the methodology used by Rogers and his team are based on pronouncements by a private defense consulting firm, made in non-peer reviewed marketing materials that Clancy mistook for "scientific literature." Clancy's criticisms of Rogers' methodology are premised on her unsupported conclusion that the controlling methodology must satisfy "Flory (2000)" of the "Quality Assurance Association." Clancy Report at 6. Clancy opines:

> A number of professional associations worldwide deal with quality assurance of scientific data. An article by Flory (2000) of the Quality Assurance *Association* describes "legally defensible" as "data quality that is suitable for the stated purpose of the analysis with sufficient documentation available to verify the suitability."

*Id.* (emphasis added). Contrary to Clancy's report, there is no "Quality Assurance Association." The "article by Flory" referenced by Clancy is a promotional marketing piece on the website of "Quality Assurance *Associates*," a private for-profit consulting firm that provides "litigation support." *See* http://www.qaallc.com/index.htm (Attached as Ex. 9).

According to Quality Assurance Associates' website, Donald A. Flory is "a partner of Quality Assurance Associates, a limited liability company that provides quality assurance services to the environmental industry and for litigation support." *See* http://qaallc.com/resumedon.htm (attached as Ex. 10). And one of Quality Assurance Associates' clients is "Tetra Tech," another private, and for-profit consulting firm that commonly works for corporate defendants and has affiliations with both Clancy and another one of Defendant's experts, Gibb. *See* http://www.qaallc.com/Projects.htm (Attached as Ex. 11).

Clancy's stated methodology was to apply the pronouncements of Flory, but she has not demonstrated adequate peer review and publication supporting the application of "the article by Flory" in this case. *See United States v. Johnson*, 122 F. Supp. 3d 272, 332 (M.D.N.C. 2015) ("Dr. Lamberth has not demonstrated adequate peer review and publication supporting the application of his methodology in this case."); *see also Nettles v. Proctor & Gamble Mfg. Co*., 33 F. App'x 670, 671 (4th Cir. 2002) (exclusion of opinion based on lack of peer-review of methodology). The Court should exclude Clancy's opinions that rely or are based upon "the article by Flory."

### C. Clancy is not a proper rebuttal expert and thus was untimely designated.

#### 1. A rebuttal witness cannot be directed toward an expected and anticipated portion of the other party's case-in-chief.

Rebuttal expert reports "necessitate 'a showing of facts supporting the opposite conclusion' of those at which the opposing party's experts arrived in their responsive reports." *See Bone Care*

*Int'l, LLC v. Pentech Pharms., Inc*., No. 08–cv–1083, 2010 WL 3894444, at *15 (N.D. Ill. Sep. 30, 2010) (*citing ABB Air Preheater, Inc. v. Regenerative Envtl. Equip., Inc.*, 167 F.R.D. 668, 669 (D.N.J. 1996)). "If the purpose of expert testimony is to 'contradict an expected and anticipated portion of the other party's case-in-chief, then the witness is not a rebuttal witness or anything analogous to one.'" *Amos v. Makita U.S.A.*, Inc., No. 2:09–cv–01304–GMN–RJJ, 2011 WL 43092, at *2 (D. Nev. Jan.6, 2011) (quoting *In re Apex Oil Co*., 958 F.2d 243, 245 (8th Cir. 1992)); *see also Morgan v. Commercial Union Assur. Cos*., 606 F.2d 554, 556 (5th Cir. 1979); *LaFlamme v. Safeway, Inc.*, No. 3:09-cv-00514-ECR-VPC, 2010 WL 3522378, at *3 (D. Nev. Sept. 2, 2010).

Rather, rebuttal testimony "is limited to 'new unforeseen facts brought out in the other side's case.'" *In re President's Casinos, Inc*., No. 06–4036–659, 2007 WL 7232932, at *2 (E.D. Mo. May 16, 2007) (quoting *Cates v. Sears, Roebuck & Co*., 928 F.2d 679, 685 (5th Cir. 1991)).

Under Rule 37(c)(1), "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." This is an either/or standard; nondisclosure must be either substantially justified or harmless to avoid being excluded under the Rule.[11]

**2. Rogers' sampling analysis was an expected and anticipated portion of Plaintiffs' case-in-chief.**

Clancy's principal report is not a proper rebuttal report. Clancy's principal report addresses anticipated evidence and does not refute unforeseen theories. Defendant clearly knew that whether

[11] *Galentine v. Holland America LineWestours, Inc*., 333 F. Supp. 2d 991, 993 (W.D. Wash. 2004) (citing *Yeti by Molly, Ltd. v. Deckers Outdoor Corp*., 259 F.3d 1101, 1106 (9th Cir. 2001)) (other citation omitted). "The sanction is automatic and mandatory unless the sanctioned party can show that its violation . . . was either justified or harmless." *Salgado v. Gen. Motors Corp*., 150 F.3d 735, 742 (7th Cir. 1998); *see also Yeti by Molly*, 259 F.3d at 1107.

its hog operations are the source of substantial interference with Plaintiffs' use and enjoyment of their properties would be a fundamental issue for trial. Plaintiffs' use of experts to identify Defendant's hog operations as the source or origin of substantial interference with Plaintiffs' use and enjoyment of their properties was not only foreseeable, it was a certainty. Defendant knew both that there would be testing and that Rogers would be the expert to conduct it.

Defendant expected Plaintiffs to offer such evidence because Plaintiffs' October 2, 2016 motion to compel site visits specifically articulated Plaintiffs' need for "video and samples," "inspection of hog sheds," and "sampling from lagoons" "by the . . . deadline for experts." (DE # 179 at 1). In support, Plaintiffs filed a declaration by Rogers in which he explained that he had been retained as an expert to offer opinions regarding the "pollution externalities" caused by Defendant's hog operations and needed to inspect the sites accordingly. (DE #179-15 at ¶ 12).

Defendant responded to Plaintiffs' motion to compel site visits and specifically alleged "undue burden created by requiring Murphy-Brown's experts to engage in irrelevant and unnecessary sampling and testing to mirror Plaintiffs' experts." (DE #201 at 2 n.1). Defendant also contended that Plaintiffs' requests would "requir[e] Murphy-Brown's experts to mirror Plaintiffs' experts in irrelevant and disproportionate sampling." (DE # 201 at 3). Despite expressly acknowledging Rogers' explanations in support of the motion to compel site visits and Defendant's resulting need for "experts" to controvert Rogers' forthcoming expert opinions, Defendant failed to designate Clancy—who participated in the site visits—or *any* expert to controvert Rogers' opinions over three months later at the January 20, 2017 deadline.

Throughout Clancy's February 17, 2017, 26–page principal report, she identifies and opines on the sampling and analysis requested by Plaintiffs, ordered by the Court, and performed by Rogers for purposes of his expert opinions and report. All of Clancy's "evidence" is exactly

what Defendant knew more than three months prior to the case-in-chief expert designation deadline it must present at the time of trial. Merely because Clancy organized her report in reference to the points made in Rogers' report does not support the conclusion that her report is a proper rebuttal report that "responds to unforeseen theories." *See Century Indem. Co. v. Marine Grp.*, LLC, No. 3:08-CV-1375-AC, 2015 WL 5521986, at *4 (D. Or. Sept. 16, 2015).

During her deposition, Clancy confirmed that she had all the information underlying her opinions prior to the case-in-chief expert designation deadline:

> Q. All of the opinions that you gave in your first report about Dr. Rogers or his team's conduct in taking samples at the hog sites is based on information that you obtained while you were at the sites, correct?
>
> MR. HENNEKE: Objection to form.
>
> A. Yes.
>
> Q. Okay. And all the opinions about the reliability of his or his team's methods and the sampling that they did or didn't do, all those opinions were formed as or after you witnessed the things happen, correct?
>
> A. Correct.
>
> Q. You had all those opinions—whatever, after you left the hog operations, correct?
>
> A. Yes.[12]

Clancy further conceded that she:

- read the site protocol ordered by the Court[13];
- was present during the site inspections when Rogers and his team conducted the sampling[14];

---

[12] Clancy Dep. at 283:1-17.
[13] Clancy Dep. at 55:15-19.
[14] Clancy Dep. at 17:17-20.

- observed Rogers and his team conduct the sampling during the site inspections[15];

- took notes, photos, videos, asked questions of Rogers and his team during the site inspections[16];

- knew what equipment was being used by Rogers and his team at the site inspections[17];

- knew what equipment would be used by Rogers and his team in advance of the site inspections[18];

- knew what Rogers and his team sampled and tested for[19];

- knew in advance of the site inspections that she was going to be present while sampling and testing would be conducted[20];

- was retained by Defendant to "watch somebody else do science and comment on it"[21]; and

- did not base her "supplemental" report on any new facts.[22]

Again, the source of the odor is the central issue of this entire litigation. Defendant knew this issue long before the case-in-chief expert disclosure deadline. It would be inequitable to allow Defendant an additional case-in-chief expert beyond the court-ordered maximum of eight by mischaracterizing her as a rebuttal expert. Defendant knew from the very beginning of expert discovery that pollution sampling and testing would be a case-in-chief issue. Defendant even indicated to the Court that Defendant would require its own expert on the issue ahead of time.

---

[15] Clancy Dep. at 17:21-25 (Ex. 6).
[16] Clancy Dep. at 18:1-16.
[17] Clancy Dep. at 19:20-25.
[18] Clancy Dep. at 20:6-10.
[19] Clancy Dep. at 20:11-18.
[20] Clancy Dep. at 56:13-16.
[21] Clancy Dep. at 62:13-23.
[22] Clancy Dep. at 159:18-22.

A defense witness whose purpose is to contradict an expected and anticipated portion of the plaintiff's case-in-chief can never be considered a "rebuttal" witness. For these reasons, Clancy is not intended to testify solely as a rebuttal expert. Defendant failed to timely disclose Clancy as a case-in-chief expert witness. *See Amos*, 2011 WL 43092, at *2 ("Causation of the fire is the central issue of this entire litigation. Makita knew that long before the expert disclosure deadlines. For these reasons, Hyde is not intended to testify solely as a rebuttal expert. Makita failed to timely disclose Hyde as an expert witness pursuant to the Court's Scheduling Order (# 11).").

**3. Defendant submitted Clancy's opinions in support of Defendant's Fifteenth Affirmative Defense, which Defendant had the burden to prove.**

Moreover, on May 19, 2017, Defendant filed a declaration by Clancy in support of Defendant's motion for partial summary judgment concerning "Plaintiffs with Insufficient Property Interests." (DE # 406-2). Clancy averred that she had "been asked to prepare this declaration . . . to assist Murphy-Brown in preparing summary judgment papers," and that "[t]he facts and opinions set forth in this declaration are . . . consistent with the opinions in my expert reports and deposition, which I adopt for these purposes."

In its Answer and Affirmative Defenses to Plaintiffs' Third Amended Petition, Defendant's Fifteenth Affirmative Defense asserts a "standing" bar to certain Plaintiffs' claims, alleging that

> some Plaintiffs do not own, lack a possessory interest in, or have assigned or transferred any such interest in the property where they are and have been living, and, therefore, those Plaintiffs have no standing to bring an action for nuisance and are not real parties in interest.

(Case 7:14-cv-00185-BR, DE # 43 at 53). Defendant's affirmative defense places upon it the burden of proving that affirmative defense, and Clancy's declaration (and report referenced and incorporated therein) provides evidence to support it. An expert rebuttal report that speaks to a

party's affirmative defenses is not considered proper rebuttal. *See Clear-View Techs.*, No. 13-02744, 2015 WL 3509384, at *3 (N.D. Cal. June 3, 2015) (striking defendants expert rebuttal report in part because "the report speaks directly to an issue on which Defendants bear the burden of proof, and cannot be properly construed as a rebuttal report"); *Morgan*, 606 F.2d at 556 ("a defense witness whose purpose is to contradict an expected and anticipated portion of the plaintiff's case in chief can never be considered a 'rebuttal witness'").

**4. Defendant's untimely disclosure of Clancy is not harmless.**

Defendant's untimely disclosure of Clancy is not harmless. The effect of misclassifying Clancy as a rebuttal expert is to give Defendant an extra case-in-chief expert contrary to the Court's order limiting each side to eight case-in-chief experts. DE #215, p. 3. And by designating Clancy as a rebuttal expert, Defendant had an extra month with Rogers' expert disclosures to prepare Clancy's expert report.

Clancy's report should have been disclosed with all other initial expert reports in accordance with the Court's Amended Interim Scheduling Order as modified per the parties' agreement. Defendant did not do that. One party's non-compliance with deadlines in such a complex case puts all complying parties at a significant disadvantage and disrupts the carefully designed structure and timing of pretrial filings and disclosures.

Moreover, because Defendant produced Clancy's report(s) after Plaintiffs produced Rogers' report, Clancy had the opportunity to craft her initial opinions in direct response to each point in Rogers' report. Rogers did not enjoy this advantage in preparing his initial opinions. And this is not a minor advantage: the source or origin of the substantial interference with Plaintiffs' use and enjoyment of their properties is a central issue in the case and the parties' respective theories of the source(s) or origin(s) is the evidentiary heart of that dispute.

Clancy avoided presenting her initial theories and, thus, avoided exposing their weaknesses to rebuttal. By way of example, Defendant's untimely designation precluded Plaintiffs from designating a true rebuttal expert to demonstrate the obvious errors in Clancy's opinions relating to Pig2Bac. Instead, she had the opportunity to conceal or minimize weaknesses in her opinions which Rogers' report—or a rebuttal expert's report—would have revealed, and to directly attack the supposed weaknesses in Rogers' theories knowing he would not have the opportunity to submit a rebuttal report. Defendant's resultant advantages cannot be adequately balanced by now offering to allow Clancy to be re-deposed and Rogers to submit supplemental reports, which would require significant time and resources in addition to those already invested in this litigation. *See Vu v. McNeil–PPC, Inc.*, No. CV 09–1656 ODW (RZx), 2010 WL 2179882, at *3 (C.D. Cal. May 7, 2010). ("Here, as a result of Costco's belated disclosure, Plaintiffs are prevented from rebutting any of Costco's expert opinions dealing with matters outside the scope of Dr, Kelly's report because the deadline for disclosing rebuttal experts has passed. This is a hornbook example of sandbagging, a litigation tactic this Court will not tolerate.").

Accordingly, the Court should strike Clancy's reports, preclude any party from using those reports at trial, and preclude Clancy from testifying at trial.

**D. Clancy's March 17, 2017 report is not a true supplemental report.**

Permissible supplementation of an expert report and disclosures can only occur in certain limited circumstances. *See Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006). "Those circumstances are when the party or expert learns the information previously disclosed is incomplete or incorrect in some material respect." *Id.* (citing Fed. R. Civ. P. 26(e); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953–54 (10th Cir. 2002)). The basic purpose of supplementary disclosures under Rule 26(e)(2) is to "prevent[ ] prejudice or surprise," *Hernandez*

*v. Swift Transp. Co., Inc*., No. SA–09–CV–855–XR, 2010 WL 2545597, at *1 (W.D. Tex. June 22, 2010) (citing *Reed v. Iowa Marine & Repair Corp*., 16 F.3d 82, 85 (5th Cir. 1994)), not "to provide an extension of the expert designation and report production deadline." *Metro Ford Truck Sales, Inc. v. Ford Motor Co*., 145 F.3d 320, 324 (5th Cir. 1998).

Courts distinguish "true supplementation" (*e.g*., correcting inadvertent errors) from gamesmanship. *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008). Here, as in *Gallagher*, Clancy was not supplementing to correct an inadvertent error or omission, nor did she claim to do so—Clancy's "supplemental" report is nearly twice the length of her principal report. Instead, Clancy is using her supplemental report to shoehorn in new opinions. For example, in it, Clancy offers the following opinions for the first time:

- Dr. Rogers failed to collect sufficient samples or do sufficient testing to establish any source of any odors or particles found at Plaintiffs' properties.
- Dr. Rogers failed to collect sufficient samples or do sufficient testing to establish any relationship between odors or particles found separately at Plaintiffs' properties and the hog farms.
- Dr. Rogers failed to collect sufficient samples or do sufficient testing to establish any relationship between odors or particles found separately at Plaintiffs' properties.
- Dr. Rogers failed to collect sufficient samples or do sufficient testing to establish any relationship between odors or particles found separately at the hog farms.

Supplemental Report of Jennifer Clancy, Ph.D, Mar. 17, 2017, p. 3 (Excerpts attached as Ex. 12). But Clancy specifically testified in her deposition that none of those new opinions was based on any new facts of which she was or Defendant was not previously aware.

Defendant offers no explanation for the late disclosure. As in *Gallagher*, Defendant "seeks to contort this sensible rule into the unacceptable rule that a party may permissibly submit a new

expert report until pretrial disclosures are due or until 30 days before trial so long as the party characterizes the new report as a supplementation." Gallagher, 568 F. Supp. 2d at 631. To otherwise admit Clancy's supplemental opinions "would promote gamesmanship and delay." *Id*. (citing Fed. R. Civ. P. 1; *Tucker v. Ohtsu Tire & Rubber Co*., 49 F. Supp. 2d 456, 460 (D. Md. 1999)). Clancy's "supplemental" report(s) should be stricken. *Beach Mart, Inc. v. L & L Wings, Inc*., No. 2:11-CV-00044-F, 2016 WL 347398, at *3 (E.D.N.C. Jan. 27, 2016).

**CONCLUSION**

Based on the above, the Plaintiffs respectfully request that the Court exclude in whole or part the expert opinions and testimony of Dr. Dalton.

Respectfully submitted this 19th day of February, 2018.

Counsel for Plaintiffs:

s/John Hughes
Mona Lisa Wallace
N.C. State Bar No. 9021
John Hughes
N.C. State Bar No. 22126
Wallace & Graham, P.A.
525 North Main Street
Salisbury, NC 28144
Phone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

Michael Kaeske
Texas State Bar No. 00794061
Lynn Bradshaw
Texas State Bar No. 02834500
Eric Manchin
Texas State Bar No. 24013094
(*All By Special Appearance*)

Kaeske Law Firm
1301 W. 25th Street, Suite 406

Austin, Texas 78705
Telephone: (512) 366-7300
Facsimile: 1(877) 826-1221
Email: mkaeske@kaeskelaw.com
Email: lbradshaw@kaeskelaw.com
Email: emanchin@kaeskelaw.com

**CERTIFICATE OF SERVICE**

I do hereby certify that on the 19th day of February, 2018, I filed this document by the ECF system which will electronically serve and notify all counsel of record.

This the 19th day of February, 2018.

By: s/John Hughes
Mona Lisa Wallace
NCSB #9021
John Hughes
NCSB #22126
Wallace & Graham, P.A.
525 North Main Street
Salisbury, NC 28144
Phone: 704-633-5244
Fax: 704-633-9434
mwallace@wallacegraham.com
jhughes@wallacegraham.com

Exhibits:

1. Rogers report pp. 1, 6, 71
2. Mieszkin 2009 article
3. Boehm 2013 article
4. Heaney 2015 article
5. Rogers dep. pages
6. Clancy dep. pages
7. Clancy report pages
8. Flory article from http://www.qaallc.com/gooddata.html
9. QAA index from http://www.qaallc.com/index.htm
10. Flory resume from http://qaallc.com/resumedon.htm
11. QAA projects from http://www.qaallc.com/Projects.htm
12. Clancy supplemental report pp. 1, 3